UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

IN RE AVON PRODUCTS, INC.  :  MASTER FILE NO. 05-CV-6803
SECURITIES LITIGATION,  :  AND RELATED CASES
_____  :
IN RE AVON PRODUCTS, INC.  :
ERISA LITIGATION,  :
_____  :
THIS DOCUMENT RELATES TO:  :
  :
IN RE AVON PRODUCTS, INC.  :
SECURITIES LITIGATION.  :  JURY TRIAL DEMANDED
-------------------------------------------------------------X

## SECURITIES CLASS ACTION CONSOLIDATED AMENDED COMPLAINT

I.    **Nature Of The Action And Basis Of The Allegations**[1]

1.    This action is brought by Lead Plaintiff, Hotel Trades Council and Hotel Association of New York City Pension Fund, on behalf of purchasers of Avon Products, Inc. ("Avon" or the "Company") common stock between February 3, 2004 through September 20, 2005, inclusive (the "Class" and the "Class Period"). It is alleged that Avon and certain officer defendants, acting in a common scheme, artificially inflated the price of Avon common stock during the Class Period by issuing materially misleading statements concerning Avon's operations and performance in China, the United States ("U.S.") and Mexico, thus allowing these same officer defendants to reap enormous profits from their insider sales at artificially inflated prices in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated under Section 10(b).

---

[1]    This Securities Class Action Consolidated Complaint (the "Complaint") and the investigation supporting the allegations herein (including the investigation described in Paragraph 2) were performed solely by Lead Counsel ("Counsel") in the Securities Class Action.

2.    Plaintiff's allegations are based on extensive investigation of counsel, including without limitation: (a) review and analysis of filings made by Avon with the Securities and Exchange Commission ("SEC"); (b) Avon's press releases; (c) Avon's presentations made to analysts; (d) media reports about the Company; (e) publicly available trading data relating to the price and volume of Avon's common stock; (f) securities analysts reports on Avon; (g) interviews with former Avon China managers; (h) multiple  interviews with former and current independent Avon store owners in China in each of the following cities and provinces: Guangzhou (Guangdong Province), Shenzhen (Guangdong Province), Shantou (Guangdong Province), Shijiazhuang (Hebei Province), Shanghai (Shanghai Municipality), Wuhan (Hubei Province), Tianjin (Hunan Province), Beijing (Beijing Municipality), Nanjing (Jiansu Province), Ningbo (Zhejiang Province), Fuzhou (Fujian Province), Chongqing (Chonqing Municipality), and Dalian (Liaoning Province) (including areas with the highest per capita gross domestic product (between  $8,000-$40,000) in China and among the largest contributors to Avon revenue and stores with monthly inventory turnover of 20,000-50,000 RMB ($2,475- $6,188)); (i) interviews with independent Avon store owners in China who participated in the April 11, 2005 protest at Avon headquarters in Guangzhou ("April Protest") (¶ 51); (j) interviews with independent Avon storeowners in China conducted by Morgan Stanley (separate from the interviews described above) as reflected in the Morgan Stanley report dated November 13, 2005 (¶ 215); (k) interviews with former and current independent Avon store owners in China conducted by Bear Stearns Companies, Inc. ("Bear Stearns") (separate from the interviews described above) as reflected in its analyst report dated September 6, 2005 (¶ **200**); (l) articles only appearing in the Chinese media including the February 27, 2003 report in <u>Xiahuanet</u> (¶ 50) and April 11, 2005 <u>Netease Business Report</u> (¶ **51**); (m) interviews with former employees of

2

Avon, including former U.S. District Managers who had worked for Avon for at least four years in multiple districts in Avon's largest regions of the U.S. (the Western, Northern and Northeast regions); and (n) former employees of Avon Mexico engaged in the areas of sales and marketing for over three years.

II.    **Introduction and Summary**

3.    Avon is a public company incorporated in New York. Its principal office is in New York City, and it is listed on the New York Stock Exchange ("NYSE") with approximately 470,712,157 shares of common stock outstanding. During all relevant a times, Avon maintained operations in North America, Asia, Latin America (including Mexico) and Europe that were engaged in the "door-to-door" sale of products in three categories: Beauty (cosmetics, fragrances, skin care and toiletries or "CFT"); Beauty Plus (fashion, jewelry, watches, apparel and accessories); and Beyond Beauty (home products, gifts and decorative products).

4.    Between 2001 and the end of 2003, Avon reported dramatic growth both in sales, profits and sales representative ("Sales Rep") recruitment. Net sales during this time increased by nearly a billion dollars – from $5.95 billion in 2001 to $6.8 billion in 2003, and reported profit increased by 36.6% – from $763.2 million in 2001 to $1.042 billion in 2003. Commensurate with this growth, Avon's common stock price appreciated significantly from $20.00 per share in January 2001 to $31.00 per share in January 2004.[2]

5.    However, by the end of 2003, Avon faced a threat to any further appreciation in its sales, profits and undoubtedly its stock price. There had been a significant erosion in the rate of growth in its largest market, North America (in which the U.S. accounted for 90% of sales), with signs of profit decline going forward. By 2003, net sales in North America had only

---

[2]    On May 28, 2004, Avon's common stock split two-for-one. All stock prices and volumes before May 28, 2004 are adjusted for the stock split.

increased by 3%, or $70 million from the prior year – from $2.457 billion in 2002 to $2.527 billion in 2003. Also, operating profit had actually declined by 4%, or $19 million from the prior year – from $445 million in 2002 to $426 million in 2003.

6.  This threat to Avon's sales, profits and stock price appreciation was not to be tolerated by a senior management group, including: Avon's Chairman and Chief Executive Officer ("CEO"), Defendant Andrea Jung ("Jung"); President and Chief Operating Officer ("COO"), Defendant Susan Kropf ("Kropf"); and Executive Vice President and Chief Financial Officer ("CFO"), Defendant Robert Corti ("Corti") – each of whom evidenced, as reflected by their subsequent sales, an intent to sell over 30% of their Avon holdings at significantly higher prices.

7.  Faced with this economic reality of a slump in sales and profits in Avon's largest market and its potential adverse effects on Avon's common stock price, this senior management group commenced their common course of conduct which consisted of issuing, materially misleading statements in three major areas of operations: China, the U.S. and Mexico. In China, beginning in 2004, Avon touted its communications with investors, the imminent lifting of a six year old ban on door-to-door selling in China. During the period of the ban, Avon operated in China through 6,000 independently-owned stores (the "stores" or "storeowners"), which then sold product to sales representatives who went door-to-door (¶ 45). The storeowners were obliged to pay for their owner overhead, such as rent, salaries, utilities, advertising, and, upon delivery, for orders of product from Avon (¶¶ 46-48). (Avon also operated 1,600 counters in malls which were not franchises but generally owned directly by Avon (¶ 45)).

8.  Beginning in early 2004 and continuing through June 2005, Avon made repeated specific positive statements about the introduction of direct selling in China – under which Sales

4

Reps could by-pass the stores and buy products directly from Avon. Avon falsely stated, for example, on February 20, 2004, that the direct sales ban was a "wonderful complement" to the stores (¶ 92); on July 28, 2004, that storeowners were a great "foundation" for direct sales (¶ 123); on October 29, 2004, that <u>Avon met with storeowners and the storeowners were " hyped and ready to go" forward with direct selling</u> (emphasis added) (¶ 141); on February 1, 2005, that the stores gave Avon a "competitive advantage" in direct selling in China (¶ 154); and on May 2, 2005, that the direct sales tests Avon instituted in April 2005 gave Avon a "first mover advantage" (¶ 175). These qualitative statements were then fortified by specific economic forecasts of at least 30% sales growth in 2005 to "well over" $300 million in sales in 2005 and $600 million by the end of 2007 (¶¶ 150, 151, 154, 160).

9.      These statements were materially misleading because Avon misrepresented and failed to disclose both China storeowners' fierce opposition to direct sales and the known causes for that opposition – namely, that  storeowners' profits had already been sharply undercut during the Class Period as a result of:  i) the proliferation of Avon stores in the same geographic location (as close as 500 meters); ii) counters owned and operated by Avon sold product at below storeowner retail prices; and iii) Avon product was available on-line and in black market at below storeowner retail prices (¶ 49). Thus, direct sales represented to storeowners **both** the loss of a material group of customers (i.e., Sales Reps who could now purchase directly from Avon) and the creation of **yet another** source of competition (Sales Reps buying directly from Avon), which could even offer more substantial discounts to retail customers because that source had no overhead.

10.      Avon disregarded and concealed storeowners' dissatisfaction due to unfair price competition and opposition to direct sales, including from storeowners in Guangdong, Huang,

Liaoning, Jiansu, Zhejiang, Tianjin and Fujian provinces. Moreover, contrary to defendants' claims, Avon <u>did not</u> elicit storeowners' views on direct selling (¶ 49) (which were easily obtainable as demonstrated by the interviews of Counsel (¶ 2), Morgan Stanley (¶ 215) and Bear Stearns (¶ 202)). Avon also disregarded and concealed reports of storeowner discontent in the Chinese media on February 27, 2003 (¶ 50); storeowner reaction to direct sale rumors in April 2004 (<u>id.</u>); protests by storeowners in late 2004 in Shanghai (<u>id.</u>); storeowner protests on April 11, 2005 (¶ 51) and in May 2005 (¶ 52) at Avon Headquarters in Guangzhou.

11.    Thus, while unknown to Avon investors, it was no surprise in China, that immediately after the first tests of direct selling were announced on April 8, 2005, Avon storeowners <u>en masse</u> <u>reduced</u> orders by approximately 20% or shut down entirely. On July 19, 2005, when Avon announced approximately 20% decline in China sales in the June 30, 2005 quarter due to storeowner reductions in order – as opposed to 30% increase Avon told investors to expect –Avon's stock price declined dramatically from $36.60 per share at the close of July 18, 2005 to $31.30 per share at the close of July 19, 2005, with over 34.2 million share trading – 15 times its average trading volume, for a market loss of $181.3 million (¶¶ 194). The analyst reaction was equally stark with accusations of management "material omissions" (¶¶ 199) and misrepresentations regarding China (¶ 198).

12.    On July 19, 2005, Avon claimed the decline was the result of only a "near-term transitional issue," which could be remedied by "step[ping] up our communications" to storeowners such that by the second half of 2005 China sales growth would return to "positive" levels (¶ 189). However, on September 20, 2005, Avon was forced to concede that the problem was not so short term and that there would be "a continued sales shortfall in China" (¶ 205). Avon's stock price once again collapsed: from $30.60 per share at the close on September 20,

2005 to $27.00 per share at the close on September 21, 2005, with 31.6 million shares trading that day, for a market loss of $113.76 million (¶ 207).

