167.    The statements in the preceding paragraph were materially misleading because Avon failed to disclose that the sales growth had been materially achieved in Mexico by forced delivery of unordered product, which undermined Avon Mexico's competitive position with Wal-Mart.

168.    The 2004 Annual Report also represented to investors that Avon was a "responsible corporate citizen" and a "force for good" as follows:

> As a responsible corporate citizen, we are a force for good, committed to helping women in their professional and personal lives, and, in the words of our founder, "to contributing to the well being of society and the environment in which it functions."

169.    In explaining Avon's accounting practices, the 2004 Annual Report stated that the Sales Reps' failure to pay on their accounts adversely impacts profits through charges to bad debt expense and assets through higher allowance for doubtful accounts. The 2004 balance sheet reflected an unbalanced increase in the allowance for doubtful accounts relative to the accounts receivable balance. Specifically, the allowance for doubtful accounts increased by 24.5% over the prior year (from $81.1 million in 2003 to $101 million in 2004) even though the account receivable balance only increased by 8.2% (from $553.2 million in 2003 to $599.1 million in 2004). This material increase was attributable, in material part, to Sales Reps failing to pay for purchases, as described above. The further adverse effects of forced delivery practices were disclosed in the 2004 Annual Report, including that the declines in U.S. operating margins were attributable, in part, to higher bad debt expense.

**April 8, 2005 Avon Receives Approval to Begin Direct Sales**

170.    On April 8, 2005, in a corporate press release from Beijing, China, Avon announced that the Chinese government "has officially approved Avon Products (China) Co. Ltd.

51

to be the first company to test direct selling in Beijing, Tianjin and Guangdong province in April."

171.    On April 9, 2005, as reported on Global News Wire, Jung reiterated the same unbridled optimism, including that China's sales grew 10 % last year and "we continue to see that same kind of growth this year."

## April 12, 2005 Avon Rejects Contention of Angry Guangdong Distributors

172.    On April 12, 2005, it was reported on Global News Wire, that Avon China confronted "blocks from its distributors in Guangzhou, which is one of the three regions that the company will test direct selling in China."

> As one of the world's largest beauty product direct sellers, Avon cheers for getting the license, however, distributors for Avon's exclusive stores in Guangzhou were angry. They asked the company to give explanation and insisted to return products because they believe the direct selling will jump over distributors while salespersons will access to products directly.

Avon China responded "that the direct selling will not damage the interests of distributors. The exclusive stores are the base of Avon's business in China and the direct selling model will not replace it."

173.    The statements in the preceding paragraph were materially misleading because Avon simply dismissed without discussion of the significance of the "distributor" opposition and because there was no disclosure of the April Protest at Avon headquarters which reflected storeowners' deep opposition to direct sales.

## May 2, 2005 Avon Announces Results for First Quarter Ended March 31, 2005

174.    On May 2, 2005, Avon issued a press release and held a conference call reporting its first quarter 2005 results. Avon announced revenue growth derived from international markets and continued decreases in U.S. performance. Avon reported that the Asia-Pacific

region posted first-quarter revenue and operating profit growth of 10% and 20%, respectively, over the prior year.

175.    In the conference call, Avon noted that the direct sale test gave Avon a "first mover advantage" making it even more "optimistic":

> As I'm sure you've read, the Chinese government in April, officially named Avon the first company to be allowed to test direct selling in China so we're very, very excited about this. The test is getting under way right now. It allows us to create a prototype for a single level direct selling model in Beijing, Tianjin and in two cities in the Guangdong province. This is a very excited development, as I said. A positive indication most of all of the trust and responsibility accorded to us by the Chinese government. **We also believe that the test gives us a first mover advantage at whatever time the final regulations are issued.**  (Emphasis added.)

176.    The statements in the preceding paragraph were materially misleading because what "first mover advantage" existed was materially undermined by undisclosed storeowner opposition to direct sales.

177.    Moreover, in the conference call, Jung was asked about "managing" the introduction of direct selling to storeowners who must now compete with the burden of store overhead. Jung's response was unequivocally positive, assuring "extensive communication" that Avon will "support" the stores:

> BILL SCHMITZ: One last one going back to China, are you modeling any **cannibalization as you experiment with the direct selling model versus what I will call franchisees, the boutique owners?** How do you manage that relationship when you introduce an entirely different kind of way of selling, where these people, obviously already have a ton of skin in the game, have already made the capital investment in their business.
>
> ANDREA JUNG: Let me just kind of give an overview here. We are obviously extremely excited about the selection being the first company, but let me just remind everybody, this is very small test. So just let's start with that. It is not going to have any immediate business impact in 2005. You probably read or heard that again it is limited to a couple of cities and it's limited in the number of people we can actually recruit. So this is more in my mind for really establishing a partnership with the Chinese government, to really model out a single level model, that understands the requirements of the forthcoming regs.