13.    Also, beginning in early 2004, defendants emphasized "record" U.S. sales representative growth achieved by the end of 2003, derived from "career" oriented "Sales Leadership" recruitment as reflecting a "renaissance" in the U.S. business, as supporting the projected 2004 sales, profit and recruitment "growth" (¶¶ 94, 98). Avon also claimed its Code of Business Conduct "ensured" the integrity of all Avon associates (¶ 102).

14.    These statements were misleading because the "record" recruitment had been achieved, in material part, by deployment of a deceptive "Personal Shopper" recruitment program and then forced delivery practices of unordered product. Under the Personal Shopper program, customers were encouraged to merely "open" a "Personal Shopper account" with Avon, particularly during the 2003 Christmas shopping period, in order to obtain a 40% to 50% discount on Avon products. Neither the brochure nor the Personal Shopper card the customer was shown and given during the sales pitch mentioned that they were becoming a sales representative, even though the paperwork the customer signed was a sales representative contract (¶ 61).

15.    These Personal Shopper recruits typically did not know that they had become sales representatives and further did not know that as sales representatives, Avon corporate had opened an account on their behalf and then shipped and recorded as instant sales **unordered** product under its "Preferred Preview" program. Such sales perpetuated the "life" of Personal Shopper recruits who otherwise would have been dropped as representatives who failed to place orders in three campaigns after their initial purchase (¶¶ 60-61). Avon U.S. District Managers, under pressure to meet recruitment quotas, similarly shipped **unordered** product to Sales Reps

7

under Avon's "Instant Delivery" program and then either paid for the unordered product themselves, used Avon certificates (provided by Avon to District Managers to purchase products as needed) as payment or let the Company seek collection from the sales representatives (¶¶ 64-65). These Personal Shopper recruits, whether recruited by other representatives under the Sales Leadership program (sales representatives who earned commissions from the sales of their recruits) or otherwise, were known to be "short lived" in duration since most did not even know they had become sales representatives or had joined the program only to obtain the discount for the immediate items being purchased (¶ 61). Further, while the Preferred Preview and Instant Delivery sales could sustain recruitment for a short period and temporarily boost sales, they ultimately adversely impacted profits as many of those "sales" could not be collected and had to be written off as bad debt expense (¶ 68).

16.    On September 8, 2004, Avon announced that, while it was reaffirming its overall third quarter 2004 earnings guidance, there was unexpected "softness" in the U.S. resulting in "flattish" U.S. sales (¶ 133). On October 29, 2004, Avon further disclosed that, for the third quarter, there had been a decline in U.S. operating profits of 9% and that U.S. Sales Rep growth was "flat" for the quarter (¶ 137). The operating profit decline in Avon's U.S. operations in the third quarter was attributed, in part, to increased "bad debt expense" (¶ 138). Notwithstanding favorable disclosures in these announcements about operations outside of North America, due to Avon's disclosures about its U.S. operations, Avon's stock price declined from $45.66 per share at the close on September 7, 2004 to $42.86 per share at the close on September 8, 2004 (with over 6.1 million shares trading), for a market loss of $17.1 million (¶ 136), and from $43.21 per share at the close on October 28, 2004 to $39.55 per share at the close on October 29, 2004 (with over 28.2 million shares trading), for a market loss of $103.2 million (¶ 145).

17.    Finally, throughout 2004, Avon touted "double digit" sales growth in Mexico, the Latin American region's largest market (¶¶ 69, 100), which was "benefiting from growth in average order" size (¶ 111) and "new product launches and incentive programs (¶ 143); that Avon Mexico was successfully competing against Wal-Mart (¶¶ 162, 181); and that declines in the first quarter 2005 were due to "timing" of Easter (¶¶ 156, 179).

18.    These statements were materially misleading because the 2003 and 2004 "double digit" growth in Mexico had not been achieved merely by "product launches" and "incentive programs" but, materially, by undisclosed forced delivery practices in the sale of Beauty products through "Automatic Demo" and "Instant Delivery" programs (¶¶ 74-79). These practices undermined and reduced the strength of Avon Mexico's beauty sales ("CFT") in relation to its non-beauty sales – from 52% in 2003 and 2004 to 45% in early 2005 (¶ 80). Avon Mexico competed far less successfully against Wal-Mart in the non-beauty product market, thus resulting in sales declines in 2005 as compared to the prior year (¶¶ 69, 72). On September 20, 2005, Avon announced a "deceleration in Latin America" which (in combination with the disclosures regarding China) caused Avon's stock price to decline, as noted above, from $30.60 at the close on September 20, 2005 to $27.00 at the close on September 21, 2005, with 31.6 million shares trading that day, for a market loss of $13.7 million (¶ 207). The third quarter 2005 Form 10-Q explained that the "deceleration" was largely driven by a decline in Avon Mexico sales and profits (¶ 212).

19.    These misleading statements about the U.S., China and Mexico artificially inflated Avon's common stock price from $31.00 per share in January 2004 to $42.00 per share in August of 2004 and $44.00 per share by February 2005 (including on February 4, 2004 (¶ 87); February 17, 2004 (¶ 91); April 29-30, 2004 (¶ 114); February 1, 2005 (¶ 159)). The partial

disclosures of the truth on September 8, 2004 (regarding the U.S.) (¶¶ 133-34), October 29, 2004 (regarding the U.S.) (¶¶ 137-38), July 19, 2005 (regarding China) (¶¶ 187-90) and September 20, 2005 (regarding China and Mexico) (¶¶ 205) resulted in dramatic stock price declines (as set forth in ¶¶ 136, 145, 194, 207). The price inflation and attendant declines, including those on these specific dates, resulted in hundreds of millions of dollars in losses to the Class.

20. Further, the issuance of these misleading statements was well timed with Jung's, Kropf's and Corti's substantial insider selling during the Class Period. The misleading statements about the U.S., China and Latin America caused Avon's common stock price to rise from $31.00 per share in January 2004 to $42.00 per share in August 2004 allowing defendant Jung to sell 34.9% of her holdings on August 6, 9 and 10, 2004 – at between $42.01 to $43.36 per share – reaping proceeds in excess of $17.2 million.[3] **Only three weeks later** – on September 8, 2004 –Avon began to advise investors of "unexpected" declining U.S. performance in the September 30, 2004 quarter (¶ 133), which after the extent of the decline was fully disclosed on October 29, 2004 (¶ 137), caused Avon's common stock price to decline to $38.67 per share that day (¶145). The defendants then replayed the "China card" between November 3, 2004 and February 1, 2005 – announcing for the first time 33.33% growth in China revenue in 2005 ("with or without direct sales") to $300 million and increasing by **50%** projected China revenue by year end 2007 from $400 million to $600 million (¶¶ 125, 148, 150, 151, 154, 160) – driving Avon stock from $37.64 on November 2, 2004 to $44.44 per share on February 3, 2005. This then permitted defendants Corti and Kropf to sell on February 3 and 9, 2005, 52.73% ($9.073 million) and 33.34% ($9.968 million), respectively, of their holdings at between $44.43 and $44.08 per share (¶¶ 27-29). The intent to sell at the peak was also shared by Stanley Gault,

---

[3]     Jung's alleged insider sales and respective percentages were calculated based on the prices, quantities and holdings reported to the SEC on Form 4, as filed on August 6 and 9, 2004.

Avon director and former Chairman of the Board of Directors, who, while in possession of non-public material adverse information sold 200,000 shares ($8.88 million) – or 56% of his holdings – at approximately $44.43 per share.[4]

**III.    Jurisdiction and Venue**

21.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated under Section 10(b).

22.    Jurisdiction is conferred upon this Court by Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337.

23.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) since Avon has its principal place of business in this District, and since many of the acts alleged herein, including the dissemination of the misleading statements at issue to the investing public, occurred in substantial part in this District.

24.    In connection with the acts, transactions and conduct alleged herein, defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of national securities exchanges and markets.

**IV.    The Parties**

25.    Lead Plaintiff purchased 27,900 shares of Avon common stock, or $1.17 million, on the New York Stock Exchange ("NYSE"), an open and efficient market, during the Class Period, as set forth below:

| Date | | Quantity | Price |
|------|--|----------|-------|

---

[4]    Gault's, Corti's and Kropf's alleged insider sales and respective percentages were calculated based on the prices, quantities and holdings reported to the SEC on Form 4, as filed on February 3, 2005, February 3, 2005 and February 9, 2005, respectively.

| 1/25/05 | Buy | 6,300 | $ | 41.40 |
|---------|-----|--------|---|-------|
| 1/26/05 | Buy | 4,200 | $ | 41.38 |
| 2/22/05 | Buy | 1,400 | $ | 44.40 |
| 2/28/05 | Buy | 6,000 | $ | 42.06 |
| 4/11/05 | Buy | 10,000 | $ | 42.73 |

26.     Defendant Avon is a company organized under the laws of the State of New York,

with its headquarters and principal offices located at 1345 Avenue of the Americas, New York,

New York, 10105.

27.     Defendant Andrea Jung ("Jung") was, at all relevant times, Avon's Chief

Executive Officer and a Director.  Jung was appointed Chief Executive Officer in November

1999 and, effective September 2001, also was elected Chairman of Avon's Board of Directors.

Jung's stock option grants under the Company's Executive Compensation program was the fuel

for enormous profits from her insider sales.  In addition to salary and bonus compensation of

$1,334,945 and $2,305,028, respectively, in 2004 and $1,213,425 and $1,304,753, respectively,

in 2003; in 2004, Jung received additional compensation by way of $12,103,200 in Restricted

Stock Awards.  Jung exercised stock option grants (410,000 shares) in executing $17.2 million of

insider sales on August 6, 9 and 10, 2004, resulting in a **141%** profit on those sales.

Additionally, Jung sold $4.08 million (60,000 shares at $34 per share (split adjusted)) of her

Avon common stock on February 5, 2004 following the Company's materially misleading

statements made on February 3, 2004.  (See pg. 10, n.1, supra.)  Jung took advantage of effect of

Avon's materially misleading statements with stock price increasing from $31.00 per share on

February 2, 2004 to an intraday price of $34.21 per share and day end close price of $34.16 on

February 5, 2004.