53

So the number one, two, and three commitment in 2005 is the continued commitment to our 6,000-plus beauty boutique owners and 1700 beauty counter businesses. I mean you saw the revenues which had nothing to do with the direct-selling tests in the first quarter, of 2005, continue to be very strong. And again, nearly 40% so this is the base of our business and will continue to be the base of our business, it has grown, compounded 32% since 2000, and this retail wholesale model which as I think I've spoken to you about, I think the beauty of the China strategy is that there is a hybrid of both, so I mean strategically de facto because of the governments ban on direct selling in 1998 <u>we have an unusual hybrid</u> model opportunity with an infrastructure of counters and beauty boutiques that have had a terrific retail business and presence in that market.

So while we're conducting this test, we are going to continue to support ever more so the infrastructure in China with heavy investments in advertising and product innovation this year as well as investments in manufacturing, and I.T. **The major thing here is the communication with our beauty boutique owners. As you can imagine since the last couple of weeks and the announcement there has been an extensive communication process by the sales team across the country with all beauty boutiques owners so that they understand our commitment to their success, but most importantly, understanding the earnings opportunities for them, in a hybrid mode, down the road in the future. So we -- again, we've baked all this in** and you heard we are not coming off our long-term target for this market of 600 million by '07 with upside opportunity depending on where the final regs really do come out.  (Emphasis added.)

178.    The statements in the preceding paragraph were materially misleading because they failed to disclose storeowner opposition despite its purported "extensive communication process" with storeowner opposition, including the April protest and Open Letter and the adverse financial effects of that opposition.

179.    In the conference call, Avon also specifically noted 10% growth in sales in Latin America in all markets except Mexico, but attributed the revenue decline in Mexico to the short term issue of the "timing of holy week," and projected "healthy growth"  for the remainder of the year.

180.    The statements in the preceding paragraph were materially misleading because any decline in revenue attributable to "holy week" was materially compounded by adverse

effects of the forced delivery of unordered product.

181.   At the Goldman Sachs Consumer Product Symposium on May 11, 2005, Jung

was asked directly about seeing declining growth in Mexico:

> [Analyst]: ... I'm trying to understand Mexico, which I know you've been there for
> a long time, but it's also, I would assume, its per cap spend is still - emerging
> markets are significantly below the U.S. So, why are we seeing low single digit
> growth in that market and what does that teach us about the long-term - when
> we'll see more maturation in your currently rapidly growing emerging markets?
>
> ANDREA JUNG: Yes, I think that Mexico is somewhere in between. I don't
> think - it's not China and Russia or even Brazil. I don't think anybody is
> projecting it to be. But I think it's a faster growth market, certainly, than your
> traditional development markets which, I would say, would be U.S., UK, et cetera.
> But I think, in Mexico, I think we see a healthy year. In Mexico, I don't see a -
> any concern, if you would, that the develop market fuel is going to have a
> significant step change negative impact. I think it is a more competitive market
> today . . .
>
> Certainly, in large cities, one of the things that we believe can continue to offset
> this is Mexico launching leadership in this next '06, '07 period, which in fact,
> again there's the proliferation of Wal-Mart, et cetera, of Mexico City. But once
> you start going outside, the continued Avon philosophy and strategy is that the
> footprint game is where we win little villages, little towns, 5,000 people. You
> can't find a store there. There's no established retail fronts, even in a country like
> Mexico. No matter what Mexico City looks like, it's going to be different out
> there and that's where Avon can win.

182.   The statements in the preceding paragraph were materially misleading because the

sales decline in 2005 had been caused, in material part, by the adverse effects of undisclosed

forced delivery of unordered product.

183.   In June 2005, Avon conspicuously did not – as it had in prior years – give

guidance regarding the June 30, 2005 financial results.