28.     Defendant Susan J. Kropf ("Kropf") was, at all relevant times, the Company's

President and Chief Operating Officer.  Kropf, who has been a Director of the Company since

1998, was appointed Avon's President and Chief Operating Officer in January 2001. Previously, beginning in November 1999, she was the Executive Vice President and Chief Operating Officer, North America and Global Business Operations. Kropf originally joined Avon in 1970 and held various positions in manufacturing, marketing and product development. Kropf also used her "bonus" stock options to further enhance the profitability of her insider sales. In addition to salary and bonus compensation of $787,978 and $824,329, respectively, in 2004 and $737,808 and $640,985, respectively, in 2003, Kropf received additional compensation in the amount of $3,228,550 in Restricted Stock Awards. Kropf exercised stock option grants (220,000 shares) in making $9.9 million of insider sales on February 9, 2005, resulting in a 148% profit on those sales. (See pg. 10, n.2, supra.)

29. Defendant Robert J. Corti ("Corti") was, at all relevant times, the Company's Chief Financial Officer. Corti, in addition to salary and bonus compensation of $515,191 and $458,114, respectively, in 2004 and $493,904 and $367,413, respectively, in 2003, in 2004, received in 2004 additional compensation in the amount of $1,457,000 in Restricted Stock Awards. Corti exercised stock option grants (204,224 shares) in making $9.0 million of insider sales on February 3, 2005, resulting in a 131% profit on those sales. (See pg. 10, n.2, supra.)

30. Defendants Jung, Kropf and Corti are collectively referred to hereinafter as the "Individual Defendants."

31. The Individual Defendants had access to all of Avon's detailed internal reporting data on its system. This system contained detailed sales and recruitment data from the individual Sales Rep level up through district and division level managers and regional Vice Presidents. Avon internal reporting data on the system included the units and dollar amounts of product shipped in each sales campaign under the Preferred Preview, Instant Delivery or, in Mexico,

Automatic Demo programs, so the Individual Defendants were able to know precisely the dollar amount and units sold pursuant to Avon's forced delivery practices. Internal reporting also showed sales by dollar amount and units for each sales campaign versus forecast, so the Individual Defendants could see the adverse effects of their forced sale practices on the success of each campaign in both the U.S. and Mexico. In the U.S., substantial orders were placed by Sales Reps online, so those orders were known to the Individual Defendants immediately or, if manually entered, within a day or two. In the U.S., District Managers were each given laptops, referred to as "Cathy," which tied directly into a corporate database so that District Manager Instant Delivery "sales" of unordered product were immediately known to Avon's corporate offices. Internal reports also showed the "LOL," or length of stay, of the Sales Reps, their units purchased and dates of purchase, the presence of short-lived recruits who purchased items in only one or two campaigns and were the "rejuvenated" by a District Manager's order for them of a single item or brochure (with an internal company voucher or certificate used by District Managers as payment), as well as over 100% turnover. (¶¶ 60, 79).    Further, the number of Personal Shopper recruits could easily be determined by the Individual Defendants from Avon's internal reported data because, among other reasons, those "sales representatives" did not purchase brochures (they were usually provided at the time of sign-up) and thus could be distinguished from the typical sales representative recruit. Finally, orders by store owners in China were placed and paid for at the beginning of each month, so the Individual Defendants would have seen the precise scope of the store owners' order reduction during the June 30, 2005 quarter no later than the beginning of May and June, 2005.

    32.    Each of the Individual Defendants were directly involved in the day-to-day operations of the Company and had access to internal Company documents and reports

concerning the Company's operations in China, the U.S. and Mexico, as alleged herein. By reason of their positions as senior management with the Company, the Individual Defendants also attended management and/or board of directors meetings and were responsible for the truthfulness and accuracy of the Company's public reports and releases described herein, and were involved in drafting, producing, reviewing and/or disseminating the misleading statements and information alleged herein. It is therefore appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the misleading and incomplete information conveyed in the Company's public filings, press releases and other publications concerning Avon's operations in China, the U.S. and Mexico, as alleged herein, were their collective actions.

33.     The Individual Defendants, as officers and/or directors of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to Avon, and to correct any previously issued statements issued by, or on behalf of the Company that had become materially misleading. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

34.     Avon and the Individual Defendants knew or recklessly disregarded that the misleading statements and omissions complained of herein would adversely affect the integrity of the market for the Company's stock, and would cause the price of the Company's common stock to become artificially inflated. Avon and the Individual Defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon Plaintiff and the other members of the Class.

35.     The defendants are liable, jointly and severally, as participants in a fraudulent

scheme and course of business that operated as a fraud or deceit on purchasers of Avon stock,

including making materially misleading statements. The scheme: (i) deceived the investing

public regarding Avon; (ii) artificially inflated the price of Avon stock; and (iii) caused Plaintiff

and the Class to purchase Avon stock at artificially inflated prices.

**V.      Class Action Allegations**

36.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased Avon

common stock on the open market during the period from February 3, 2004 through and

including September 20, 2005 (the "Class Period") and who suffered damages thereby.

Excluded from the Class are defendants, the officers and directors of the Company, at all

relevant times, members of their immediate families and their legal representatives, heirs,

successors or assigns (the "Class").

37.     The members of the Class are so numerous that joinder of all members is

impracticable. While the exact number of Class members is unknown to plaintiffs at this time

and can only be ascertained through appropriate discovery, Lead Plaintiff believes there are, at

minimum, thousands of members of the Class who traded during the Class Period. The

Company had more than 470,712,157 shares of its common stock outstanding as of March 16,

2005.

38.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions affecting solely individual members of the Class. Among the

questions of law and fact common to the Class are:

            a)     whether the federal securities laws were violated by the
      defendants' acts as alleged herein;

b)      whether Avon issued misleading financial statements during the Class Period;

c)      whether the Individual Defendants caused Avon to issue misleading financial statements during the Class Period;

d)      whether the defendants acted knowingly or recklessly in issuing misleading financial statements;

e)      whether the market prices of Avon securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

f)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

39.    Lead Plaintiff's claims are typical of the claims of the members of the Class as plaintiffs and members of the Class sustained damages arising out of the Individual Defendants' wrongful conduct in violation of federal law as complained of herein.

40.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

41.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

42.    Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a)      Avon and the Individual Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

17

b)      the omissions and misrepresentations were material;

c)      the securities of the Company traded in an efficient market;

d)      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

e)      Plaintiffs and members of the Class purchased their stock between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

f)      Avon common stock, at all relevant times, traded in an efficient market, reflected by the fact that Avon traded on the NYSE, had average volume of several hundreds of thousands of shares each day, was widely covered by securities analysts from large brokerage firms, such as Bear Stearns, Morgan Stanley, Credit Suisse First Boston, Prudential and Citigroup, and Avon stock price reacted to new market information.

43.      Based upon the following, Plaintiff and members of the Class are entitled to the presumption of reliance upon the integrity of the market.

## VI.    Substantive Allegations

### A.      Avon China – Undisclosed Fierce Storeowner Opposition to Direct Sales Arising From Unfair Competition Complaints and Protests

44.      Avon began doing business in China in or about 1990 and was joined soon thereafter by other international companies such as Mary Kay, Inc. and Amway Corporation. At that time, Avon engaged in both multi-level and single level direct selling. Single level direct sellers receive compensation based only on their own sales revenues. Multi-level direct sellers receive additional compensation or incentives based on sales revenues achieved by sellers they have developed or recruited. Multi-level direct selling potentially fosters "pyramid schemes" where revenue is generated merely from recruitment without the sale of any product – and, indeed, such pyramid schemes began to proliferate in China. On April 18, 1998, as a result, the Chinese State Council prohibited all direct selling activities.

45.     To circumvent this ban, Avon began a program to establish independently-owned stores selling Avon product in addition to counters in supermarkets and department stores. The independent stores sold both at retail and to individual Sales Reps, who could go door-to-door as long as they purchased their product from the stores and not Avon itself. The counters were generally wholly owned and operated by Avon. Counters were located in shopping malls and supermarkets such as Carrefour, Haoyoudou and Guangbai, and in department stores. These stores and counters grew dramatically, and by 2005 there were approximately 6,000 stores and 1,600 counters.

46.     The economics of store ownership in China was uniform. The store owner would pay a membership fee as high as 91,000 RMB (US $11,262.37) to Avon and had to order a minimum amount of product – approximately 7,000 RMB (US $866.33) per month – to continue as a franchisee. (There were higher "management" level stores which were required to order at least 25,000 RMB (US $3,084) per month and who then received greater discounts.)

47.     The store owner was wholly responsible for employee salaries, rent, utilities and all local and national taxes. It is estimated that, in the city of Guangzhou (where Avon's China headquarters are located), a half million RMB (US $61,881) was needed to open and sustain store operations. Most storeowners derived approximately 10%-30% of their business from Sales Reps and the remainder from retail customers.

48.     The storeowners had to pay for all product prior to delivery. Orders were sent directly to Avon headquarters in Guangzhou, though product was distributed through regional warehouses. Thus, Avon headquarters knew immediately at the beginning of each month of its performance that month.

49.     Storeowners purchased Avon products at a 32%-40% discount to the store retail

price. This discount, offset by overhead, was the sole source of storeowner profit. However, what was known to Avon but not to investors was that, throughout the Class Period, storeowner profit had been further materially diminished. Storeowners were forced to reduce their retail prices to compete with the proliferation of new Avon stores opening up in the same geographic area (as close as 500 meters), Avon counters in the same proximity which sold below the store retail price, and online and black market sales. (Online and black market product was believed by storeowners to have been supplied materially by Avon managers).

50.    Avon therefore was a primary source of storeowner profit deterioration since Avon authorized each new store opening and location, controlled pricing at its 1,600 counters in department stores, and also sought to reestablish direct marketing, which would provide even further competition to store owners. Avon systematically disregarded complaints made in 2003 and 2004 by storeowners in the Guangdong, Huang, Liaoning, Jiansu, Zhejiang, and Fujian provinces that Avon was engaged in unfair competitive pricing and that the storeowners were opposed to Avon's resumption of direct sales. Also, Avon made no attempt to elicit directly from the storeowners their views of direct sales (which, as noted, was easily discernable as reflected not only in the interviews by Counsel, but also those by Morgan Stanley (¶ 215) and Bear Stearns (¶ 202)). Storeowner dissatisfaction due to pricing pressures was also reported in a Chinese media report on Xiahuanet on February 27, 2003. Additionally, a widespread rumor in China in April 2004 of immediate store closings by Avon as a result of direct sales presented a clear "red flag" as to the depth of storeowner fear of direct sales, which could not be assuaged by Avon's response that it would not "close" stores or that it would continue to "support" stores— responses which failed to address storeowners' underlying profit and unfair competition

concerns. Also, in late 2004, there were demonstrations in Shanghai against the proliferation of new stores and the adverse financial effect on storeowners.