184.   On June 13, 2005, it was reported in Newsday that defendant Kropf reiterated that

direct sales would lead to increased China revenue:

Just recently, Avon received approval to begin direct selling in specific regions of China. That, said Kropf, will allow the company to do a better job in increasing its sales there.

185.   The statements in the preceding paragraph were materially misleading failing to

disclose storeowner opposition to direct sales, including the April and May Protests and the

Open Letter, the May and June 2005 reduced China orders and the adverse financial effect of

that storeowner opposition

186.   On June 17, 2005, as reported in <u>Business Wire</u>, Fitch affirmed the "A+" rating

on Avon's $1.1 billion unsecured debt and $600 million bank credit facility.  Fitch attached this

highest rating noting in particular anticipated growth in "international markets" including "China

and "strong positions in Latin America including Mexico."  Fitch also stated:

> Avon expects to be a $10 billion revenue company by 2007, much of which will
> be fueled by growth in a number of international markets such as China, Turkey,
> and Eastern Europe (leading position in Russia).  Increased emerging market
> penetration has offset slower growth to some developed market such as the U.S.,
> U.K., and Japan.  The company also has strong positions in Brazil and Mexico.

**July 19, 2005 Avon Discloses Results for Second Quarter Ended June 30, 2005,**
**Including Disclosure of "Clearly Unexpected" 19% Decline in China Revenue**

187.   On July 19, 2005, Avon issued a press release reporting results for its second

quarter-ended June 30, 2005.  Avon disclosed that 2005 revenue in the second quarter only grew

by 6% (instead of projected double digit growth) to $2 billion and that **instead of 30% growth**

in China sales, China sales <u>**declined by 19%**</u>:

> In Asia Pacific, revenue was flat (down 2% in local currency) and units declined
> 7% as the region's performance was impacted by a 19% decline in China's
> revenue due to the direct-selling transition issues. … <u>Operating profit declined
> 23%,</u> versus the year-ago quarter primarily <u>as a result of the China revenue
> decline.</u>

> In commenting on the company's second-quarter results, Andrea Jung, Avon's
> chairman and chief executive officer, said, "While the U.S. and Latin America
> performed in line with our expectations, the situation in China was clearly

unexpected. <u>We are moving rapidly to assure our Beauty Boutique owners that
they will have an opportunity to earn as much or more with Avon in our future
model, and believe this will be a transitional issue</u>. (Emphasis added.)

188.    In the conference call, that same day, Jung reiterated the same disappointment in

China sales:

> However, a number of different factors converged to pressure our topline results
> in the quarter, with the lion's share of the impact coming from two key issues, the
> first being China, which you read about this morning. <u>But we entered the quarter
> with the expectation that revenues in China would increase at least 30%</u>, our run
> rate over a number of years. <u>Instead, they declined 19%</u>, close to $30 million
> lower that our expectations, and by any measure, this was truly an extraordinary
> occurrence. (Emphasis added.)

189.    Jung claimed the underlying cause was the inability to communicate how store

owners could continue to profit:

> <u>At this point in time, I think we have a very clear understanding of the issue.</u>
> We're moving rapidly to address it through short-term tactical initiatives,
> including performance-based incentives, new policies specifically designed to
> address Beauty Boutique concerns during this period of transition. <u>We've also
> stepped up our communications to make it very clear to our Beauty Boutique
> owners that their earnings will be the same or even greater when the new
> regulations are finalized, including new opportunities to expand their current
> retail business with salon services, supported by a healthy increase in brand
> advertising as we've been doing all year and plan to do for the balance of this year,
> supplemented also by the incremental opportunity to run their own direct selling
> business.</u>
>
> We believe we're dealing with <b>a near-term transition issue</b> that will right itself
> over the next several months.
>
> We anticipate that <u>we will see positive revenue growth</u> in China as we move
> <b>through the year</b>.
> Until the regs go national, <u>our ability to actually communicate exactly what a
> Beauty Boutique dealer can have, what her opportunity is to transition to direct
> sales</u>, if she doesn't want to carry the fixed asset cost, or the other opportunities
> which I talked about today, to have some salon services, as well as the fact that
> we're beefing up our advertising to draw and make sure maintain the consumer
> throughput. <b>That's really the strategic message <u>we are heavily communicating
> -- hyper-communicating would be an understatement -- as we speak.</u></b>
> (Emphasis added.)