51.    Once the Chinese government partially lifted the direct sales ban on April 8, 2005 to allow direct sales in Beijing, Gangzhou and Tianjin, storeowner opposition flowed into the streets, and Avon's material misrepresentations and omissions to investors became even more deliberate and egregious. It was reported in the English media on April 12, 2004 that distributors "blocked" orders in opposition to direct selling. (¶ 172). Avon's only response was that it would continue to support the stores. What Avon did not disclose, but was reported in the Chinese Netease Business Report, was that there was a protest on or about April 11, 2005 at Guangzhou at Avon headquarters, and that at that protest, the storeowners, in addition to opposing direct sales outlined in an "open letter" (the "Open Letter") to Avon, all of the undisclosed areas of dissatisfaction which gave rise to their opposition to direct sales including: deteriorating profits as a result of discounting by Avon counters, in the black market and internet sales. The Open Letter also criticized Avon's failure to communicate and listen to storeowners on these issues.

52.    In or about May 2005, a second demonstration by storeowners occurred at Avon's China headquarters and was so animated that the demonstration was dispersed by police. This demonstration raised the same issues as those in the April 11, 2005 demonstration. Further, in May 2005, Avon stopped providing loans to Guangzhou storeowners because so many stores were closing due to Avon's direct sales announcement.

53.    Avon not only ignored these red flags and failed to publicly disclose storeowner dissatisfaction and opposition to direct sales, but it affirmatively misrepresented storeowners' enthusiastic support for direct sales such that investors were led to believe the 30% growth or $300 million for 2005 to $600 million through 2007 were conservative figures.

**B.    Avon United States – Deceptive Sales Rep Recruitment
and Forced Delivery of Unordered Product**

54.    Avon's U.S. operations were divided into four regions: Southeast, North,

Northeast and West.  By far, the Western region, which included California, dominated all the

regions in terms of sales generation, constituting more than half of total U.S. sales.  In 2002, the

North and Northeast regions were combined so that, in aggregate, their sales figures could

compete with the Southern and Western regions.  California generated the largest revenue of all

the states.  The regions were then divided into divisions and sub-divided into districts.  California,

for example, had 20 divisions which in turn each had approximately 20 districts.  There were

regional and divisional sales managers.  Further, each district had a District Manager.  There

were approximately 1,600 District Managers across the country.  In California, for example, in

many of the 20 or so districts in each of the 20 divisions, there were 450 or more Sales Reps.

55.    The regional managers reported directly to a corporate Vice President.  John

Fleming ("Fleming") was the corporate Vice President until 2002 and Garth Warner ("Warner")

thereafter.  Both Fleming and Warner had offices in New York.  Brian Connelly ("Connelly")

was formerly President of U.S. operations and thus directly involved in monitoring the financial

performance of each region and division.  Fleming and Warner reported to Connelly and to

defendants Kropf and Jung.  Connelly, Warner and Fleming were directly involved with District

Manager performance  particularly at the end of the quarters and at year end, pushing for

achievement of performance goals in three areas: sales, orders and new Sales Rep recruitment.

(Quotas for each performance area existed for each of the 26 sales campaigns during throughout

the year.)  Fleming and Warner held conference calls during each quarter with the District

Managers to discuss performance and, more specifically, to push performance in terms of sales

recruitment and orders toward the end of each quarter.  Further, there was a conference call at the

beginning of each month when District Managers would hear reports on the performance of all regions of the U.S.

56.     Divisional Sales Managers and District Managers depended heavily on incentive compensation. District Managers' salaries were typically in the range of $30,000 to $38,000 between 2000 and 2005, but incentive compensation would potentially double that figure. Divisional Managers had salaries of $60,000 to $70,000 but could similarly double compensation through incentive payments. The incentive compensation took two forms. There was a quarterly payment to each District Manager based on that manager's individual achievement of specific sales, order and recruitment goals. Then also there were cruises, trips and gifts at year-end for reaching the "Circle of Excellence." District Managers in the Circle of Excellence during 2000-2004 enjoyed cruises to Mexico, the Caribbean and Disney World.

57.     It was the job of the District Managers to drive the recruitment of new representatives in their district. All that was required for "recruitment" was obtaining an address, email, Social Security number, credit card, name and address of a reference and driver's license. However, in 2003 and 2004, contracts were accepted even if the applicant had no credit card or driver's license. Given the pressure to recruit, very little effort was made to verify social security numbers even in areas where there were a high density of potential illegal aliens such as in Southern California. The Sales Rep was paid entirely on commission. The Sales Rep was granted a 40% commission on the Sales Rep's first three campaigns (unless orders were placed by the internet, in which case the Sales Rep received a 50% commission). Thereafter the Sales Rep received a commission on a sliding scale based on the amount sold beginning with 20% on the first $250.00 per sale. The Sales Rep had to pay off his or her balance by the next order. Upon entry as a Sales Rep, an "account" was opened for the Sales Rep by Avon. This "account"

reflected all of the Sales Rep's Avon purchases and could be accessed by Avon's corporate office in New York and by the Sales Rep's District Manager. <u>This "access" meant that both Avon corporate and District Manager could record purchases in these Sale Rep accounts without the knowledge of the Sales Rep.</u>

58.    Each Divisional Manager and District Manager was given specific quotas per each of the 26 sales campaigns Avon corporate initiated each year for orders, sales, new Sales Rep recruitment and Sales Leadership recruitment. Since certain bonus compensation was based on the entire division meeting its quotas, District Managers for districts within each division were well aware of each other's performance and the need to increase performance at the end of a quarter or year end to achieve incentive compensation for the group.

59.    District Managers also met with Avon corporate, including defendants Jung and Kropf as well as Connelly, Fleming and Warner at annual conferences. These multi-day conferences would have meetings broken out by region and division within each region and afforded participants the opportunity to speak with and meet with corporate management.

60.    Avon corporate continuously monitored the Divisional Mangers', District Managers' and Sales Reps' performance in terms of meeting their quotas per campaign and per quarter. Avon maintained an internal computer system, which provided Avon corporate with a detailed printout of regional, divisional, district and individual Sales Rep performance in terms of orders, sales and Sales Rep and Sales Leadership recruitment. For example, on the divisional and district level, the system provided a "Daily Sales Organization Report," which reflected for each district within each division: commissioned sales by district, income, orders, Sales Rep "additions" and Sales Rep "removals." As noted, if a Sales Rep failed to place an order in three consecutive campaigns, the Sales Rep was "removed." The quotas in terms of recruitment

required growth in recruitment over the prior year. By the end of 2003, the rate of removals was at least 100%, and Avon increased the recruitment quotas creating an enormous burden on the District Managers to not only replace the Sales Reps who had been removed but increase recruits over and above that amount. For example, the quota in 2003 for a California district with approximately 450 Sales Rep was increased to 12 new recruits (in addition to replacing the 100% who had left) per each of the 26 campaigns in the year.

61.     As a result, Avon depended heavily at the end of 2003 and early 2004 upon recruitment using the "Personal Shopper" program. Under this program, customers were convinced, particularly during the 2003 Christmas season to open a "Personal Shopper Account," so that they could obtain the 40% to 50% discount on purchases. Customers were told that they did not have to buy more products in the future if they did not want to. The selling brochure and the "Personal Shopper Card" the customer received never mentioned that the customer was becoming an Avon Sales Rep and was signing a standard Avon Sales Rep contract. The "Personal Shopper" program was openly promoted at the National Sales conferences at which defendants Kropf and Jung played prominent roles.

62.     Avon also engaged in practices at the end of 2003 and 2004 which both extended the "life" of the Personal Shopper recruits and artificially boosted sales and unit orders at the end of 2003 and early 2004. The first such program was "Preferred Preview," where Avon corporate would send **unordered** product to sales representatives and immediately record such orders as sales. These Preferred Preview shipments were also sent to Personal Shopper recruits in Avon sales campaigns after the holiday sales campaigns since such shipments would "prolong" the life of these sales representatives who might otherwise have to be dropped from the rolls for not placing any orders.

25

63.    Originally, the Preferred Preview program was used as a marketing tool to preview products being introduced in an upcoming sales campaign. In 1999, there were a limited number of such "Direct Ships" per quarter. By 2003, however, "Preferred Preview" shipments were made to U.S. Sales Reps in virtually every campaign during the year. Also, the Direct Ships were originally only to go to certain Sales Reps based on rating of their performance and creditworthiness. This rating of Sales Rep creditworthiness was established based on a hierarchy of "A" through "E" – with a "D," for example, representing a Sales Rep who had not had a steady residence over the year prior to becoming an Sales Rep and who had no credit, and an "E" representing a Sales Rep with no indicia of creditworthiness. However, by 2002 and 2003, Avon corporate was directing its Direct Ships to all Sales Reps "A" through "D."

64.    Shipments direct from corporate to the Sales Rep provided a right of return, but Avon created impediments to having the product returned. First, the Sales Rep would have to pay for the cost of returning the product. Second, if a Sales Rep returned more than 50% of any shipment, his or her account was flagged by Avon corporate so that the Sales Rep would no longer receive instant credit for returns. This meant that a Sales Rep so flagged would have to wait minimally six campaigns to have the returns credited to his or her account. Many Sales Reps had very little disposable funds and were dependent on instant credit to continue to operate.

**Instant Delivery**

65.    By way of an Avon corporate practice known as "Instant Delivery," Avon corporate also shipped product directly to the District Managers which had not been ordered either by them or any of their Sales Reps. The District Managers were then obligated in order to meet their quotas to have their Sales Reps sell these products. District Managers were advised that they had no right of return with respect to these products. Avon gave to each District

Manager in connection with each Instant Delivery shipment a print out (on green and white paper) which had the names of all the Sales Reps in their district. The District Manager then submitted to Avon Corporate through the Divisional management the number of units each Sales Rep would buy. Avon had no system to verify that the Sales Rep actually accepted that order. Under enormous pressure to meet the quotas District Managers would then "order" 1 item or a brochure to "rejuvenate" a Sales Rep (including those obtained through the Personal Shopper program) who had not ordered any product in the last two campaigns. The District Manager would pay for these products using demo certificates disseminated to District Managers by Avon corporate from time to time.