190.    Under questioning, the specific nature of the "hyper communication" emerged that "strong stores" would be able to weather direct the conversion to "services" (e.g., facials, etc.) while small stores would "transition to direct selling":

> .... **It's just the ability to communicate. I mean, they've always -- we've been working for, you know, a year, even prior to getting the test, on the transition plan, obviously. We are unique. We believe that it's advantageous to have a hybrid model** and to have a situation where we have built a very successful quarter of $1 billion business in a franchise that's predominantly franchised and retail model. **But, in that thought, we have always built in the fact that Beauty Boutique owners can have an opportunity to convert to direct sales if they don't want to carry, if you would, the fixed cost of the fixed asset.**
>
> \*       \*       \*
>
> ..... **If you've been to some of our boutiques, you'll see that some of them actually have rooms in the back where they are offering facials and service. This is a distinct proposition that will not be available to direct sellers who are going around in the countryside, so this concept, particularly in some of our more successful Beauty Boutiques, of being able to offer service we think is a great distinctive positioning -- products to do facials, as well as the services itself and the training for that.** (Emphasis added.)

191.    The statements in the preceding four paragraphs were misleading because Avon claimed it had already been intensively "communicating" with storeowners, storeowner opposition was not merely a "communication problem" but a fundamental economic problem and the "solution" of the stores converting to service providers was a <u>non-solution</u> since much more capital and expertise were needed for such a conversion, which the typical storeowners did not have and the other option to direct selling was essentially telling the storeowner to shut down.

192.    The July 19, 2005 press release also discussed growth in Latin America, particularly noting that weakness in Mexico was limited to only "non core categories":

> In Latin America, broad-based strength across most of the region contributed to second-quarter revenue growth of 17% (10% in local currencies) with strong results in Brazil and Venezuela, in particular, and a solid increase in Mexico's Beauty sales offsetting softness in several non-core categories in that market. Active Representatives and units in the region both grew 9%. Operating profit increased by 13%, and operating margin was 25.0%.

193.    In the July 19, 2005 press release, Avon announced that it was reducing its earnings outlook for fiscal year 2005 to $2.03-$2.08 per share, down from prior expectation of $2.12-$2.17 per share.

**July 19, 2005 Adverse Material Stock Price Reaction to Disclosures**

194.    Avon's common stock price collapsed from $36.60 per share at the close of July 18, 2005 to $31.30 per share at the close of July 19, 2005 – in excess of 14.48% – with volume of 34.29 million shares, resulting in a market loss of $181.7 million.

**July 19, 2005 Analyst Reaction to Disclosures**

195.    Analyst response was also deceivingly negative.  Standard & Poor's downgraded Avon stock from "Buy" to "Hold"; Prudential downgraded it from "Overweight" to "Underweight"; Fulcrum downgraded to "Neutral," citing "weak management control over change particularly in China"; and Deutsche Bank reiterated a "Hold."

196.    On July 19, 2005, Citigroup challenged the veracity of Avon's prior claims of 20% same store growth in China:

> Instead we believe that the robust rates of growth that AVP has realized over the last several years (a CAGR of 35% since 2000) in China have largely been given by new store openings and channel fill rather than real same store sales growth. Indeed, we do believe that with fewer new doors opening (in fact some doors perhaps closing), Avon's core same-store-sales growth has most likely slowed dramatically (again, while Avon management estimated that their same-store-sales growth in China remained in the 20% range, *we just can't get comfortable that this was in fact the actual result,* as its discrepancy to the 19% reported sales decline for the region is so big).   (Emphasis added.)

197.    On July 20, 2005, a Bear Stearns analyst directly attacked management's credibility.  First, the analyst explained that the earnings results for the second quarter were much worse once the one time gains were removed.  Moreover, he rejected Avon's claim that the poor results were caused by an unexpected "perfect storm" but, instead, believed that they were

due to an erosion in all <u>markets reflecting a overall decreased representative growth</u>:

> However, much has changed for Avon, and we think the controversy remains an overhang on AVP shares. We think investor perception of Avon as a growth company must be called into question after several quarters of less-than-stellar growth, especially with key growth markets are showing huge drop-offs. **And in our opinion, Avon has not come clean on its issues. Looking forward, we see many reasons to question whether this quarter's poor results were just a "perfect storm" of issues. In particular, we believe there are major issues at Avon that could set up for further earnings disappointments.** (Emphasis added.)