66. District Managers would also ship and bill their Sales Reps for assigned amounts of Instant Delivery products even though the Sales Reps never ordered those products. When a Sales Rep complained and refused to make payment, Avon nevertheless did not reverse the sale. Further, if the Sales Rep returned the product (which they had not ordered), the Sales Rep would have to pay for the return and suffer the consequences of a "flagged" account and not receive instant credit in the future. Avon also commenced collection proceedings for these bogus "instant delivery sales."

67. In 2003, a number of Avon Sales Reps commenced a class action in California alleging, inter alia, unfair and deceptive business practices. The action is still pending against Avon after being reinstated by the Court of Appeal of the State of California, Second Appellate District on June 1, 2004.

68. Ultimately, Sales Reps who did not order product refused to pay, adversely impacting Avon's profits through charges to increased bad debt expense and assets through a higher allowance for doubtful accounts. In Avon's Form 10-Q for the third quarter 2004, Avon

reported that U.S. operating profit declined because of "higher bad debt expense." Further, in Avon's 2004 Annual Report, Avon disclosed that it had increased its allowance for doubtful accounts, which included refusals of Sales Reps to make payments on orders, by 24% even though accounts receivable had only increased by 7%.

C.    **Avon Mexico – Forced Delivery of Unordered Product**

69.    Mexico represented Avon's largest market in Latin America, reporting in 2003 and 2004, $669 million and $676 million in sales, respectively, or approximately 10% and 9%, respectively, of Avon's total sales. Operating profits in Mexico in 2003 were $190.2 million, or approximately 19% of Avon's total operating profit for that year.

70.    Avon Mexico was operated under the overall control of Amilcar Melindez. Leon Zlotnik was General Manager in charge of Mexico. Norma Barbosa was the Sales Vice President in Mexico. There are three regions and seven divisions. Within the divisions, there are over 550 zones. Over the course of the year, there were 19 separate "campaigns. There were 12 "trend setter zones," representing approximately 3.5 percent of sales in Mexico, which sold two campaigns ahead. This permitted the Company to develop a trend line reflecting how successful it anticipated a campaign would be.

71.    Until 2005, cosmetics or CFT made up at least 52% of sales in Mexico, and the balance was non-CFT or Beyond Beauty products. Avon competed unsuccessfully against Wal-Mart in the non-beauty or non-CFT product areas.

72.    Avon Mexico had a sales representative base of approximately 450,000 representatives. Sales Reps received a 30% commission on CFT products and a 20% commission on Home Fashion and Apparel ("HFA") products.

28

73.    Avon Mexico was subject to Avon's system of quotas per campaign for various zones, divisions and regions.  Avon Mexico had developed prior to 2003 sales aids referred to as Automatic Demo and Instant Delivery, used primarily in the sale of beauty products.  The use of Automatic Demos and Instant Deliveries were originally to be limited to once a quarter.  However, beginning in late 2003, Avon Mexico began to use these purported sales aids frequently in order to meet sales and order quotas.

74.    Automatic Demo products were sent to the Sales Reps, without the Sale Reps placing any order for them, at a discounted price two campaigns ahead of the intended campaign launch.  There was no right to return these products (until a policy change in 2005 initiated after the commencement of the California lawsuit commenced by Avon Sales Reps (see ¶ 67).  Another sales aid was Instant Delivery, under which products were also shipped out without the Sales Reps ordering the product.  For Instant Delivery products, Sales Reps were allowed to postpone payment until for one campaign – normally Sales Reps had to make payment immediately for product ordered.  There was a right of return, but here, again, the Sales Rep had to pay for the return, and the return was highly discouraged.

75.    While Automatic Demo and Instant Delivery programs originally were designed to test the market or begin to generate interest for a product to be introduced in the future, beginning in the final months of 2003, they were used to try and meet sales targets.  Thus, a Tresselle fragrance was shipped as an Automatic Demo product in Campaign 14 and also as an instant delivery product in Campaign 15.  This Tresselle fragrance was ultimately introduced in campaign 16, and it sold dramatically under forecast.  This failure was due to the forced sale of the fragrance in the prior two campaigns, which permitted Avon Mexico to achieve immediate sales and order quotas, but also generated the resentment and departure of Sales Reps, who

29

objected being forced to purchase this relatively expensive product. These forced sales also impeded the sale of other products, since the Sales Reps spent their time and effort trying to sell the products that they had been required to take before selling any other products.

76.    This forced delivery continued through the end of Campaign 19 in 2003. In Campaign 17, an expensive men's fragrance was shipped as an Automatic Demo at the same time that "Anew Clinical" was being shipped as an Instant Delivery. That meant that, in Campaign 17 alone, Avon generated two forms of instant but unordered sales. Campaigns 18 and 19 also included Instant Delivery shipments of Anew Clinical. Automatic Demos and Instant Deliveries were used to increase sales by $22 million dollars in the fourth quarter of 2003 alone.

77.    After Campaign 19, there was a significant loss of Sales Reps, although new Sales Reps were quickly recruited who were unfamiliar with the forced delivery practices. This new recruitment by Avon Mexico covered up the fundamental problem which its forced delivery practices caused – namely, undermining sales and the effectiveness of the campaigns, and creating Sales Rep dissatisfaction.

78.    In the early campaigns in 2004, the Cosmetics line in Mexico was consistently behind plan, largely due to the forced delivery practices in late 2003, and so Avon Mexico once again turned to the forced delivery to meet sales and order quotas. Instant Delivery shipments were made in 10 of the 19 campaigns during in 2004:  1, 4, 5, 7, 8, 15, 16, 17, 18 and 19. Automatic Demo shipments were made in 4 of the campaigns:  3, 6, 10 and 14. In 2004, Automatic Demo and Instant Delivery shipments increased sales by $63.8 million – or approximately 10% of total Avon Mexico sales. However, the use of these programs had the same adverse effects on the 2004 sales campaigns in Mexico that they did in late 2003.

79.    Moreover, in Campaigns 7, 14 and 18, Automatic Demo or Instant Delivery shipments were intentionally used to boost sales because the "trend line" forecasts from the three trendsetter zones showed that the products being introduced in those Campaigns were poor performers and could not be sold successfully without the forced sales. Throughout 2004, there was extremely high turnover of representatives and poor morale, though, again, there was sufficient new Sales Rep recruitment to conceal the adverse impact that these programs were having on Sales Rep morale.

80.    Due to the use of the forced delivery practices in Mexico in late 2003 and 2004, Beauty sales declined as a percentage of Avon Mexico's total sales from 52% in to 45% by early 2005. This forced Avon Mexico to compete more heavily and unsuccessfully with Wal-Mart in the non-beauty areas to maintain sales, resulting in sales declines in 2005 and contributing to the "deceleration in Latin America" disclosed by Avon on September 8, 2005 that resulted in material Avon stock price declines.

**D.    Material Misrepresentations and Omissions**

81.    On February 3, 2004, in a corporate press release issued through PR Newswire, Avon announced "Record earnings and sales growth" for the quarter-ended December 31, 2003 driven by "continuing strong performance in international operations." Avon reported 17% gains in sales and operating profit in Asia with China, in part, "driving the gain." During the February 3, 2004, conference call, Avon announced sales in China of nearly $160 million, and anticipated dollar sales growth in the mid- to high-teens going forward into 2004.

82.    In the same February 3, 2004 press release, Avon reported U.S. sales in the fourth quarter of 2003 only increased by 2% and that operating profit declined by 4%. However, Avon emphasized the 3% growth in the number of active sales representatives. Jung also forecasted

U.S. growth in 2004 stating, "<u>Full year U.S. sales are expected to return to a mid-single-digit growth rate</u>, with operating profit forecast to be up 8-10%." (Emphasis added.)

83.     The statements in preceding two paragraphs were materially misleading because (a) the Sales Rep growth was achieved, in material part, by use of Personal Shopper accounts, and District Managers automatically sustained Sales Reps by purchasing product for them; and (b) sales growth was achieved by forced delivery of unordered product, including the use of Preferred Preview and Instant Delivery.

84.     In the same press release, Avon also touted that sales and operating profit and units increased 16% and 21% and 4%, respectively, in Latin America, mainly due to further improvement in both Mexico and Brazil.

85.     During the February 3, 2004 conference call, Avon stated that Mexico had a "very solid quarter with local currency sales increasing 10 percent on flat dollar sales; and that beauty sales were up 16 percent in local currency. Mexico's operating profit increased 10 percent and operating margin improved 270 basis points to 30 percent."

86.     The statements in the two preceding paragraphs were materially misleading because the sales and operation profit growth in Mexico were due to forced delivery practices.

**February 3, 2004 Material Positive Stock Price Reaction to Avon Disclosures**

87.     Following the press release, Avon's common stock price increased from $29.99 at the market close on February 2, 3004 to $31.00 per share the next day, with 9.7 million shares trading, and then to $34.15 per share on February 4, 2004, with 7.2 million shares trading.

88.     On February 9, 2004, it was reported that an official from the Chinese Ministry of Commerce stated that it was anticipating lifting of direct selling ban by the end of year, and that a new law was being drafted with input from companies, including Avon.

89.    On February 16, 2004, an article in the <u>Business Daily Update</u> reported that Avon China affirmatively stated that the "lifting of the [direct sales] ban <u>will not have a big impact on retail existing outlets.</u>" (Emphasis added.)

90.    The statements in the preceding paragraph were materially misleading for failing to disclose the storeowner opposition to lifting the direct sales ban and direct sales' adverse financial impact on the "retail outlets."

**<u>February 17, 2004 Material Positive Stock Price Reaction to Avon Disclosures</u>**

91.    Avon's common stock price increased from $33.81 per share at the close on February 13, 2004 to $34.92 per share at the close on the next trading day (February 17, 2004), with a volume that day of 2.2 million shares.