**Analysts Found Avon's July 19, 2005 Disclosures Reflect Fundamental
Conflict Exits Between Direct Sales and Store Owners**

    198.    The Bear Stearns analyst also <u>disbelieved that management's statements</u> that the

poor performance in China was an "extraordinary occurrence" -- disbelieving a kiosk owner

would ever not be threatened by direct sellers in his territory:

> •    <u>We are not believers that China's 19% sales decline in the quarter is an</u>
> <u>"extraordinary occurrence."</u> ...
> We think Avon's China retailer model will remain under pressure. **This past
> quarter, Avon claimed that kiosk owners sold less because they think that the
> return of direct selling to China will hurt their business. We think this is a
> well-founded claim: We do not know of anywhere in the world that a hybrid
> direct selling/retail model has worked.** At the very least, **we expect several
> quarters of growing pains from this changeover.** If kiosk owners were reacting
> negatively this quarter, when Avon was only running a pilot program in a few
> markets, we could imagine that the reaction will be much worse when the
> company starts to recruit thousands of reps all over the country. **We just do not
> see how kiosk owners, many of whom paid good money for their businesses,
> are going to react positively to commissioned reps coming into their territory,
> with no fixed costs except for products and (potentially) a signup fee.** Nor do
> we think these kiosk owners will be happy that they can become reps themselves.
> How many kiosk owners would want to lose the exclusivity of their kiosk in order
> to become reps? (Emphasis added.)

**After July 19, 2005 Disclosures Analyst Claims Material Non-Disclosures
and Sudden Absence of Guidance Was No "Coincidence"**

    199.    The Bear Sterns analyst also suggested management knew of the collapse of

China revenue in June 2005 when it discontinued its usual earnings guidance and suggested the

latter was a "material event" that should have been disclosed:

> <u>Regaining Credibility with Investors May be Difficult</u>
>
>         *     *     *
>
> We respectfully submit that such a large miss occurring in the same quarter that Avon stopped giving mid-quarter guidance will hinder AVP's multiple. **It is now more difficult to argue that the decision to change guidance policy during such a troubling quarter was merely a coincidence. In addition, we wonder if a double- digit decline in China was known before the guidance change was announced in early June, and whether it should have been previously disclosed as a "material event."** (Emphasis added.)

200.    On August 11, 2005, it was reported in <u>AFX International Focus</u> and the <u>National Business Daily</u> that China's state council had approved a draft law governing direct sales to be put into effect next month as follows:

> According to the law, maximum commissions for individuals engaged in direct selling will be 30 pct, up from a 25 pct level that had been set in a previous version. The threshold for licensing approval for direct sales has also been lowered under the legislation. A company engaged in direct sales must set up 10 stores in five such stores plus 10 membership stores in any one province before being cleared to conduct direct sales.

201.    On September 2, 2005, it was reported in <u>APX International Focus</u> and <u>Information Time</u> that China's state council had approved a new direct selling law to become effective December 1, 2005. The law required direct sellers to pay a minimum of 20 million Yuan (US$2.97 million) deposit and have a registered capital of at least 80 million Yuan (US$9.86 million). Also, maximum commissions for individuals engaged in direct sales will be 30 % – up from the 25 percent allowed before the 1998 ban.

202.    On September 6, 2005, Bear Stearns issued a report reflecting its own interviews with 54 of the largest Avon storeowners and which confirmed overwhelming opposition to direct sales and continued order cutbacks.

203.    Avon's response to these long-awaited regulations, including at a Prudential Back to School Conference on September 7, 2005, on these long awaited regulations was muted at best,

claiming the full laws had not been issued.

204.    Avon stated nothing substantive about China at the September 13, 2005

Oppenheimer & Co. analyst conference.

**September 20, 2005 Avon Announcement of Downward Forecast Due
to Continued Decline in China Sales and "Deceleration in Latin America"**

205.    On September 20, 2005, Avon issued a press release announcing that it was

lowering its full year 2005 earnings forecast, revenue and profit forecast as follows:

> Avon Products, Inc. (NYSE: AVP) announced today that it is revising its full-year
> 2005 earnings forecast downward from previous expectations of $2.03 to $2.08
> per share. .... Full-year revenues are expected to increase mid-single digits (up
> slightly in local currencies), and full-year operating profit is anticipated to be flat
> to down somewhat.
>
> Avon attributed the expected shortfall to general weakness across each of its four
> regions, with **continued sales shortfall in China**; slower than expected
> improvement in Central and Eastern Europe, including Russia; and **deceleration
> in Latin America.** (Emphasis added.)