92.    On February 20, 2004, in a presentation to the Consumer Analyst Group of New York conference, defendant Corti, Avon's Executive Vice President and Chief Financial Officer, was unequivocal about the positive effect of the advent of direct selling on Avon's existing China operations:

> I'm sure most of you know that direct selling as a model – not just for Avon – was prohibited by the [Chinese] government in 1998 due to abuses that some companies had fostered. We came up with an alternative. We have a very nice business. **It grows between 25 and 30 percent.** It is based in department stores, it's based in hypermarkets. **But the key to the growth there has been the 6,000 independently owned beauty boutiques** that we sell through. We've said in the past that the Chinese government as part of the accession agreement into the WTO has agreed to resume direct selling in the future, **and just last week it finally came out with an announcement that by the end of this year regulations will be promulgated that will allow direct selling to resume. <u>And we are ready and we believe it will be a wonderful complement to an already successful business. And we're prepared, as I said, and ready to go with that as the regulations come out.</u>** I think our model is one –particularly the fact that it's a single level model, which means in that part of the world particularly you sell to a representative who sells to a customer and earns a commission – that will probably be the model that is most adopted quickly, so I think we're in a very, very good position. (Emphasis added.)

93.    The statements in the preceding paragraph were materially misleading because direct sales would compete with, and would not be "a wonderful complement" to, the stores. Moreover, Avon failed to disclose storeowner opposition to direct sales and the adverse financial effects of that opposition.

94.    During that same conference, defendant Corti touted a 9% increase in Beauty sales and a "record number of Representatives" for the U.S. operations, as follows:

> **The renaissance in the US continues.** We had a US business in the mid-90s that was really recognizing slow to no growth. We turned that around, and I will get into some of the levers for growth very shortly. **But the business continues to grow. Most importantly, beauty sales last year were up nine percent, and that is one of the key strategies for us. We had a record number of representatives -- 650,000 representatives** -- driven in part by a sales leadership strategy which I will talk about in a moment. (Emphasis added.)

95.    The statements in the preceding paragraph were materially misleading because the "record number of representatives" was achieved, in material part, by deceptive practices which yielded unknowing and transient Sales Reps.

**March 1, 2004 Avon Files Its 2003 Annual Report**

96.    On March 1, 2004, Avon issued its 2003 Annual Report (the "2003 Annual Report"). China was described in a section entitled "Expanding Highly Potential Markets," with the beauty counters and 5,500 stores to be the "hubs" of direct selling once it was re-allowed by the Chinese government.

97.    The statements in the preceding paragraph were misleading because Avon failed to disclose that direct sales representatives would also be competitors with storeowners, and storeowners thus opposed direct sales and would not function as a supportive "hub."

98.    The 2003 Annual Report also touted the growth in Sales Reps as reflecting the fundamental strength of its U.S. business, stating:

> **Because of Sales Leadership, the U.S. over the past three years has added a record number of new Representatives to its sales force following a decade of flat-to-low growth.**
>
> *      *      *
>
> **Sales Leadership continued to fuel U.S. recruiting, as the number of active Representatives grew to nearly 480,000. In addition, the number of Leadership "upline" Representatives advanced 55% to 39,000, indicating the importance of Sales Leadership in the continuing transformation of U.S. direct selling.** (Emphasis added.)

99.     The statements in the preceding paragraph were materially misleading since the growth achieved was the material result of deceptive transient "Personal Shopper" recruitment (including recruitment done as part of Sales Leadership).

100.    The 2003 Annual Report was also unequivocal in touting the performance of Avon Latin America, which reflected 6% sales growth to $1.747 billion and 12% operating profit growth to $408.3 million, "double digit" sales growth in Mexico from "healthy increases in the number of active sales representatives," and "strategies for building the Avon brand, boosting market penetration."

101.    The statements in the preceding paragraph were materially misleading because the sales growth was achieved, in material part, from undisclosed forced delivery of unordered product.

102.    The 2003 Annual Report also emphasized Avon's commitment to business ethics and the "highest standards of integrity and corporate responsibility," as follows:

> In addition Avon is committed to ethical business behavior. **Our Code of Business Conduct and Ethics ensures that all Avon associates act according to the highest standards of integrity and corporate responsibility.** (Emphasis added.)

103.    The statements in the preceding paragraph were materially misleading since Avon engaged in deceptive and unethical recruitment practices and forced delivery of unordered product in the U.S. and Mexico.

35

104.    On or about April 5, 2004, it was reported by <u>SinoCast China Business Daily News</u> that, on March 28, 2004, sources in Guangzhou City (where Avon's China headquarters are located) disclosed that Avon intended to close specialty stores and counters once the new law permitting direct sales was issued.  The article also reported that an Avon executive from the Beijing office denied these reports, "confirm[ing] that Avon has spent much time and money on its own marketing networks in China so it does <u>not</u> absolutely close up specialty stores and specialty counters.  Even if China really releases the law, it will stick to its marketing model, 'specialty store plus sellers.'  In addition, it plans to open 500 specialty stores and specialty counters in China in 2004." (Emphasis added).

105.    On April 26, 2004, it was reported in <u>The Edge Singapore</u> that in order to "quell the fear" that lifting of direct selling ban would result in Avon store closings or adversely impacting stores, Avon China issued a press release "praising its 'wholesale and retail mode without the so-called direct selling mode.'"

**April 29 and 30, 2004 Avon Announces Results for First Quarter Ended March 31, 2004**

106.    On April 29 and 30, 2004 Avon issued a press release and filed its Form 10-Q, respectively, reporting financial results for the quarter-ended March 31, 2004.  Avon reported sales growth in China, U.S. and Latin America and raised its year-end 2004 earnings expectation to $3.30 per share, up from $3.18 - $3.20 that it had reported a month before.  The release stated that China was "<u>targeted as one of Avon's top growth prospects</u>, and continued as the largest contributor to the region's growth." (Emphasis added).

107.    In Avon's April 30, 2004 conference call with analysts, Kropf only positively described the move to direct sales as "expanding the reach" of Avon:

> I think what [direct selling in China] would do, <u>it would expand the kind of the reach, if you would, of our direct sales force</u>.  As you know, we now operate with

a concept called the store representative, who is able to service customers, but she is operating within a limited -- limited geographic stand from the individual beauty boutique with which she is affiliated. <u>And this would allow us to really expand the reach of these representatives beyond the limitations that currently exist.</u> And it also would allow us just strategically to , I think, to perhaps inject some more kind of traditional direct selling, motivation, goal setting, etcetera, directly with these representatives. Whereas now it's running through the beauty boutique owners. So it's a bit of a different model and I think it would permit more direct contact between Avon and the representative, as well as enabling her, and others like her, to have a broader span, if you would, in terms of geography that she can service. (Emphasis added.)

108.    The statements in the preceding two paragraphs were materially misleading because they failed to disclose storeowner opposition to direct sales and the adverse financial effects of that opposition.

109.    In the April 30, 2004 conference call, Kropf stated that U.S. sales and Sales Rep growth was "showing continued strength" with current and future growth prospects:

The US generated $90 million of operating profit in the quarter, down 7% versus the prior year as planned due to the inventory clearance. ... Overall <u>U.S. representative growth was 2%, reflecting less reliance on activity programs</u> than those put in place during the weak consumer environment in last year's first quarter. I would note in the last two campaigns post clearance, representative growth has been, again, in the 3 to 4% range and we expect full year growth in this range as we previously said.

<u>The U.S. has 40,000 upline representatives at quarter end, an increase of 55% over first quarter '03 and leadership representatives made up 52% of representatives and 49 percent of sales.</u> (Emphasis added.)

110.    The statements in the preceding paragraph were materially misleading given the transient nature of the Sales Reps, Avon's deceptive and unethical recruitment practices and their undisclosed impact on U.S. sales and operating profit.

111.    Avon's April 29, 2004 press release touted "extraordinary" performance in Latin America, stating that "Latin America delivered excellent results on broad-based strength access the region," and reporting a 17% increase in net sales in that region. Avon's Form 10-Q also

noted that, in Mexico, "Net sales increased, benefiting from growth in average order" size.

112.    Defendant Kropf stated on the April 30, 2004 conference call:

> . . . <u>Mexico performed in line with expectations, posting growth on growth facing the most difficult comparison of the year against a very strong first quarter last year</u>. (Emphasis added.)

113.    The statements in the preceding two paragraphs were materially misleading because they failed to disclose the positive results were achieved, in material part, by undisclosed forced delivery of unordered product.

## April 29, 2004 Disclosures Material Positive Stock Price Reaction to Disclosures

114.    Following the April 29, 2004 announcements, Avon's common stock price appreciated dramatically from $39.09 per share at the close on April 28, 2004 to $42.00 per share at the close on April 30, 2004, with over 9.7 million shares trading on April 30, 2004.

115.    On June 8, 2004, as reported on <u>PR Newswire</u>, Avon increased earnings target for the second quarter and for the 2004 year. Avon also reported that U.S. sales showed mid-single digit growth, with Asia/Pacific sales growing in high-teens, and that "<u>China continues to be a as the standout performer with sales projected to grow nearly 50%</u>." (Emphasis added).

116.    As reported on the <u>China Daily</u> on June 25, 2004, Avon disclosed that it expected that "its business in China will grow by 50 per cent this year, and expects its revenues to hit US $400 million by 2007," and that Avon would still support the stores after the introduction of direct selling:

> "The beauty boutiques are the lifeblood of Avon in China," said Shou-Kang Kao, president of Avon China. He said <u>Avon China will keep the boutiques while developing new direct selling methods that conform to new Chinese regulations expected to be out this year</u>. (Emphasis added.)

117.    The statements in the preceding two paragraphs were misleading because they concealed storeowner opposition to direct sales, the reasons for that opposition and its potential

adverse financial effects.

118.    In a June 28, 2004 article in CNNMoney.com, an Avon spokesperson was quoted

that Avon would continue to open 500 boutiques a year "for the next few years." The article also

noted that, according to industry watchers:

> [Avon's] domestic market growth drying up, **Avon needs to penetrate the**
> **Chinese markets as well as expand into other fresh pastures if it wants to**
> **keep growing at is current strong pace.**
>
> "Avon's international business is key to its growth going forward. There's no
> disputing that," said William Steele, analyst with Banc of America Securities.
>
> Already, about 63 percent of its $6.8 billion revenue in 2003 came from outside
> the United States and Avon operates in over 100 countries. (Emphasis added.)

119.    On June 29, 2004, in an article in Business Daily Update, Andrea Jung described

only the positive effects of direct selling on China boutique owners:

> The [direct sales] law is expected to be promulgated this year. Although no
> details have been revealed, Avon said it is looking forward to resuming direct
> selling, which had been its core sales tool for 117 years. "**We believe direct**
> **selling can bring us new opportunities for more than 5,500 beauty boutiques**
> **in China**," said Andrea Jung, Avon's Chairman and chief executive officer
> (CEO). "We are trying everything we can to create more earning opportunities
> for beauty boutique owners." ... So far, the company markets its products
> through direct sales in 140 countries. Jung said she believes the new China
> legislation will create a good environment for direct-sales in China. (Emphasis
> added.)