206.    These disclosures reported indications that China was not a quick fix.

**September 20, 2005 Material Adverse Stock Price Reaction to Avon Disclosures**

207.    Avon's common stock price further collapsed significantly following the

September 20, 2005 disclosure from $30.60 per share at the close that day to $27.00 per share at

the close on September 21, 2005, with over 31.6 million shares trading that day.

208.    The response from analysts was equally as severe. On September 20, 2005, the

Bear Sterns analyst wrote "we think the latest shortfall will cause some of Avon's remaining

bullish investors to throw in the towel ...." Credit Suisse rated Avon "Underperform," citing "no

quick fixes ... revenue disappointments ... [in] nearly all of Avon's major markets" with the

"greatest surprise being decelerations in Latin America." Deutsche Bank wrote on September 21,

2005: "We believe Avon's long term structural issues accelerated to the present with no clean

end in sight." Also on September 21, 2005, Morgan Stanley downgraded Avon to "Equal-Weight-V" noting that the "slowdown [in U.S.] is expanding to new markets" (e.g., Latin America)." Further, on September 22, 2005, SG Cowen & Co. downgraded Avon to "Neutral," citing "further signs of weakening in critical territories (China, Latin America)."

**October 28, 2005 No Second Half Improvement**
**In China and Poor Performance in Mexico**

209.    On October 28, 2005, Avon issued a press release, held a conference call and filed its Form 10-Q, reporting results for its third quarter-ended September 30, 2005. Avon reported that revenue grew 4%, but was flat in local currencies; units were flat and operating profit declined 6%. Asia Pacific revenue decreased 3%, reflecting a 16% decline in China revenue due to continued reduction of orders by store owners.

210.    In the conference call, Avon conceded that the "second half" was not "playing out as expected as beauty boutique owners continue to reduce orders."

211.    When asked by an analyst "do you think we have hit bottom in China?", Andrea Jung reported "I think there is still some volatility" given that the regulations on direct selling would not be promulgated to December 1, 2005.

212.    Further, Avon reported that "deceleration" in Latin American was driven, in material part, by poor performance in Mexico. Earnings operating profit decreased 6% ($163.8 million versus $176.9 million in third quarter 2004), and operating margin declined (-13.1%), there was a "significant slowing" in revenue growth.

213.    In the October 28, 2005, analyst conference call, Jung explained that "competitive intensity" and "tactical and executional missteps" led to Mexico's performance:

> In Latin America, I know everybody has been concerned about his region since September, when we alerted you that performance would be below expectations, however, as you read this morning, this is a Mexico-specific issue. Third quarter

revenue in Latin America grew 14% in dollars, 4% in local currencies.  <u>A 4% sales decline in Mexico, or 9% in local currencies offset performances in Brazil and Venezuela with both – which both experienced strong double-digit local currency growth in the quarter.  Mexico has also been experiencing **an increase in competitive intensity,** which continues to pressure our price value equation in both beauty and nonbeauty categories, but our issues in this market accelerated in the second half to a number of **tactical and executional missteps.**  We've recently made a number of key management changes including at the general management level, to address these executional challenges.</u>  (Emphasis added.)

**October 30, 2005 Morgan Stanley Interviews Confirm**
**Avon China Boutique Owners Fear of Direct Sales**

214.    On October 30, 2005, Morgan Stanley issued a report about Avon which recognized that storeowner opposition to direct sales was not being  resolved by "communication":

> <u>China's decline in the mid-teens, **despite Avon's**</u> stepped-up advertising, spending and **communication efforts** with the boutiques, was well below management's original expectations of flat sales in the quarter.  **The new shortfall indicates that Avon is yet to persuade it franchisees that the new model carries benefits to them.**  The rollout of direct selling seems gradual, which will likely delay the cross point at which direct sales would have enough critical mass to offset issues with the boutiques.  (Emphasis added.)

215.    On November 13, 2005, Morgan Stanley issued another report which was based on a series in-depth interviews with manager level boutique owners in China from August through October 2005.  These interviews confirmed storeowners' fear and opposition to direct sales, including the specific fear that direct sellers would erode storeowners' profits by discounting, caused the sales cutbacks:

> •    **Boutiques' main worry is price degradation.**  For most boutique owners, competing with direct sellers means lower prices.  The fear that they will be undercut by reps, resulting in a reduction in their gross margins which currently average 35-40%.