120.    The statements in the preceding paragraph were materially misleading because

they concealed storeowner opposition to lifting the direct selling ban and the adverse effect on

the "good environment" for direct sales.

121.    On July 23, 2004, as reported in South China Post and China Daily, Avon

received "verbal permission" to test direct selling to mainland consumers after a six year ban by

the central government. The President of Avon China reiterated that "Avon China would keep

the beauty boutiques while developing new selling methods that conform to Chinese regulations

expected to be issued this year."

**July 28, 2004 Avon Announces Results for Second Quarter Ended June 30, 2004**

122.    On July 28, 2004, Avon issued a press release reporting financial results for the

quarter-ended June 30, 2004. Avon reported that quarterly earnings increased by 36% and sales

increased by 13% compared to the second quarter in the previous year. The press release also

reported that sales in the U.S. increased by 3%, Latin American sales rose by 10%, and that

"China, Avon's largest long term growth opportunity, continues to post dramatic growth with

sales increasing more than 60% in the quarter." Avon again raised its year-end 2004 earnings

forecast to $1.72 per share, up from $1.70.

123.    On the July 28, 2004 analyst conference call, Kropf explained there was not a

plan for continued growth of stores, but described positive continued "growth" with or "without"

direct sales:

> But I can say that we are not in the mode [in China] as we were a year or two ago
> of opening dramatically increased numbers of Beauty Boutiques around the
> country. And what we are attempting to do strategically and what we are doing
> successfully now is really leveraging the sales through the store representative
> concept from the existing Beauty Boutique. . . . But we are at kind of a study
> state mode right now, and we are leveraging our infrastructure that we have
> through the store representative strategy. So we are very pleased at where this is
> going, and they just continue to do a great job over there. They really do. **The
> energy is phenomenal and we feel very good about the growth prospects,
> with and without direct selling.**
>
> Let's just say that we do believe the Beauty Boutiques and the store
> representatives that we have are **a great foundation** that from which we can build
> out in whatever way we decide to do that. And we're working through that with
> the China team right now.    (Emphasis added.)

124.    The statements in the preceding two paragraphs were misleading because

storeowner opposition to direct sales was "negative energy," and thus the stores were not a great

"foundation" for direct sales.

40

125.    Jung further suggested the $400 million China sales figure by 2007 was <u>without</u>

direct selling, which would only <u>add</u> to the forecast:

> You know, I think when we talk about the opportunities – and I think many of
> you have covered this week – <u>we had talked about a $400 million business in the
> '07-08 period, but that was without the true resumption of direct sales and that
> would all be, you know, an opportunity for the longer term on top of that, which
> is why we believe in our hearts that this will be one of Avon's largest growth
> opportunities in the next decade.</u>  (Emphasis added.)

126.    The statements in the preceding paragraph were materially misleading because

they suggested only positive revenue effects from direct sales while omitting the adverse

financial effects of implementing direct sales, including the effects of storeowner opposition.

127.    Jung and Kropf also highly hyped U.S. performance in the second quarter and

<u>anticipated positive performance in the third quarter.</u>"

> <u>I'm also very encouraged by the significant strategic progress we continue to
> make in the United States with sustained impressive **increases** again in Beauty
> and **Active Representatives**; and those are our two most strategic indicators.</u>  It is
> clear that this business is transforming itself. ...
>
>            \*      \*      \*
>
> <u>The U.S. had a healthy representative growth of 4% in the quarter, with the ranks
> of leadership upline growing to a total of 42,000 representatives at quarter end.</u>
>
> For the third quarter, sales in the United States are expected to increase in the 3-
> 4% range with operating profit growth ahead of sales as a result of reduced selling
> expenses, as well as anniversary and launch costs associated with Mark.
> <u>Representative growth in both third and the balance of 2004 is expected to be in
> the 3% range.</u>
>
> Like Andrea, I continue to be very optimistic about the long-term growth outlook
> for the U.S. <u>**Our beauty business there has never been stronger**</u>, and the
> innovation in the second half product line is extremely exciting, as is the pipeline
> for 2005.  (Emphasis added.)

128.    The statements in the preceding paragraph were materially misleading because the

recruitment "growth" was achieved, in material part, by short-term transient recruits and forced

delivery of unordered product, which would ultimately adversely impact sales and profits.

41

**August 6, 9 and 10, 2004 Andrea Jung Sells $17.2 Million of Her Avon Stock**

129.    Jung sold 410,000 shares of Avon common stock – or 34.9% of her total

holdings – reaping proceeds in excess of $17.2 million.  Jung never before sold such a substantial

position of common stock during her entire career at Avon.

130.    On August 16, 2004, as reported in <u>Kiplinger's Finance</u>, Jung reiterated Avon

China forecast of $400 million by 2007:

> But China could be Avon's biggest opportunity, says Jung.  Although China
> passed a law in 1998 banning all direct selling, Avon has prospered by marketing
> through 7,000 beauty boutiques and store counters.  Jung's goal is to reach sales
> of $400 million in China by 2007, up from $157 million in 2003, and she foresees
> annual sales of $1 billion within the next ten to 20 years.

131.    The statements in the preceding paragraph were materially misleading since they

failed to disclose or quantify any adverse effect of transitioning to direct sales, including the

effects of storeowner opposition to direct sales.

132.    The positive statement about China was integrated by the market as a reason to

invest in Avon.  For example, on August 31, 2004, as reported on the <u>Business Wire</u>, <u>Zacks.com</u>

highlighted Avon as a stock investment rating performance in China as driving future earnings

momentum:

> Avon (NYSE:AVP) is in the midst of a strong growth phase, particularly in
> international sales.  Avon generated 60% sales growth in China in its most recent
> quarter, and 13% sales growth overall.  The company beat earnings estimates by 3
> cents, and the brand recognition it is achieving in <u>foreign markets, particularly
> China, should drive continued earning momentum.</u>  (Emphasis added.)

**September 8, 2004 Avon Disclosed Lower U.S. Sales Forecast for Quarter Ended
September 30, 2004 – Four Weeks After Jung's $17.2 Million Insider Sales**

133.    In a press release issued through <u>PR Newswire</u> on September 8, 2004, Avon

announced that, while it reaffirmed its third quarter 2004 and 2004 earnings guidance, it was

reporting "softness in the U.S.," resulting in expected "flattish" U.S. sales growth (as opposed to

the 3-4% growth forecasted in July) and 1-2% growth in the number of U.S. sales representatives (as opposed to the 3% previously forecasted).

134.    Avon explained it was only as a result of "standout international operations," including Mexico, that the projected earnings would be achieved:

> Avon's second largest market, is expecting an approximate 13% increase in local-currency sales, including an extremely positive response to the new fourth quarter fragrance. The region's dollar operating profit is expected to increase in the range of 15%, exceeding earlier expectations, with significant operating margin expansion of approximately 200 basis points. (Emphasis added.)

135.    The statements in the preceding two paragraphs were materially misleading because Mexico "growth" was achieved, in material part, as a result of undisclosed forced delivery of unordered product.

136.    Avon stock price reacted negatively to the September 8, 2004 announcement, Avon common stock price declined from $45.66 per share at the close of September 7, 2004 to $42.86 per share at the close of September 8, 2004, with over 6.1 million shares trading, or a market loss of more than $17.1 million.

**October 29, 2004 Avon Disclosed Results For Third Quarter Ended September 30, 2004**

137.    On October 29, 2004, Avon issued a press release, held a conference call and filed its Form 10-Q reporting results for its third quarter-ended September 30, 2004. Avon reported that U.S. sales and operating profit declined 1% and 3%, respectively, versus the prior year and Avon U.S. representative growth was flat due to "general consumer malaise." Kropf forecasted continuing U.S. sales and recruitment declines of 3% and 1%, respectively, due to continuing "weak consumer environment" and declining Beyond Beauty business.

138.    Further, the October 29, 2004 Form 10-Q reported that operating margins were negatively affected by increases in "bad debt expense." (Form 10-Q at p. 24.)

139.    In the October 29, 2004 conference call, Jung continued the hype on China with

unequivocally positive statements about the transition to direct selling in China.

> So, I can't tell you a date, but I just meant by that that [lifting of the direct sales ban] is imminent, and we certainly hope to talk to you more about that in December. And we will work on the time that's not conflicting with somebody else's, but so I just want to say, Connie, that **the [direct sale] regs really favor Avon's model**, OK, and the-- I think when you look at why direct selling was banned in 1998, and then you look at what the government, and I don't want to speak for them, it considering in the regulations for <u>2005 and beyond, I mean, it is not an accident that we have 6,000 points of sale</u>.

> That this company structure, as it relates to our point of view on commissions, etcetera, I think it's extremely well poised to have major advances as we move into this period. So, we've done -- not just right now, but everything over the past six years to prepare ourselves for what we believe will be the right regulations for this industry going forward . . . (Emphasis added.)

140.    The statements in the preceding paragraph were materially misleading because

they omitted to disclose a conflict between storeowners and direct selling and the adverse

financial effects of this conflict in transitioning to direct sales.

141.    Jung also described "motivational gatherings with over 2000 China boutique

owners" and that "<u>the potential to unleash direct selling was very clear. So, they are hyped and

ready to go</u>," Jung also stated:

> China has two dimensioned. I mean we couldn't be more pleased with the business there 6,000 boutiques, covering 70% of the cities. We are exceptionally well positioned versus the competition, **and poised for rapid implementation of direct selling tests.**

> Our on the ground team has been working very closely with the Chinese government, working through all the last-minute details of these regulations, and we anticipate written authorization any minute. We recently held our first ever motivational gatherings. **I was part of that attended by 2,000 beauty boutique owners. The potential to unleash direct selling energy was the very clear. So, they are hyped and ready to go. And there is no doubt in my mind that we're going to hit the ground running.** (Emphasis added.)

142.    The statements in the preceding paragraph, including Jung's touting of "direct

selling energy" and that the storeowners were "hyped and ready to go" were materially

misleading because they concealed and misrepresented storeowner opposition to direct sales, the

reasons for the opposition, and the adverse financial impact from the storeowner opposition.