> We found weak acceptance for Avon's new model among participating boutiques.

*      *      *

**Boutiques' response to impending direct selling**

1)    De-stocking and a focus on keeping minimum inventories

•    The sales shortfall continued in early 4Q throughout China: *all boutiques* have lowered inventories by scaling back the size of orders by approximately 10-20% and <u>no one expects to dial back purchase orders to pre-pilot levels until each of them sees how direct selling will affect his or her business directly</u>.

*          *          *

•    All halted expansion plans (the opening of new boutiques) and some franchisees guesstimate that <u>10% of boutiques have already closed by the end of the 3Q</u>.  (Emphasis added.)

216.    Morgan Stanley's interviews further found Avon's purported clarifying "communication" to storeowners that they could make money by offering services to storeowners by offering services was fundamentally flawed, leading storeowners to other products:

•    Upfront expenditures are the main barrier for the boutiques to expand into services faster.  They would need to add staff and pay higher rent (if a larger location is needed) and those costs become fixed.

•    Many don't appear to have the shopper base or management skills to generate a constant stream of services revenue to amortize these costs.

•    <u>With the increased emphasis on facials, some boutiques in Guangzhou have started using non-Avon products at clients' request</u>.  Note that Avon is headquarters there, <u>so this negative trend is progressing under Avon's watch</u> and evidences Avon's diminishing bargaining power vis-à-vis franchises.  (Emphasis added.)

217.    Finally, the Morgan Stanley research revealed that in storeowners' fears of price deflation were augmented by the availability of product on the internet and their concern that direct sales representatives would be able to undercut store owners:

•    Fears of price erosion have been heightened by excess inventory now being sold by 3rd party liquidators who consolidate inventory from closures in smaller cities and dump it in large beauty markets like Shanghai or auction it on taobao.com

- Pricing pressure would result from differences in mark-ups between boutique and direct sellers. <u>Currently Avon's most productive boutiques earn a 40% mark-up while direct selling reps can potentially undercut them, as they don't incur fixed costs such as rent.</u> (Emphasis added.)

218. On November 15, 2005, Avon announced that it would suspend all projections of positive revenue and profit growth in 2006 as a result of its implementation of a $300-$500 million restructuring of the Company.

**E.**   <u>**Statutory Safe Harbor**</u>

219. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false forward-looking statements pleaded in this Complaint to the extent that said forward-looking statements were not identified as a "forward-looking statement" when made or to the extent that meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements did not accompany those forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements because at the time each of those forward-looking statements was made, the speaker knew the forward-looking statement was false and the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

**F.**   <u>**Avon Violated Regulation S-K**</u>

220. Defendants also violated Item 303(a) of Regulation S-K, promulgated under both the Securities Act of 1933 and the Exchange Act, <u>see</u> 17 C.F.R. § 229.303(a), by failing to disclose in the Management's Discussion and Analysis sections of Avon's 2003 and 2004 Form 10-Ks and Form 10-Qs for the quarters ended March 31, 2004, June 30, 2004, September 30, 2004 and March 31, 2005, the adverse information regarding China, U.S. and Mexico operations

66

and conditions as alleged herein, including the deceptive recruitment practices in the U.S., the forced delivery of unordered product in the U.S. and Mexico, the material effects of those practices, storeowner opposition to direct sales in China and that opposition's material adverse impact on future China operations, sales and profits.

## COUNT I
### (Against All Defendants For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 of the Securities and Exchange Commission)

221.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

222.    This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. 78j(b), and Rule 10b-5 promulgated thereunder.

223.    During the Class Period, Defendants, singularly and in concert, directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce Plaintiff and the other members of the Class to purchase Avon common stock during the Class Period at artificially inflated prices.

224.    During the Class Period, Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, participated in the preparation and issuance of deceptive and materially false and misleading statements to the investing public as particularized above.

67

225.    Throughout the Class Period, Avon acted through the Individual Defendants, who was portrayed and represented to the financial press and public as its valid representative. The willfulness, motive, knowledge, and recklessness of the Individual Defendants are therefore imputed to Avon, which is primarily liable for the securities law violations of the Individual Defendants while acting in his or her official capacity as a Company representative, or, in the alternative, is liable for the acts of the Individual Defendants under the doctrine of respondent superior.