143.    In its October 29, 2004 Form 10-Q, Avon also reported 13% net sales increase in

Latin America, including Mexico:

> In Mexico, Net sales increased in both periods, driven by growth in units and
> active Representatives, partially offset by the negative impact of foreign exchange.
> Net sales benefited from new product launches and consumer and field sales
> incentive programs.

144.    The statements in the preceding paragraph were materially misleading because

Mexico "growth" was achieved, in material part, as a result of undisclosed forced delivery of

unordered product.

**October 29, 2004 Material Adverse Stock Price Reaction to Avon Disclosures**

145.    Avon's October 29, 2004 disclosure regarding the U.S. resulted in further

dramatic stock decline from $43.21 per share at the close of October 28, 2004 to $39.55 per

share at the close of October 29. 2004, with over 28.2 million shares trading, for a market loss of

more than $103.2 million.

146.    The market integrated Avon's purported good news about China.  For example,

an October 29, 2004 the Business Week Online report stated:

> Certainly, at least one very bright spot is on the horizon: Avon's China business
> could get a major boost starting in 2005.  Chinese regulators will soon introduce
> legislation that could legalize the direct selling for which Avon is famous.

147.    Following Avon's October 29, 2004 announcements Deutsche Bank lowered its

rating on Avon from a "Buy" to "Hold" "on U.S. weakness"; and UBS lowered its rating on

Avon from a "Buy 2" to a "Neutral 2" "to reflect uncertainty around U.S. sales/profit outlook."

**November 3, 2004 Avon Replays the China Card**

148.    On November 3, 2004, Avon held an analyst conference at the Morgan Stanley

Global Consumer Conference where Jung returned to stress "harmony" of storeowner and

director sales in China:

> Most of our [China] business, and we have nice healthy businesses in the large
> cities, but as you know, we have about 6,000 duty boutiques today. They are
> franchised, they are owned by independents, but they are in every province in the
> country. From a geographic footprint point of view, I mean our game is
> penetration and coverage, we are everywhere in that country. We are affordable,
> we're a well known globally aspired brand to buy, but we are everywhere and you
> don't have to travel to the big cities or move to the big cities to buy us. **And
> when you combine on top of that the opportunity to have direct selling,
> which we believe can live in harmony in hybrid mode with the already very
> healthy wholesale or franchise model, if you would, that we've established, I
> think the opportunity is extraordinary.** So we do see that $400 million
> opportunity just in the model we're in, very confident about that. And then you
> add on top, too early to exactly quantify it, but to all of us in the company believe
> this will be a billion dollar market. (Emphasis added.)

149.    The statements in the preceding paragraph were materially misleading because

they misrepresented storeowner opposition to direct sales and "disharmony" between two

business models.

150.    On December 8, 2004, Avon International president Robert Toth upped Avon's

China sales forecast to **$600 million by 2007**. This assurance resonated with securities analysts.

For example, on December 8, 2004, Prudential analyst Constance Moneaty ("Moneaty")

maintained a favorable rating on Avon despite poor U.S. performance. Moneaty stated, as

reported on Market Watch on December 9, 2004:

> Developing market growth continues to be the main reason we like this stock. …
> We like the prospect of an incremental $1 billion in sales from China, Russia and
> Turkey by the end of 2007.

151.    In a December 27, 2004 Newsweek, article Jung reiterated the dramatically

revised forecast key "revenue" in China would nearly triple to $600 million by 2007.

152.    On January 2, 2005, an article in The Houston Chronicle highlighted the market's recognition of Avon's dependence on China, given declining and faltering U.S. performance:

> **Jung needs China because** she can no longer count on the United States, still Avon's largest single market with 33 percent of the company's sales, to boost profit. U.S. sales fell 1 percent in the third quarter, and on Dec. 8 the company forecast they would decline 5 percent in the fourth quarter and fall further in 2005. That news sent the stock down 3.9 percent in one day.

> The U.S. is clearly one of their more difficult markets, and it'll continue to be challenging,' says Steve Paspal, a money manager at Sovereign Asset Management in Berwyn, Pa., a unit of John Hancock Funds. 'They have to continue to lean on international growth.'

**February 1, 2005 Avon Discloses Results for Fourth
Quarter and Year Ended December 31, 2004**

153.    On February 1, 2005, Avon issued a press release and held a conference with analysts to report on 2004 fourth quarter and year-end results and forecast 2005 performance. Avon reported its 2004 results and forecasted for 2005 "another year of steady growth" based on "ongoing strength in international operations." (Emphasis added.) For 2005, Avon forecasted "another stand-out year" derived from international markets including China and Latin America, with Latin America projected to grow at 10% and Asia revenue to grow by "low-teens."

154.    In the February 1, 2005 conference call, Jung increased the 2005 China sales projection to **$300 million**, or 33.33% growth over 2004 China sales of $225 million, and reiterated that Avon was well positioned for direct sales:

> China's full-year 2004 sales increased to nearly 225 million and its operating margin improved 300 basis points. Our proposition and opportunity in China continue to be extremely compelling. **Irrespective of the timing of the opening of direct selling, we expect our 2005 growth in that market to be in line with that of 2004, which would put China's revenue well over $300 million this year.**
>
> \*    \*    \*
>
> As you know, the industry is still awaiting the final government's regulations for the resumption of direct selling. When issued, we believe that this new framework will benefit both the Chinese consumer and the direct selling industry.

Very importantly, as I know, we've talked about before; **we feel that Avon is very well positioned with our current business model. We believe that our 6,000 beauty boutiques will continue to be a powerful competitive advantage.** (Emphasis added.)

155.    The statements in the preceding two paragraphs were misleading because storeowners, in fact, opposed rather than provided, a "competitive advantage" for direct sales and the 33.33% growth in 2005 and the $300 million sales projection omitted any disclosure or quantification for the effect of storeowner opposition to direct sales.

156.    In the February 1, 2005 conference call, Avon also stressed solid growth in Latin America in 2004 and in 2005, except for a short term negative first quarter for Mexico:

For full year 2004, Latin America's Beauty sales increased 16% on a dollar basis, outpacing overall sales in the region by 3 points. ... For the year, the region remained Avon's most profitable, with an operating margin of nearly 25%.

In 2005, we expect the Latin American region to post revenue growth in the range of 10%, and operating profit growth in the mid-teens. For the first quarter, we expect revenues to increase in the mid-to-high single digits with operating profit growth ahead of revenue. **The timing of the Easter holiday, which has a significant negative quarterly impact in Mexico, due to the length of holiday closings is influencing the first quarter's growth rate, and we expect this region to resume double-digit growth in the second quarter.** (Emphasis added.)

157.    The statements in the preceding paragraph were materially misleading because the poor performance was due additionally, in material part, to the adverse effects of forced delivery of unordered product.

158.    The touting of Avon's international markets was "bought" into by a number of analysts. On February 1, 2005, Morgan Stanley rated Avon "Overweight," stating better earnings quality derived from the "strong momentum already in place in . . . China . . ." Prudential also rated Avon an "Overweight," stating that "[China] growth continues to be robust." Citigroup upgraded Avon to "Hold 2," and Fulcrum Global Partners "Fulcrum")

upgraded Avon to a "Buy" based on the February 1, 2005 disclosures, particularly regarding international growth.

**February 1, 2005 Material Positive Stock Price Reaction to Avon Disclosures**

159.    Avon's stock price rose from $42.22 per share at the close of January 31, 2005 to $43.64 per share at the close of February 1, 2005. On February 2, 2005, Sturdivant & Co. rated Avon an "Outperform," "expecting strength in international markets to offset softness in the U.S.," and Fulcrum also revised its estimate and rated Avon a "Buy." Avon common stock price increased yet further to $44.51 per share on February 2, 2005.

160.    At a February 25, 2005 Consumer Analyst Group Conference in New York, Avon again touted its international performance and future prospects, particularly focusing on China and reaffirming sales of $600 million by the end of 2007:

> Just a few comments on a few specific markets. But as you know, China, which **delivered about $0.25 billion last year, we believe will be a $600 million market by the end of '07**, with a local currency growth rate of about 40 percent. And that's the growth rate we had in '04. That's the growth rate we project in '05, with or without the resumption of direct sales. ... **So, just that number alone, $600 million, is $200 million ahead of what we had said about a year ago. And again, we feel very bullish about China.** And I would say -- I contend that over the next decade this will be Avon's number one opportunity. (Emphasis added.)

161.    The statements in the preceding paragraph were materially misleading because Avon failed to disclose or quantify the adverse effects from storeowner opposition to direct sales.

162.    Defendant Jung also reaffirmed Mexico's strength even against heavy Wal-Mart competition:

> But I believe image investments that we're making in Mexico would be a good example, we've got the number one share there; we've got number one image in the market. That's an important thing to maintain. Because if you can only get Avon through direct sales in Mexico, no matter how many Wal-Marts come, as long as we're not selling Avon in Wal-Mart, the channel has to be strong, leadership is going to help bolster the earnings opportunity there. That's really

our competitive response, is to just continuing investing in the brand, which is already leadership and making sure that the direct-selling earnings opportunity is competitive.

163.    The statements were materially misleading because forced delivery of unordered product in Mexico had reduced in 2005 the CFT portion of sales versus the non-CFT sales, and thus increased Avon Mexico's exposure to unsuccessful competition with Wal-Mart for non-Beauty products.

**March 12, 2005 Avon Files 2004 Annual Report**

164.    On March 12, 2005 Avon filed its 2004 Annual Report with its Letter to Shareholder's signed by Jung and Kopf reiterating the same China theme:

> In 2004, strong sales from our three international regions of Europe, Latin America and Asia Pacific more than offset softness in the U.S. where challenges in the toy and gift categories negatively affected results.
>
> \*        \*        \*
>
> In Asia Pacific, China grew by 42% in local currencies – on top of 20% growth last year – and we anticipate that this growth will accelerate when the government allows the resumption of direct selling, as anticipated in 2005. (Emphasis added.)

165.    The statements in the preceding paragraph forecasting China sales growth were materially misleading because they failed to disclose or quantify material adverse effects from storeowner opposition to direct sales.

166.    The 2004 Annual Report emphasized sales growth in Latin America and Mexico, in particular, were driven by "active representatives," and discounted the decrease in Mexico's operating margin:

> Latin American's net sales grew 13% in 2004 with increases in nearly all markets in the region . . .
>
> \*        \*        \*
>
> In Mexico, net sales increased driven by growth in units and active Representatives, almost entirely offset by the negative impact of foreign exchange. Net sales benefited from new product launches and field sales incentive programs. (Emphasis added.)

50