226.    As a result of the dissemination of the false and misleading statements set forth above, the market price of Avon common stock was artificially inflated during the Class Period. In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said Defendants, Plaintiff and the other members of the Class relied, to their detriment, on the integrity of the market price of the stock in purchasing Avon common stock. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said shares or purchased them at the inflated prices that were paid.

227.    Plaintiff and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by the Plaintiff and the Class as reflected and indicated by material increases (in Avon's stock price in reaction to materially false information (¶¶ 87, 91, 114, 159) and decreases in reaction to the disclosure of previously misrepresented or omitted facts (¶¶ 136, 145, 194, 207)).

228.    By reason of the foregoing, Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:  (a) employed devices,

schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state

material facts in order to make the statements made, in light of the circumstances under which

they were made, not misleading; or (c) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon Plaintiff and the other members of the Class in connection

with their purchases of Avon common stock during the Class Period.

**COUNT II**

**(Against the Individual Defendants For Violations
of Section 20(a) of the Exchange Act)**

229.    Plaintiff repeats and realleges each and every allegation contained in each of the

foregoing paragraphs as if set forth fully herein.

230.    The Individual Defendants, by virtue of their positions, stock ownership and/or

specific acts described above, were, at the time of the wrongs alleged herein, controlling persons

within the meaning of Section 20(a) of the 1934 Act.

231.    The Individual Defendants had the power and influence and exercised the same to

cause Avon to engage in the illegal conduct and practices complained of herein.

232.    By reason of the conduct alleged in Count I of the Complaint, the Individual

Defendants are liable for the aforesaid wrongful conduct, and are liable to Plaintiff and to the

other members of the Class for the substantial damages which they suffered in connection with

their purchases of Avon common stock during the Class Period.

**PRAYER FOR RELIEF AND JURY DEMAND**

WHEREFORE, Plaintiff, on its own behalf and on behalf of the Class, prays for

judgment as follows:

A.    Declaring this action to be a proper class action and certifying Plaintiff as a

class representative under Rule 23 of the Federal Rules of Civil Procedure;

69

B.    Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of defendants, together with interest thereon;

C.    Awarding Plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys and experts; and

D.    Granting such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated: New York, New York
      December 26, 2005

                           Respectfully submitted,

                           By: /s/ Joel P. Laitman
                           Samuel P. Sporn (SPS-4444)
                           Joel P. Laitman (JL-8177)
                           Christopher Lometti (CL-3775)
                           Ashley Kim (AK-0105)
                           Frank R. Schirripa (FS-1960)
                           **SCHOENGOLD SPORN LAITMAN & LOMETTI , P.C.**
                           19 Fulton Street, Suite 406
                           New York, New York 10038
                           Telephone: (212) 964-0046

                           *Lead Counsel for the Plaintiffs*

## CERTIFICATE OF SERVICE

I, FRANK R. SCHIRRIPA, one of the counsel for Lead Plaintiff Hotel Trades Council

and Hotel Association of New York City Pension Fund, hereby certify that on December 26,

2005, I emailed a copy of Lead Plaintiff's Securities Class Action Consolidated Amended

Complaint to Clerk of the Court and served a copy of said document by email on the following:

Peter C. Hein, Esq.
Kenneth K. Lee, Esq.
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019
Tel. (212) 403-1117

- and -

Melissa C. Rodriguez, Esq.
Morgan, Lewis & Bockius LLP
101 Park Avenue, 37th Floor
New York, New York 10178
Tel. (212) 309-6394

*Attorneys for Defendants Avon Products,*
*Inc., Andrea Jung, Susan J. Kropf., and*
*Robert J. Corti*

Stephen J. Fearon, Jr., Esq.
Squitieri & Fearon, LLP
32 East 57th Street
New York, New York 10022
Tel. (212) 421-6492

*Attorneys for ERISA Plaintiffs*

Jeffrey Fink, Esq.
Geoffrey H. Matranga, Esq.
Robbins Umeda & Fink, LLP
610 West Ash Street, Suite 1800
San Diego, CA 92101
Tel. (619) 525-3990

-   and –

Marvin Frank, Esq.
GregoryB. Linkh, Esq.
Murray, Frank & Sailer, LLP
275 Madison Avenue
New York, New York 10016
Tel: (212) 682-1818

*Attorneys for Derivative Plaintiffs*


/s/ Frank R. Schirripa
Frank R. Schirripa