UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------x
IN RE AVON PRODUCTS, INC.
SECURITIES LITIGATION,          :

----------------------------:     REPORT AND RECOMMENDATION
IN RE AVON PRODUCTS, INC.          05 Civ. 6803 (LAK) (MHD)
ERISA LITIGATION,               :

----------------------------:
This document relates to:
                                :
IN RE AVON PRODUCTS, INC.
SECURITIES LITIGATION           :
----------------------------x

TO THE HONORABLE LEWIS A. KAPLAN, U.S.D.J.:


    This lawsuit was filed on behalf of a class of purchasers of

common shares of Avon Products, Inc. ("Avon") who bought their

shares during the period from February 3, 2004 to September 20,

2005. Naming Avon and three of its senior officers as defendants,

plaintiffs assert that the defendants were responsible for

"materially false and misleading statements" during the pertinent

period concerning Avon's business operations in three geographic

markets -- China, the United States, and Mexico -- and that class

members were consequently injured in purchasing shares that had

been artificially inflated by those corporate statements. (Am.

Compl. ("AC") ¶¶ 1, 19, 223-24, 226-27).


    Defendants, who include Avon's Chairman and Chief Executive

Officer Andrea Jung, the company's former President and Chief

Operating Officer Susan J. Kropf, and the company's former Executive Vice President and Chief Financial Officer Robert J. Corti, have moved to dismiss the complaint as legally deficient in a number of respects under both Fed. R. Civ. 12(b)(6) and Rule 9(b). For the reasons that follow, we recommend that the motion be granted and the complaint dismissed with prejudice.

BACKGROUND

## I. Rule 12(b)(6) Criteria

We start by noting the standards that the movant must meet in order to obtain dismissal for failure to state a claim. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds, Davis v. Scherer, 468 U.S. 183 (1984); accord, e.g., Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007); Patane v. Clark, 508 F.2d 106, 111 (2d Cir. 2007).

In assessing such a motion, the court must assume the truth of the well-pled factual allegations of the complaint and must draw all reasonable inferences against the movant. See, e.g., Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir. 2006);

Still v. DeBuono, 101 F.3d 888, 891 (2d Cir. 1996). Unlike the traditional test on a Rule 12(b)(6) motion, which required that the complaint not be dismissed unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief", id. at 891 (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)), under Twombly a purported claim will not survive unless it is apparent from the face of the complaint that the claim is at least "plausible." Twombly, 550 U.S. at 559; see also Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007). Twombly does not impose "a universal standard of heightened fact pleading, but . . . instead requir[es] a flexible 'plausibility standard', which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." Iqbal, 490 F.3d at 157-58 (emphasis in original). In short, the pleading must "raise a right to relief above the speculative level." ATSI Commc'ns, Inc. v. Shaar Fund Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Twombly, 550 U.S. at 555).[1]

In addressing a Rule 12(b)(6) motion, the court may not consider evidence proffered by any party. Rather, it is limited to reviewing the four corners of the complaint, any documents attached

---

[1] Twombly was not decided until after the initial briefing of defendants' motion to dismiss.

to that pleading or incorporated in it by reference, any documents that are "integral" to the plaintiff's allegations even if not explicitly incorporated by reference, and facts of which the court may take judicial notice. See, e.g., Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S. Ct. 2499, 2509 (2007); ATSI Commc'ns, 493 F.3d at 98; Leonard F. v. Israel Disc. Bank of New York, 199 F.3d 99, 107 (2d Cir. 1999); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991). In the context of a securities-fraud claim, the court may look to the full text of statements alleged in the complaint as well as to public filings of the defendants. See Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000); Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991).

## II. The Plaintiffs' Allegations
   (A Very Long Story)

With these standards in mind, we summarize the allegations that are targeted by defendants' motion. In substance, plaintiffs allege that Avon engaged in three sets of business practices, the nature and adverse impact of which the defendants did not disclose during the class period and the revelation of which caused significant drops in the company's share price. Plaintiffs further allege that some of the defendants' public statements during the pertinent period affirmatively misrepresented the material facts by

4

touting the company's future prospects in terms that either stated or implied facts that defendants knew to be untrue. Based on these allegations, they assert claims under section 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 of the Securities Exchange Commission, as well as claims under section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), based on the notion that defendants perpetrated a fraud on the market.

A. The Challenged Business Practices

The targeted business practices are to some degree unique to each of the geographic markets cited by plaintiffs. We summarize plaintiffs' allegations as to each in turn.

1. China

The traditional world-wide business model for Avon involves the use of individual sales representatives, who undertake door-to-door retail sales efforts. (AC ¶¶ 3, 44). In China, however, such a marketing approach was prohibited by law since 1998, and accordingly Avon relied instead on a network of approximately 6,000 Chinese-owned retail stores, approximately 1,600 Avon-owned and controlled counters in other Chinese-owned stores, and internet sales. (Id. ¶¶ 44-45). Plaintiffs also allege that there were some

5

black market sales of Avon goods, but does not suggest that the company bore any responsibility for that phenomenon. (<u>Id.</u> ¶ 49). The Chinese stores paid in advance for Avon products at 32 to 40% below retail, a margin that included expenses as well as profits. (<u>Id.</u>).

Plaintiffs assert that in 2003 and 2004 these store owners encountered a significant amount of competition from Avon's own stores underpricing the same products, as well as from internet and black market sales. (<u>Id.</u> ¶¶ 49-50). This competition undercut the Chinese stores' prices and profit margins. (<u>Id.</u>).

In 2004 it was reported in the press and repeated by Avon that the Chinese government was considering repealing the ban on door-to-door marketing by sales agents. (<u>Id.</u> ¶¶ 8, 50). In mentioning this potential development, Avon represented that it viewed this development as highly positive for its business prospects in China. (<u>Id.</u> ¶ 8). Ultimately, the Chinese government designated a period for undertaking this form of selling on an experimental basis, and named Avon as the first company that would be authorized to make this effort, which began on April 8, 2005. (<u>Id.</u> ¶ 170).

Plaintiffs allege that in the 2004 and 2005 run-up to the use of such itinerant sales representatives by Avon, many of the

Chinese store owners who had been selling Avon products in their stores communicated their unhappiness about this prospect to Avon by conducting public protests and writing an "open letter" to Avon about their dissatisfaction. (Id. ¶¶ 10, 50-52). The alleged reason for this opposition was the fear of these store owners that the sales representatives would compete with their own sales and thereby either force them to lower prices, thus diluting their profits, or cause reductions in their sales, or both. (Id. ¶¶ 9, 50). According to plaintiffs, in 2004 and 2005 defendants made false or misleading statements about Avon's prospects in China because they (a) did not disclose the Chinese store owners' unhappiness with, and their protests against, the proposed use by Avon of sales representatives, (b) made optimistic statements about the impact of the prospective new sales arrangement on the company's sales, and (c) appeared to imply in some of their statements that the new sales force would not have a negative effect on the current selling base of Chinese retailers. (Id. ¶¶ 8-10, 50-53, 89-90, 92-93, 96-97, 108).

Plaintiffs note that during the second and third quarters of 2005, Avon sales in China declined, in terms of both volume and revenue. (Id. ¶¶ 11-12). They further state that the announcements by Avon of that downturn led to a notable decrease in the share price of Avon stock. (Id.).

7

2. <u>The United States</u>

Plaintiffs allege that in the United States Avon has divided the country, for sales purposes, into geographic regions, divisions, and districts, each with its own corporate hierarchy, and has set closely-monitored performance goals for sales of product, orders of product, and recruitment of new sales representatives. (<u>Id.</u> ¶¶ 54-55). The complaint states that the targets were set on a quarterly and annual basis and that the company also imposed quotas for each of the 26 sales campaigns it conducted each year. (<u>Id.</u> ¶¶ 55, 58). Plaintiffs further assert that the Avon managers were paid a significant part of their compensation through incentive monetary awards and other benefits. (<u>Id.</u> ¶ 56).

Focusing on the use of sales representatives, plaintiffs allege that they were paid solely on a commission basis and were required to purchase the Avon products that they were selling. (<u>Id.</u> ¶ 57). Plaintiffs further state that by the end of 2003 the turnover of sales representatives in the United States was "at least 100%." (<u>Id.</u> ¶ 60). This rapid turnover, together with the company's increasing recruitment quotas, is said to have put great pressure on district and regional managers to find more and more willing sellers. (<u>Id.</u> ¶¶ 57, 60).

8

To obtain constant increases in the enrollment of sales representatives, Avon is said to have relied heavily on what was known as the "Personal Shopper" program, a set of practices in effect long before the class period. (Id. ¶ 61). Under this program, customers were encouraged to open a "Personal Shopper Account" to obtain substantial discounts on Avon products. (Id.). According to plaintiffs, customers were told that they did not have to purchase more products in the future if they did not wish to do so. (Id.). They were required, however, to sign "a standard Avon Sales Rep contract" and thus become an Avon sales representative, although plaintiffs allege that neither the "selling brochure" for the program nor the "Personal Shopper Card" sent to the enrollee mentioned this fact. (Id.). It appears that if the enrollee did not thereafter order any products for two consecutive selling campaigns, Avon dropped that person from the rolls of its sales representatives. (Id. ¶ 60).

Plaintiffs go on to allege that defendants engaged in certain practices that "both extended the 'life' of the Personal Shopper recruits and artificially boosted sales and unit orders at the end of 2003 and early 2004" (id. ¶ 62), although they also indicate that these practices were in force in earlier years. (Id. ¶ 63). They assert that these efforts included, under the title "Preferred Preview", shipments of unordered products sent by the company to

Avon sales representatives, with those shipments then booked as sales. (<u>Id.</u> ¶ 62). They allege that such products were also sent on a regular basis -- particularly after the 2003 holiday season -- to "Personal Shopper recruits", supposedly because by doing so the company could prolong the inclusion of those recruits on the Avon list of sales representatives. (<u>Id.</u> ¶¶ 61-63).

According to plaintiffs, the sales representatives were permitted to return unordered product and receive a credit. (<u>Id.</u> ¶ 64). They allege, however, that the representative would have to pay the shipping cost of the return and that if he or she returned more than 50% of any shipment, Avon would no longer give that representative instant credit, thus delaying the credit for subsequently returned items by weeks or months. (<u>Id.</u>).

Plaintiffs also mention a practice known as "Instant Delivery," under which Avon shipped unordered product to district managers. (<u>Id.</u> ¶ 65). The company would prohibit the managers from returning the product, and the managers in turn would be pressured to have their sales representatives buy the product for resale. (<u>Id.</u>). Plaintiffs further allege that the managers would use so-called "demo certificates" to purchase at least one item from the unordered shipment for each of their sales representatives (including representatives brought in through the Personal Shopper

10

program) who had not themselves bought any product for at least two sales campaigns. (Id.). The apparent reason for the manager to do this was that a sales representative who had not ordered any items through two such campaigns was normally dropped by Avon, but the manager could avoid that result by buying items for such sales representatives and thus keeping those representatives on his list. (Id.).

Plaintiffs assert also that the Avon managers would ship their sales representatives "assigned amounts of Instant Delivery products" and would bill them for those products. (Id. ¶ 66). The sales representative was permitted to return these products to Avon, but if the representative did so, he or she would have to pay for that delivery and would be denied instant credit in the future, thus delaying the credit received for subsequent product returns. (Id.).

The timing of the commencement of this Instant Delivery program is unclear from the complaint but plainly predated the class period. (Id. ¶ 67). Indeed, plaintiffs refer to a class-action lawsuit that a number of Avon sales representatives in California filed in 2003 alleging that this program involved "unfair and deceptive business practices." (Id.). As of the filing of the current action in 2006, that California lawsuit was still

pending. (Id.).

    As for the impact of these practices on Avon's financial performance, plaintiffs allege that refusals by sales representatives to pay for unordered product resulted in increased corporate bad-debt expense, which in turn adversely impacted Avon's profits and assets. (Id. ¶ 68). They go on to note that in Avon's third quarter 2004 Form 10-Q, the company reported that United States operating profits had declined as a result of "higher bad debt expense", and that in its 2004 Annual Report it announced that it had increased its allowance for "doubtful accounts, which included refusals of Sales Reps to make payments on orders, by 24% even though accounts receivable had increased by only 7%." (Id.).

    Plaintiffs allege that defendants failed to disclose these practices in public statements made throughout the class period, even though the cited practices would likely result at some point in a downturn in profits. (See, e.g., id. ¶¶ 110, 128). They further allege that defendants falsely represented that the company engaged in only ethical practices in accordance with publicly stated Avon policy, and that these unannounced practices violated that corporate norm. (Id. ¶¶ 102-03).

3. <u>Mexico</u>

Plaintiffs' allegations concerning Avon's business practices in Mexico resemble their allegations concerning the United States market. They allege that Avon used a similar set of quotas for sales and for recruitment of sales representatives for regions and divisions. (<u>Id.</u> ¶ 73). To maximize sales, starting prior to 2003 Avon Mexico used so-called sales aids known as "Automatic Demo" and "Instant Delivery", principally for beauty products. (<u>Id.</u>). Although originally used only once a quarter, the company eventually used them more frequently to meet quotas. (<u>Id.</u>).

As described, the company sent Automatic Demo products -- apparently new products -- to sales representatives at a discounted price even though the representatives had not ordered them. (<u>Id.</u> ¶ 74). The products were sent well in advance of the intended campaign launch for which they were to be used. (<u>Id.</u>). In sending these unordered products, the company originally made no provision for the sales representatives to return them to the company, although plaintiffs note that this policy was changed in 2005, after the filing of the California lawsuit. (<u>Id.</u>).

The company also used the Instant Delivery program, previously described in connection with plaintiffs' allegations about the

13

United States market. These products were also sent unordered to the sales representatives, but the representatives could return them and could postpone payment for them for one campaign. (Id.). Nonetheless, the representative had to pay the cost of mailing returned items. (Id.).

As recounted by plaintiffs, both of these programs were originally designed to test-market new products, but in late 2003 Avon Mexico began to use them to attempt to meet sales targets. (Id. ¶ 75). Citing several examples, plaintiffs allege that the use of these programs in several campaigns in late 2003 led to reduced sales of several products -- such as a fragrance known as Tresselle -- because sales representatives resented the forced early sales to them and left the Avon workforce or because the emphasis on the new products interfered with the sale of other Avon products, since the sales representatives focused first on selling the items that had been sent to them unordered. (Id.).

Despite the asserted negative impact of these two programs, plaintiffs themselves assert that they increased sales in Mexico in the fourth quarter of 2003 by $22 million. (Id. ¶ 76). The complaint alleges that the forced delivery programs were used in 2004 to increase otherwise lagging sales and that in fact they increased sales by $63.8 million that year. (Id. ¶ 78).

14

Plaintiffs further allege that although the forced deliveries led to the departure of numbers of sales representatives, in early 2004 Avon replaced those representatives with new personnel "unfamiliar with the forced delivery practices." (Id. ¶ 77). According to plaintiffs, these hirings and the continued use of the two programs "covered up the fundamental problem which [Avon's] forced delivery practices caused -- namely, undermining sales and the effectiveness of the campaigns, and creating Sales Rep dissatisfaction." (Id.).

B. The Alleged Misrepresentations and Omissions

Plaintiffs cite a very lengthy series of public statements by defendants, mainly made through press releases, conference calls, and public filings, that plaintiffs contend were misleading to the investment community, principally by omitting reference to the business practices that plaintiffs cite in the complaint. Spanning more than twenty pages of text, plaintiffs' allegations recite numerous statements by the company reporting data on prior performance, offering predictions on future performance, and commenting in general terms on the likelihood that future developments in the respective markets would be helpful to the company's financial performance. In substance, plaintiffs contend that even if the positive performance figures mentioned publicly by

15

defendants (notably, sales, profits, and sales-representative hiring) were correct, the company was obliged to also state that the practices at issue were partially or wholly responsible for the touted corporate achievements. They further contend that predictions or general statements about the future should also have been hedged with cautions based on what plaintiffs claim were poor or unethical decisions by management in designing Avon's marketing practices. Plaintiffs do not, however, allege that Avon improperly stated the performance numbers or engaged in improper accounting of sales, profits, and sales-representative recruitment.

We quote some examples:

1. <u>Announcements of Past Performance and Future Predictions</u>

-- Plaintiffs cite a February 3, 2004 "corporate press release" announcing "'[r]ecord earnings and sales growth'" for the last quarter of 2003, including a 17% increase in sales and operating profit "with China, in part, 'driving the gain.'" (<u>Id.</u> ¶¶ 81-82) (quoting press release). During the accompanying conference call, plaintiffs say, Avon mentioned sales in China of nearly $160 million, "and anticipated dollar sales growth in the mid- to high-teens going forward into 2004." (<u>Id.</u>). In the next paragraph plaintiffs cite the same press release and conference call,

16

observing that "Avon reported U.S. sales in the fourth quarter of 2003 only increased by 2% and that operating profit declined by 4%. However, Avon emphasized the 3% growth in the number of active sales representatives." (Id. ¶ 82). Plaintiffs then state that "Jung also forecasted U.S. growth in 2004 stating '<u>Full year U.S.</u> <u>sales are expected to return to a mid-single-digit growth rate</u>, with operating profit forecast to be up to 8-10%.'" (Id.) (emphasis in complaint).

Plaintiffs then allege that "the statements in the two preceding paragraphs were materially misleading." (Id. ¶ 83). In explanation of that assertion, they state that the representations were "misleading because (a) the Sales Rep growth was achieved, in material part, by use of Personal Shopper accounts, and District Managers automatically sustained Sales Reps by purchasing product for them; and (b) sales growth was achieved by forced delivery of unordered product, including use of Preferred Preview and Instant Delivery." (Id.).[2]

In the same vein, plaintiffs cite the same press release and

---

[2] Plaintiffs do not even attempt to explain why the statements cited in paragraph 81 which referred to Asia generally and to China specifically, were implicated by Personal Shopper Accounts (alleged to have been used in the United States) or by forced deliveries (alleged to have been used in the United States and Mexico).

conference call for references to Latin America and Mexico. Thus they say that in the release "Avon also touted that sales and operating profit and units increased 16% and 21% and 4%, respectively, in Latin America, mainly due to further improvement in both Mexico and Brazil." (Id. ¶ 84). They then note that at the conference call "Avon stated that Mexico had a 'very solid quarter with local currency sales increasing 10 percent on flat dollar sales; and that beauty sales were up 16 percent in local currency. Mexico's operating profit increased 10 percent and operating margin improved 270 basis points to 30 percent." (Id. ¶ 85). They then go on to assert that all of these statements "were materially misleading because the sales and operation profit growth in Mexico were due to forced delivery practices." (Id. ¶ 86).

-- Plaintiffs also invoke references in the 2003 Annual Report pertaining to both the United States and Mexico. Thus, they quote and emphasize a statement by Avon regarding sales representative recruitment in the United States:

> **Because of Sales Leadership, the U.S. over the past three years has added a record number of new Representatives to its sales force following a decade of flat-to-low growth.**
>          \*       \*       \*
> **Sales Leadership continued to fuel U.S. recruiting, as the number of active Representatives grew to nearly 480,000. In addition, the number of Leadership "upline" Representatives advanced 55% to 39,000, indicating the importance of Sales Leadership in the continuing transformation of U.S. direct selling.**

(Id. ¶ 98) (emphasis in complaint). Plaintiffs then allege that these statements were "materially misleading since the growth achieved was the material result of deceptive transient 'Personal Shopper' recruitment (including recruitment done as part of Sales Leadership)." (Id. ¶ 99).

Plaintiffs also target a statement in the same annual report regarding sales growth in Latin America, alleging that:

> The 2003 Annual Report was also unequivocal in touting the performance of Avon Latin America, which reflected 6% sales growth to $1.747 billion and 12% operating profit growth to $408.3 million, "double digit" sales growth in Mexico from "healthy increases in the number of active sales representatives" and "strategies for building the Avon brand, boosting market penetration.

(Id. ¶ 100). According to plaintiffs, these statements were "materially misleading because the sales growth was achieved, in material part, from undisclosed forced delivery of unordered product." (Id. ¶ 101).

Plaintiffs add that the same Annual Report was "materially misleading" because it stated that "'Avon is committed to ethical business behavior. **Our Code of Conduct and Ethics ensures that all Avon associates act according to the highest standards of integrity and corporate responsibility.**'" (Id. ¶¶ 102-03) (bold in complaint). The misleading aspect of this statement, according to

19

plaintiffs, resided in the alleged fact that "Avon engaged in deceptive and unethical recruitment practices and forced delivery of unordered product in the U.S. and Mexico." (Id. ¶ 103).


2. Comments About Business Future in China


    -- Plaintiffs invoke a February 20, 2004 statement by defendant Corti about the prospects in China if and when the Chinese government authorized direct selling. The statement begins by noting that Avon's worldwide approach involves direct selling, which China prohibited in 1998. The portion of the statement that is highlighted by plaintiffs says, referring to the alternative model of selling through Chinese retail outlets:


> It grows between 25 and 30 percent . . . But the key to the growth there has been the 6,000 independently owned beauty boutiques . . . . [A]nd just last week [the Chinese Government] came out with an announcement that by the end of this year regulations will be promulgated that will allow direct selling to resume. And we are ready and we believe it will be a wonderful complement to an already successful business. And we're prepared, as I said, and ready to go with that as the regulations come out.


(Id. ¶ 92) (emphasis in complaint). Plaintiffs then go on to assert that the statements that they quote were "materially misleading because direct sales would compete with, and would not be 'a wonderful complement' to, the stores. Moreover, Avon failed to disclose storeowner opposition to direct sales and the adverse

financial effects of that opposition." (Id. ¶ 93).

        -- Plaintiffs also cite Avon's 2003 annual report, which is said to have described its China business as having "beauty counters and 5,500 stores [as] the 'hubs' of direct selling once it was re-allowed by the Chinese government." (Id. ¶ 96). Purportedly this statement -- although the only quote from the Report was the word "hubs" -- was "misleading because Avon failed to disclose that direct sales representatives would also be competitors with storeowners, and storeowners thus opposed direct sales and would not function as a supportive 'hub'". (Id. ¶ 97).

        -- In similar fashion, plaintiffs refer to Avon's announcements on April 29 and 30, 2004 -- in a press release and in its Form 10-Q -- of results for the first quarter of 2004. They refer to the figures showing sales growth in China and the statement that Avon had "targeted" China "as one of [its] top growth prospects" and characterized that market as "the largest contributor to the region's growth." (Id. ¶ 106). They then cite a statement from a conference call by defendant Kropf concerning the prospect of direct selling in China. In pertinent part they emphasize her saying:

        I think what [direct selling in China] would do, it would expand the kind of the reach, if you would, of our direct sales force. As you know, we now operate with a concept

called the store representative, who is able to service
customers, but she is operating within a limited -- limited
geographic stand from the individual beauty boutique with
which she is affiliated. <u>And this would allow us to really
expand the reach of these representatives beyond the
limitations that currently exist.</u>

(<u>Id.</u> ¶ 107) (emphasis in complaint). The passage continues with
Kropf saying that the use of direct selling representatives would
also "inject some more kind of traditional direct selling,
motivation, goal setting, etcetera, directly with these
representatives" and that this would be "a bit of a different
model" from the current posture, which was "running through the
beauty boutique owners." (<u>Id.</u>).

Again plaintiffs characterize these statements as "materially
misleading." (<u>Id.</u> ¶ 108). The basis for that contention is, again,
that "they failed to disclose storeowner opposition to direct sales
and the adverse financial effects of that opposition", although
plaintiffs fail to specify how the cited opposition of some
unspecified number of storeowners in 2004 had "adverse financial
effects." (<u>Id.</u>).

3. <u>Other Allegations of Material Misstatements
   and Their Impact</u>

The complaint refers to, paraphrases or quotes from a
continuing series of statements by Avon personnel through October

22

2005 reporting quarterly and annual results and characterizing future business prospects in the Chinese, United States, and Mexican markets. We address each market separately, providing only an overview.

a. <u>China</u>

After a news report in April 2004 that the Chinese government would approve a limited use of direct selling for some period in the future, Avon issued its second quarter 2004 results in July 2004, showing an increase in sales in China that quarter of 60%. (<u>Id.</u> ¶ 122). At the time Avon touted its future growth prospects there, while noting that it was in a "study state mode", apparently referring to the contemplated modification of its sales model to accommodate direct selling while still relying on its then current base of boutiques. (<u>Id.</u> ¶ 123). At the time it also made optimistic predictions of increased sales for 2007-08, a period three to four years distant. (<u>Id.</u> ¶ 125).

In its October 2004 report of third-quarter performance, Avon again alluded to the prospect of direct selling in China, a strategy not yet approved for immediate implementation. (<u>Id.</u> ¶ 137). In an accompanying conference call Ms. Jung expressed optimism that "the [direct sale] regs really favor Avon's model."

(Id. ¶ 139). She also referred to a meeting with 2,000 of the Chinese boutique owners and said that those who had attended the meeting were "hyped and ready to go." (Id. ¶ 141).

In November 2004 Ms. Jung again addressed the potential for direct selling. In her quoted remarks she seemed to allude to the possibility of a selling overlap between the stores and direct sellers, stating that "we believe [the independent sales representatives] can live in harmony in hybrid mode with the already very healthy wholesale or franchise model, if you would, that we've established." (Id. ¶ 148). This was followed the next month by another optimistic forecast for total China sales in 2007. (Id. ¶¶ 150-51).

The plaintiffs' allegations regarding the announcement of fourth-quarter and 2004 year-end results are quite similar. Avon had not yet been approved for direct selling but reported that China sales had grown by more than 40% in local currencies that year, and the company's representatives expressed continued optimism that direct selling would improve Avon's performance in China. (Id. ¶¶ 153-54, 164, 171).

On April 8, 2005 the Chinese government approved of Avon engaging in direct selling on a limited basis in three locations --

Beijing, Tianjin and Guangdong. (Id. ¶ 170). In the wake of that announcement, Ms. Jung was quoted as predicting a ten-percent growth spurt in 2005. (Id. ¶ 171).

Within a few days, on April 12, 2005, a report appeared on the Global News Wire that Avon distributors in the City of Guangzhou "were angry" and had asked Avon "to give [an] explanation and insisted to return products because they believe the direct selling will jump over distributors while salespersons will [have] access to products directly" from Avon. (Id. ¶ 172). Avon China was quoted in the same article as saying in response that direct selling would not damage the interests of "the exclusive stores." (Id.).

This question of the impact of direct selling on the pre-existing stores soon became a topic of inquiry by the press. Thus when Avon reported its first-quarter 2005 results on May 2, 2005, which showed continued gains in East Asia (the complaint does not specify the China results), a reporter asked Ms. Jung whether the company had modeled "any cannibalization as you experiment with the direct selling model versus what I will call franchisees, the boutique owners." (Id. ¶ 177). He went on to ask: "How do you manage that relationship when you introduce an entirely different way of selling, where these people, obviously already have a ton of skin in the game, have already made the capital investment in their

businesses." (Id.). In response Ms. Jung emphasized that although Avon was the first company that was to be allowed to engage in direct selling, "this is [a] very small test." She noted it was limited to three cities with a cap on the number of direct sellers who could be used and that it was in the nature of an experiment intended to establish a better working relationship with the Chinese government. (Id.) She went on to stress that the company was committed for the following year to supporting its boutique and counter business, including through heavy investment in advertising, product innovation, manufacturing, and information technology. (Id.). She then added, in a passage emphasized by plaintiffs: "As you can imagine since the last couple of weeks and the announcement there has been an extensive communication process by the sales team across the country with all beauty boutique owners so that they understand our commitment to their success, but most importantly, understanding the earnings opportunities for them, in the hybrid mode, down the road in the future." (Id.). She then reiterated optimism about Avon's "long-term target" of total sales in 2007, although she noted that the outcome depended on the timing of final Chinese regulations on direct selling. (Id.).

Avon reported its second-quarter results very early, on July 19, 2005. These were particularly disappointing with regard to China, where sales declined by 19%. (Id. ¶ 187). The company

attributed that decline, which it characterized as "unexpected", to "direct selling transition issues." (Id.). In an explanatory statement defendant Jung "claimed the underlying cause was the inability to communicate how store owners could continue to profit." (Id. ¶ 189). She reported that the company was working to improve communications and also to address the problem "through short term tactical initiatives, including performance-based incentives, new policies specifically designed to address Beauty Boutique concerns during this period of transition" and additional advertising by Avon. (Id.). She also went into detail about the possible conversion of some boutique owners to direct selling and the advantages to some of the boutiques in being able -- unlike direct sales representatives -- to offer services (for example, facials) as well as products. (Id.). She also defended the hybrid model as the best for the company in the long run and noted that the Chinese government had not yet issued final regulations on direct selling, which would provide a better basis for long-term decision-making on the precise form of Avon's selling operations. (Id.). Finally, she expressed optimism that the financial picture would gradually improve later in the year. (Id. ¶¶ 189-90).

China reportedly adopted direct-selling regulations in the later summer of 2005, which were to be effective December 1, 2005. (Id. ¶ 201). Plaintiffs mention, cryptically, that Avon responded

27

to these new regulations in September 2005 in a "muted" fashion, saying that final regulations had not been issued. (<u>Id.</u> ¶ 203). Later that month Avon noted a "continued sales shortfall in China" (<u>Id.</u> ¶ 205), and on October 28, 2005 it reported third-quarter results, with a 16% reduction in China attributable to decreased orders from Chinese store owners. (<u>Id.</u> ¶ 209).

Plaintiffs go on to quote several Morgan Stanley reports, from October 30 and November 15, 2005, about the China situation. The reports noted that "despite Avon's stepped-up advertising, spending and communications efforts with the boutiques", sales were "well below management's original expectations of flat sales in the quarter." (<u>Id.</u> ¶ 214). They reported that boutique owners were worried about future "price degradation" resulting from being undercut by sales representatives, thus cutting into their then-current 35 to 40% gross margins and that they were therefore cutting back on inventory. (<u>Id.</u> ¶ 215). The second report said that the store owners were not planning to increase their orders to their old level "until each of them sees how direct selling will affect his or her business directly." (<u>Id.</u>). The reports also indicated that Avon's suggestion to the store owners to offer services as well as products was not realistic because some stores did not have the space or personnel or lacked managerial expertise for this expansion, and that some who had begun offering facials,

as Avon suggested, started using non-Avon products at the request of customers. (Id. ¶ 216).

Plaintiffs' allegations about defendants' representations concerning the China market end at this point.

b. United States

With regard to the United States market, the complaint catalogues a continuing series of references to performance that it characterizes as materially misleading because they did not mention the use of the Direct Shopper program and other cited practices, which plaintiffs themselves allege contributed to the growth of sales and the increase of sales representatives. (See, e.g., id. ¶ 109) (noting 2% increase in sales reps for first quarter 2004 and expected continued growth of 3 to 4%). When Avon reported the 2004 second-quarter performance, plaintiffs allege, Ms. Jung and Ms. Kropf "highly hyped U.S. performance . . . and anticipated performance in the third quarter." (Id. ¶ 127) (emphasis in complaint). Plaintiffs do not allege that the predictions of third-quarter growth of 4% were anything other than predictions, and criticize them only for the omission of references to the criticized recruitment and sales practices. (Id. ¶¶ 127-28).

In September 2004, before the close of the third quarter, Avon offered a reduced sales forecast for the United States. Thus it predicted "flattish sales and sales rep recruitment of only 1-2%." (Id. ¶ 133). It then announced third quarter results on October 29, 2004, reporting United States sales and operating profit down 1% and 3%, respectively. (Id. ¶ 137). Its Form 10-Q referred to "bad debt expenses" as negatively affecting the profit margins. (Id. ¶ 138).

Plaintiffs allege that the market recognized the weakness in Avon's position in the United States in late 2004 or early 2005. (Id. ¶¶ 145, 152). They also note that analysts had observed that this domestic weakness meant that the company's prospects in overseas markets were therefore more significant. (Id. ¶ 152).

Plaintiffs' only other allegations concerning corporate references to the United States market note the quarterly announcements of performance and comments on them, all of which simply observe that the United States sector was lagging, as already recognized. (Id. ¶¶ 174, 186). They do not allege that any of these announcements or comments were misleading.

c. <u>Mexico</u>

Plaintiffs cite a series of statements about Mexico from spring 2004 until late 2005, all of which involve either reports of past performance or predictions of future performance. As to most of these plaintiffs allege that, insofar as they do not mention the use of sales-representative recruitment techniques deemed unsavory by plaintiffs or the use of so-called forced delivery of unordered product, the statements were materially misleading. (<u>See</u>, <u>e.g.</u>, <u>id.</u> ¶¶ 111-13, 134-35, 143-44, 156-57). Plaintiffs also mention a comment by defendant Jung in February 2005 to the effect that Avon was in a good competitive position in Mexico vis-a-vis Wal-Mart by virtue of its direct selling model. (<u>Id.</u> ¶ 162). As to this remark, plaintiffs allege cryptically that it was misleading "because forced delivery of unordered product in Mexico had reduced in 2005 the CFT portion of sales versus the non-CFT sales, and thus increased Avon Mexico's exposure to unsuccessful competition with Wal-Mart for non-Beauty products." (<u>Id.</u> ¶ 163).

The plaintiffs next cite Avon's annual report for 2004, released in early 2005. It mentioned increased sales in Mexico and a decreased profit margin, which it seemed to attribute, at least in part, to currency exchange fluctuations. (<u>Id.</u> ¶ 166). Again, plaintiffs assert that Avon should have disclosed that increased

sales resulted from forced delivery and that this somehow "undermined Avon Mexico's competitive position with Wal-Mart." (<u>Id.</u> ¶ 167). Oddly, though, plaintiffs do cite a statement in the annual report that the failure of sales representatives to pay on their accounts -- arguably a product of the forced-delivery system -- had adversely affected profits and assets through charges to bad debt expenses and allowances for doubtful accounts on the balance sheet. (<u>Id.</u> ¶ 169).

Avon announced second-quarter results on May 2, 2005, and these showed a decline in revenue in Mexico. (<u>Id.</u> ¶ 179). Plaintiffs allege that the company ascribed these results to the effect of the "timing of holy week" and predicted "healthy growth" for the rest of the year, representations that plaintiffs say were materially misleading because they did not take into account that the losses were "materially compounded by adverse effects of the forced delivery of unordered product." (<u>Id.</u> ¶¶ 180).

Plaintiffs also cite comments by defendant Jung at a symposium on May 11, 2005 when asked why growth in Mexico was only in the single digits, in contrast to projections for the so-called emerging markets. (<u>Id.</u> ¶ 181). She responded in substance that Avon faced significant competition in Mexico City and other urban centers but that she was optimistic about long-term prospects

because Avon intended to expand into smaller towns and villages, where there was little or no competition. (Id.). Again plaintiffs allege that these statements were materially misleading in not mentioning "the adverse effects of undisclosed forced delivery of unordered product." (Id. ¶ 182).

The company's July 11, 2005 press release referred to Mexico, noting "a solid increase in Mexico's Beauty sales, [which] offset[] softness in several categories in that market." (Id. ¶ 192). This reference came in the context of noting substantial revenue and profit growth overall in Latin America by 17% and 13% respectively, together with a 9% increase in sales representatives. (Id.).

The last two cited representations by defendants concerning Mexico came on September 20 and October 28, 2005. In September Avon issued a press release revising downward its 2005 estimate of world-wide earnings. In doing so it referred to "deceleration in Latin America." (Id. ¶ 205). In October Avon reported that third-quarter revenues worldwide grew by 4% and operating profit decreased 6%. (Id. ¶¶ 209, 212). In Ms. Jung's statement, she noted that performance in Latin America was hampered principally by difficulties in Mexico, reflected in a 4% sales decline, which she ascribed to "an increase in competitive intensity, which continues to pressure our price value equation in both beauty and nonbeauty

categories", but she also emphasized that "our issues in this market accelerated in the second half [due] to a number of tactical and executional missteps" which had resulted in "a number of [recent] key management changes including at the general management level, to address these executional challenges." (Id. ¶ 213). Plaintiffs do not allege that these statements were misleading.

## C. Share Price Fluctuations

Plaintiffs contend that the defendants' various alleged omissions and misstatements, starting in February 2004 and extending to late 2005, artificially raised the share price of Avon common stock. They further assert that the individual defendants engaged in false statements for this precise purpose, to enable them to maximize their profits when selling off large portions of their holdings in Avon stock. (Id. ¶ 20). They further allege that when the truth emerged, share prices tumbled precipitously. (Id. ¶ 19).

Thus, on February 3, 2004, the day after announcement of fourth-quarter 2003 performance, the share price increased from $29.99 to $31.00. (Id. ¶¶ 81, 87). When word was received that the Chinese government was contemplating allowing some direct selling, the price increased from $33.81 on February 13, 2004 to $34.92 on

February 17, 2004. (<u>Id.</u> ¶¶ 88, 91).

After Avon's announcement on April 29, 2004 of its first-quarter 2004 performance and optimism about the rest of the year, the share price went up from $39.09 on April 28 to $42.00 on April 30, 2004. (<u>Id.</u> ¶¶ 106, 114). Prices went down, however, on September 8, 2004, from $45.66 to $42.86, following a report by the company that it anticipated "flattish" sales in the United States and a very small increase in American sales representatives. (<u>Id.</u> ¶¶ 133, 136). When Avon's third-quarter report on October 29, 2004 confirmed a small decline in United States sales, despite optimism and a positive performance elsewhere (including China), the share price decreased from $43.21 on October 28 to $39.55 on October 29, 2004. (<u>Id.</u> ¶¶ 137, 145).

Avon announced fourth-quarter 2004 results on February 1, 2005, expressing some optimism about China and elsewhere overseas, although discussing a weak performance in Mexico. (<u>Id.</u> ¶¶ 153-57). The share price then went from $42.22 on January 31 to $43.64 the next day. (<u>Id.</u> ¶ 159).

The complaint next alludes to a price change following Avon's July 19, 2005 announcement of its second-quarter 2005 performance, which included a significant decrease in sales in China, gains in

35

Latin America (17% revenue growth) albeit with weakness in non-core business in Mexico, as well as an announced reduction in predicted earnings for 2005 (from $2.12-2.17 per share down to $2.03-2.08). (Id. ¶¶ 187, 192-93). In the wake of that report, shares dropped from $36.30 on July 18 to $31.30 on July 19, 2005. (Id. ¶¶ 193-94).

On September 20, 2005 the share price again went down, in the wake of a new Avon announcement lowering its earnings forecasts. (Id. ¶¶ 205-07). The price went from $30.60 on September 28 to $27.00 on September 19, 2005. (Id. ¶ 207). This price drop is the last price fluctuation specified in the complaint.

D. Scienter Allegations

Plaintiffs seek to explain the purported cover-up by Avon senior personnel of the alleged negative information about corporate policies by asserting that the individual defendants sought artificially to inflate the share price at certain times in order to permit them to offload large quantities of their own Avon stock. Specifically, they allege that defendant Jung sold 60,000 shares of Avon stock on February 5, 2004, after the positive report of February 3, 2004, and that she exercised stock options and sold 410,000 shares of Avon stock on August 6, 9 and 10, 2004. (Id. ¶¶ 27, 124). As for defendant Kropf, they assert that she exercised

stock options to sell 220,000 shares on February 9, 2005. (Id. ¶ 28). Finally they allege that defendant Corti sold over 204,000 shares on February 3, 2005. (Id. ¶ 29).

III. Defendants' Motion to Dismiss

Defendants have moved to dismiss the complaint in its entirety as failing to state a claim and as failing to satisfy the pleading requirements of Rule 9(b). We briefly summarize the grounds that they assert.

Defendants first argue that all or virtually all of the allegedly misleading representations regarding China are forward-looking statements that come within one or the other of the "safe harbor" provisions of the Private Securities Litigation Reform Act ("PSLRA"): either the statements were accompanied by "meaningful cautionary statements" or the complaint does not plead that they were uttered with "actual knowledge" that they were false or misleading. (Defs.' Mem. 8-13; Defs.' Reply Mem. 2-5). They next argue that the China-related statements were expressions of opinion or optimism protected by the "bespeaks caution" principle. (Defs.' Mem. 14-15; Defs.' Reply Mem. 5-6). They further assert that the complaint does not allege with the particularity required by the PSLRA or by Rule 9(b) the utterance of materially false statements

because plaintiffs fail to articulate facts that, if true, would establish that the statements were materially false or misleading. (Defs.' Mem. 15-17; Defs.' Reply Mem. 6-9). Finally, they urge that the pleadings concerning the China statements, even if credited, fail to demonstrate scienter. (Defs.' Mem. 17-22; Defs.' Reply Mem. 9-14).

As for the United States market, defendants first argue that the allegedly concealed facts had been public knowledge before the class period and well before the one named plaintiff had purchased his shares. (Defs.' Mem. 22-26; Defs.' Reply Mem. 9). They then reiterate the arguments pressed with regard to the China statements -- that the challenged representations are protected by the safe-harbor provisions of the PSLRA, that they are statements of corporate optimism and are protected by the "bespeaks caution" rule, that plaintiffs fail to plead materiality with the required detail, and that the complaint does not adequately plead scienter. (Defs.' Mem. 26-29). In addition, defendants argue that plaintiffs fail to plead loss causation. (Defs.' Mem. 29-31; Defs.' Reply Mem. 14-15).

With respect to the Mexico-related statements, defendants press similar arguments. They insist that the alleged misrepresentations are protected by the safe-harbor provisions of

the PSLRA, and that they are not actionable as expressions of corporate optimism, or are protected by the "bespeak caution" principle. (Defs.' Mem. 31). They further argue that the pleading does not allege the materiality of the statements (or omissions) with particularity, that the complaint is deficient in not identifying its sources with specificity, that the complaint does not plead scienter, and also that it fails to plead loss causation. (Defs.' Mem. 32-34; Defs.' Reply Mem. 14-15).

Finally, defendants contend that plaintiffs' control-person claims under section 20(a) of the 1934 Exchange Act should be dismissed for the reasons pertinent to the section 10(b) claims, as well as because plaintiffs fail to plead actual control by the individual defendants as well as their direct participation in the alleged wrongdoing. (Defs.' Mem. 34-35).

<u>ANALYSIS</u>

I. <u>The Section 10(b) Claims</u>

Plaintiffs seek recovery principally on the basis of an implied right of action under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5. When asserting such a claim regarding purchases and sales in public

securities markets, the plaintiff must plead and prove:

   (1) *a material misrepresentation (or omission)*, see *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-232 (1988);

   (2) *scienter, i.e.*, a wrongful state of mind, see *Ernst & Ernst* [*v. Hochfelder*, 425 U.S. 185,] 197, 199 [(1976)];

   (3) *a connection with the purchase or sale of a security*, see *Blue Chip Stamps* [v. *Manor Drug Stores*, 421 U.S. 723,] 730-31 [(1975)];

   (4) *reliance*, often referred to in cases involving public securities markets (fraud-on-the-market cases) as "transaction causation", see *Basic*, *supra*, at 248-249 (nonconclusively presuming that the price of a publicly traded share reflects a material misrepresentation and that plaintiffs have relied upon that misrepresentation as long as they would not have bought the share in its absence);

   (5) *economic loss*, 15 U.S.C. § 78u-4(b)(4); and

   (6) "*loss causation*", *i.e.*, a causal connection between the material misrepresentation and the loss, *ibid.*; cf. T. Hazen, Law of Securities Regulation, §§ 12.11[1], [3] (5th ed. 2002).


Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005); accord

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., __ U.S.

__, 128 S. Ct. 761, 768 (2008). Defendants contend that plaintiffs

fail to satisfy most of these requirements. We address these

arguments separately with respect to each of the geographic markets

in question.[3]

---

   [3] We do not discuss all aspects of defendants' arguments. We conclude that the matters that we address suffice to justify dismissal.

A. <u>China</u>

Plaintiffs' allegations target a lengthy series of statements in 2004 and the first half of 2005 by corporate personnel articulating optimism about the effect of a decision by the Chinese government, ultimately made provisionally in April 2005, to permit at least limited direct selling in China. The principal claim of the plaintiffs is that the failure to reference the unhappiness of some unspecified number of Chinese retailers about this prospect meant that the statements were materially misleading. In addition, plaintiffs appear to contend that a few Avon statements predicting that the use of direct selling would not injure the interests of the retailers was misleading by virtue of the same omission of a suggestion that at least some retailers were opposed.

We infer, although plaintiffs do not explicitly state, that widespread unhappiness by the approximately 6,000 retailers might presage a reduction in their purchases from Avon, with potential adverse financial consequences for the company. Nonetheless, we note at the outset that although plaintiffs refer to a protest and open letter as well as a demonstration at the Avon China headquarters in Guangdong in the spring of 2005, they do not indicate or even approximate the number of retailers who participated in any of these activities or allege any economic

consequences except for the period of two quarters in 2005. Depending on whether there was a groundswell of opposition, or merely a minor ripple, the fact of such unhappiness might well have been a circumstance of very minor consequence, and its non-disclosure would then be plainly not material. In any event, for purposes of most of our analysis we will bypass this omission by plaintiffs, and address the failings more central to the pleading.

### 1. Statutory Exemption for Forward-Looking Statements

_____The PSLRA defines a so-called "safe harbor" for forward-looking statements if and to the extent that

> (A) the forward-looking statement is . . .
>   (i) identified as a forward-looking statement, and is
>   accompanied by meaningful cautionary statements
>   identifying important factors that could cause actual
>   results to differ materially from those in the forward-
>   looking statement . . .
> or
> (B) the plaintiff fails to prove that the forward-looking
> statement–
>     (i) if made by a natural person was made with actual
>     knowledge by that person that the statement was false
>     or misleading; or
>     (ii) if made by a business entity, was --
>         (I) made by or with the approval of an executive
>         officer of that entity; and
>         (II) made or approved by such officer with actual
>         knowledge by that officer that the statement was
>         false or misleading.

15 U.S.C. § 78u-5(c)(1).

Most, if not all, of the statements on which plaintiffs focus are forward-looking since they concern, in whole or in part, the expected future performance of Avon. 15 U.S.C. § 78u-5(i)(1); see, e.g., In re NTL, Inc. Sec. Litig., 347 F. Supp. 2d 15, 35 (S.D.N.Y. 2004); see generally In re Aegon N.V. Sec. Litig., 2004 WL 1415973, at *11-12 (S.D.N.Y. June 23, 2004). Moreover, the omission of an historical fact -- as plaintiffs here allege -- does not alter the characterization of the challenged statement. "[W]hen the factors underlying a projection or economic forecast include both assumptions and statements of known fact, and a plaintiff alleges that a material fact is missing, the entire list of factors is treated as a forward-looking statement." Ehlert v. Singer, 245 F.3d 1313, 1318 (11th Cir. 2001) (observing that a statement "must . . . be either forward-looking or not forward-looking in its entirety"); see also 15 U.S.C. § 78u-5(i)(1)(D).

In this case, most if not all of the allegedly misleading statements concerning China were accompanied by "meaningful cautionary statements" that identified "important factors that could cause actual results to differ materially", 15 U.S.C. § 78u-5(c)(1), thus justifying dismissal.[4] For those statements cited

---

[4] The "safe harbor" provisions of the PSLRA permit dismissal, in appropriate circumstances, based on the face of the complaint. See, e.g., In re Sierra Wireless, Inc. Sec. Litig., 482 F. Supp. 2d 365, 367 (S.D.N.Y. 2007).

from Avon's SEC filings or press releases, the documents in question contained warnings as to the uncertainty of predicting future financial performance and mentioned a variety of factors that could change results from those anticipated in the predictions. (See, e.g., Decl. of Kenneth K. Lee ("Lee Decl.") Ex. 11 at 1, Ex. 26 (Ex. 99.1 at 7); Defs.' Mem. App. B). Moreover, although the warnings do not specifically reference the possibility that retailers in China might reduce purchases, such specificity is not required. The warning need only cite "important factors", Ehlert, 245 F.3d at 1319-20, and need not mention "the particular factor that ultimately causes the forward-looking statement not to come true . . . ." H.R. Rep. 104-369, at 44 (1995) (Conf. Rep.), as reprinted in 1995 U.S.C.C.A.N. 730, 743.

As for Avon's cited oral statements, they will come within the safe harbor provision if cautionary language is found in a "readily available written document." 15 U.S.C. § 78u-5(c)(2). Such readily available documents include "SEC filed documents, annual reports and other widely disseminated materials, such as press releases." H.R. Rep. 104-369, at 45 (1995) (Conf. Rep.), as reprinted in 1995 U.S.C.C.A.N. 730, 744.

In this case Avon's Form 8-Ks, press releases and conference calls throughout the relevant period specified the uncertainty of

future predictions and either mentioned or referred to texts that listed a variety of factors that could lead to less favorable future results. (<u>See</u>, <u>e.g.</u>, Lee Decl. Ex. 38 at 3). These include, <u>inter</u> <u>alia</u>, "general economic and business conditions in [Avon's] markets", "[Avon's] ability to implement its business strategies", "[Avon's] ability to achieve anticipated cost savings and its profitability and growth targets", and "[Avon's] ability to successfully identify new business opportunities." (<u>See</u>, <u>e.g.</u>, Lee Decl. Ex. 8 (Ex. 99.2 at 5-6)). That should suffice to immunize most, if not all, of the statements cited by plaintiffs as materially misleading.[5]

Plaintiffs' allegations also fail to satisfy the alternative safe-harbor test. In reaching this conclusion, we note that the statute refers to proof of actual knowledge of falsity rather than pleading of it, but that provision has been interpreted as imposing a pleading, as well as a proof, burden on the plaintiff, an interpretation that accords with the general purpose of the PSLRA to discourage strike suits and other meritless litigation. <u>See</u> <u>Fellman v. Electro Optical Sys. Corp.</u>, 2000 WL 489713, at *4-6 (S.D.N.Y. Apr. 25, 2000). More precisely, plaintiffs must allege

---

[5] These include statements stating that direct selling will be a "wonderful complement" to and add to the growth of Avon's Chinese operations, representing China as one of Avon's top growth prospects, and projecting growth in its Chinese markets. (<u>See</u>, <u>e.g.</u>, AC ¶¶ 92, 106, 122-23, 150).

"specific facts" from which actual knowledge of falsity may be inferred. Id.

We may infer that the three individual defendants and any other responsible corporate officials who made the cited statements were aware that some Chinese retailers had protested or criticized the prospect of direct sales by Avon both before and after the Chinese government had approved such a marketing technique, and that those retailers had expressed some unhappiness about competition from other stores in which Avon sold product through Avon counters or even about competition from internet selling. The statutory question posed by plaintiffs' allegations, however, is whether the people who made and authorized the targeted corporate statements had "actual knowledge" at the time that the statements -- by virtue of their omission of any mention of the alleged unhappiness of those retailers -- were false or materially misleading. The complaint fails to make these requisite allegations.

Plaintiffs repeatedly assert that the absence of a reference to retailer unhappiness made the statements materially misleading, but they do not cite facts that would permit the inference that the Avon representatives making or authorizing the statements knew that to be the case, that is, that they knew that retailer unhappiness

of some unstated degree was likely to adversely affect corporate performance. The specific facts alleged suggest, if anything, the opposite.

First, although plaintiffs allege that expressions of unhappiness were made by some unstated number of retailers in both 2003 and 2004, Avon's sales in the Chinese market expanded substantially and steadily in both 2003 and 2004, by 20% and 42% respectively, and continued to expand even in the first quarter of 2005, by 42%. (AC ¶ 164; Lee Decl. Ex. 32). Thus, Avon officials had no obvious reason to believe that storeowner opposition, of whatever magnitude, was materially adverse to the company's future prospects, and plaintiffs invoke no other facts that would have clearly demonstrated otherwise.

Second, on its face the possibility of geographically expanding the scope of Avon's selling efforts, which is what direct selling potentially permitted, was the evident point of welcoming future Chinese government approval of the new selling model. That would presumably enure ultimately to the long-term benefit of Avon even if it created some overlap, and hence competition, with the independent and pre-existing retail network represented by the 6,000 Chinese-owned stores selling Avon products. Thus, while storeowners may have feared competition that implicated their sales

volume and profits, this potential competition did not necessarily adversely implicate the total sales volume and profits of Avon itself, at least in the long run.

Third, depending on the geographic dispersal of the independent sales representatives, the actual implementation of direct selling might have little or no impact on the performance of the retailers already in place. Obviously, the scope and nature of the direct-sales project would depend on decisions by the Chinese government, and plaintiffs do not suggest that those details were known to Avon at any point before April 2005, when the government announced an experimental program limited to three narrow geographic locations and limited in terms of the number of sales representatives permitted to operate in those areas.

Fourth, the cited statements by Avon representatives about prospects in China emphasized that the company was looking at the long-term benefit of the proposed new system, and refrained from promising that it would be profitable in the short term. Indeed, a number of the cited statements referred to prospects three or more years down the road, in 2007 and later.

Given all of these unknowns, as well as the absence of specifics in the complaint regarding the scope of retailer

"unhappiness" with the prospect of direct selling or other competition, the complaint cannot be said to plead facts that, if credited, demonstrate that corporate officials actually knew that the statements made on behalf of Avon in 2004 and 2005 were false or materially misleading in not mentioning retailer distress. This pleading omission provides a separate and adequate basis to apply the safe-harbor provision to the complaint.[6]

## 2. Failure to Plead Material Mistatements or Omissions

For reasons that largely parallel the foregoing analysis, the statements cited by plaintiffs cannot be deemed to amount to materially misleading statements because they simply reflected optimistic beliefs by corporate executives about future corporate prospects in China. The statements in question involved predictions or projections about how the company would likely do in the long term if the Chinese government approved some form of direct selling. Such statements of corporate optimism are not actionable,

---

[6] It also bears mention that Avon announced the first sales reductions in the China market -- which took place in the second quarter of 2005 -- only nineteen days after the end of the quarter, long before the company was required to do so. (AC ¶ 187); 17 C.F.R. §§ 240.13a-13, 249.308a(a) (quarterly reports for form 10-Q due 45 days after end of first three quarters). This too is inconsistent with the premise that the prior statements were made with any compelling reason to believe that they were false or materially misleading, much less made with intent to mislead.

since corporate executives can be expected to "be confident about their stewardship and the prospects of the business that they manage." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129-30 (2d Cir. 1994). Similarly, statements that reflect opinions of corporate management cannot trigger liability. See, e.g., In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 557 (S.D.N.Y. 2004). Finally, for reasons noted, the cautionary statements found in various corporate filings about the uncertainty of such future predictions shield the claimed misleading assertions from liability. See, e.g., San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris Cos., Inc., 75 F.3d 801, 805-07, 811 (2d Cir. 1996) (finding optimistic statements protected under "bespeaks caution" principle).[7]

The complaint fails as well because it does not comply with the statutory requirement that it articulate with particularity "specific contemporaneous data or information known to the defendant that was inconsistent with the representation in question." In re Merrill Lynch Tyco Research Sec. Litig, 2004 WL 305809, at *4 (S.D.N.Y. Feb. 18, 2004); see also NTL, 347 F. Supp.

_____

[7] Statements protected by this principle include statements discussing expanding the reach of Avon in China through direct selling, referencing high sales projections in China, discussing feeling good about the company's growth prospects in China, and discussing the belief that direct selling can exist in "harmony" with the existing model of sales. (See, e.g., AC ¶¶ 107, 115, 123, 148, 164, 189).

2d at 23 (quoting 15 U.S.C. § 78u-4(b)(1)). As noted, the complaint does not articulate specific facts that would demonstrate that Avon's optimism about the advent of direct selling -- at least for the corporation itself -- was premised on any falsehood known to the corporate executives, or that the unhappiness of some unstated portion of Chinese retailers about that prospect was material to defendants' assessment of future corporate performance.

To the extent that any of the cited statements allude directly to the attitude of the Chinese retailers -- notably a statement by Ms. Jung about having met with 2,000 retailers in China in the fall of 2004 (AC ¶ 141) -- plaintiffs fail to allege that her statement that those with whom she had met "were hyped and ready to go" was false. Indeed, the particular retailers whom she saw may well have been more favorably disposed to the direct-selling program than whichever retailers were allegedly unhappy about it, or they may simply have chosen to be polite when encountering the CEO of Avon, or it may have been too early for them to express much concern since the meeting occurred five months before the Chinese government approved any form of direct selling. In any event, plaintiffs utterly fail to allege facts demonstrating the falsity of Ms. Jung's statement.

In substance, plaintiffs' allegations appear to be premised on

the notion that Avon made a serious mistake in deciding to pursue direct selling, because it antagonized its retail-seller base. Whether correct or not, that is not a basis for holding defendants liable, see, e.g., Acito v. IMCERA Group, Inc., 47 F.3d 47, 55 (2d Cir. 1995); NTL, 347 F. Supp. 2d at 27, and plaintiffs offer no basis for inferring (1) that as Avon pressed for governmental approval of direct selling, its executives knew that such a change would damage the company because of retailer opposition, and (2) that defendants sought to conceal that knowledge from the investing public.

3. Scienter

Defendants argue as well that plaintiffs' China-related allegations fail to state facts sufficient to create "a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). We agree.

A plaintiff must "state with particularity" facts that strongly suggest an "intention to deceive, manipulate or defraud." Tellabs, 127 S. Ct. at 2501 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, & n. 12 (1976)); Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 194 (2d Cir. 2008); 15 U.S.C. § 78u-4(b)(1)-(2). The statutorily required

52

"strong inference" must rest on specifically-pleaded facts that give rise to a "cogent and compelling" inference of scienter "in light of other explanations." Tellabs, 127 S.Ct. at 2508. Moreover, they must do so separately for each defendant and each allegedly fraudulent statement. See, e.g., Teamsters Local 445, 531 F.3d at 193-94; In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 440 (S.D.N.Y. 2005); In re Bayer AG Sec. Litig., 2004 WL 2190357, at *15 (S.D.N.Y. Sept. 30, 2004). In general, plaintiffs may satisfy the scienter pleading requirement in one of two ways. One is by alleging facts indicating "that defendants had both motive and opportunity to commit fraud." NTL, 347 F. Supp. 2d at 28. The other is by allegations that, if credited, constitute "strong circumstantial evidence of conscious misbehavior or recklessness." Id.[8]

   The allegations that plaintiffs advance to satisfy this requirement concern the stock sales by defendants Jung, Kropf, and Corti. In substance plaintiffs assert that the defendants engaged in a deliberate course of artificially inflating the price of the Avon stock so as to permit them to sell a large portion of their own shares at higher prices. Although such a theory may suffice in appropriate circumstances, it does not do so here. On examination,

---

   [8] The Second Circuit has recognized recklessness as an alternative basis for scienter in the event that fraudulent intent cannot be shown. See Teamsters Local 445, 531 F.3d at 194.

plaintiffs' allegations fall well short of the requirement for pleading scienter.

First, as defendants properly point out, the last sale of shares by any of the individual defendants took place on February 9, 2005, by Mr. Corti. Necessarily, then, plaintiffs fail to plead a basis for inferring intent for statements made after that date (see AC ¶¶ 160, 164, 172, 175, 184, 187-90) (alleging post-February 9, 2005 statements), since there would have been no motive for any of the defendants to seek to inflate the market price after, rather than before, a sale of stock. See, e.g., Acito, 47 F.3d at 54; In re Apple Computer Sec. Litig., 886 F.2d 1109, 1117 (9th Cir. 1989). As for defendant Jung, since her last sale alleged by plaintiffs took place as early as August 10, 2004, no statements by her after that date are pled to have been made with the requisite state of mind. (See AC ¶¶ 130, 139, 141, 148, 153-54) (post-August 10, 2004 statements by Jung).

Wholly apart from the timing of the sales, plaintiffs' allegations do not reflect sales that were so "unusual" as to drive "an inference of bad faith and scienter." Acito, 47 F.3d at 54. In this regard it bears emphasis that the sale of stock by company executives -- including offloading substantial stock holdings -- does not necessarily provide a strong inference of motivation. See,

e.g., id. at 54 (affirming dismissal for lack of scienter even though defendant sold a majority of his holdings two months before public disclosure of adverse information); BISYS, 397 F. Supp. 2d at 444; NTL, 347 F. Supp. 2d at 31.

In this case the public record reflects that during the entirety of the class period two of the individual defendants -- Jung and Kropf -- ended up owning more shares than they started with because of added share options (Defs.' Mem. App. C), a circumstance that at least calls into question what inference can be drawn from their sale of portions of their holdings on several occasions during the class period. More telling, the third defendant -- Mr. Corti -- disposed of a significant portion of shares shortly before his retirement in 2005 (Lee Decl. Ex. 42), a reason that undercuts the theory that it was motivated by a desire to take advantage of fraudulently inflated market prices. See, e.g., In re Health Mgmt. Sys., Inc. Sec. Litig., 1998 WL 283286, at *6 n.3 (S.D.N.Y. June 1, 1998). In addition, a large part of Corti's divestment of shares during the class period consisted of a gift to his wife (Lee Decl. Ex. 44), a circumstance equally inconsistent with plaintiffs' theory of fraudulent intent.

Still more telling is the actual timing of the sales at issue in this case. The prototypical example of a pattern of stock sales

reflecting the requisite intent involves sales "shortly before the public disclosure of negative information." BISYS, 397 F. Supp. 2d at 444. That did not occur here. Indeed, the last sale occurred five months before the announcement of a slowdown in Avon's business in China, and in fact Jung last sold stock almost a year before. It also bears mention that all of the sales occurred shortly after announcements of quarterly results, (Defs.' Mem. App. D), a pattern that appears benign on its face, and the opposite of an indication of fraud. Moreover, the last sale took place two months before the Chinese government approved limited direct selling, an event that, according to plaintiffs, triggered protests by retailers. (Id.; AC ¶¶ 51, 170). Finally, it bears further note that although plaintiffs mention alleged expressions of unhappiness by an unspecified number of Chinese retailers in 2003 and 2004 at the prospect of such a new selling format, there is no indication that sales by the individual defendants closely followed those expressions of retailer unhappiness.

In short, plaintiffs' allegations regarding stock sales do not provide a "cogent and compelling" inference of "motivation and opportunity." Plaintiffs equally fail to plead "strong circumstantial evidence" of "conscious misbehavior or recklessness" on the part of the defendants. Rombach v. Chang, 355 F.3d 164, 176 (2d Cir. 2004).

To satisfy this alternative scienter test, the plaintiffs must allege "facts and circumstances that would support an inference that defendants knew of specific facts that are contrary to their public statements." Id.; accord Teamsters Local 445, 531 F.2d at 194. At most, plaintiffs' China-related allegations can be read to say that defendants knew that some retailers were unhappy at the prospect of future direct selling. Whether that be true or not, the statements publicly made by defendants that purportedly were untrue and pertained to company performance concerned simply the likelihood that direct selling, when implemented, would provide a long-term benefit to Avon. Plaintiffs cite no facts supposedly known to the defendants that demonstrated that this statment of optimism was untrue, rather than simply (and only arguably) misplaced. In substance, plaintiffs appear really to be complaining that the company mishandled its relations with the Chinese retailers, and that this adversely impacted the company's later performance in China. Even if true, such an allegation of managerial missteps does not yield a claim for securities fraud based on "conscious misbehavior" or "recklessness." See, e.g., Rothman v. Gregor, 220 F.3d 81, 90-92 (2d Cir. 2000).

If defendants underestimated the significance of expressions of unhappiness by some number of retailers about their own prospects in the face of a future change in selling structure, that

may have been a managerial error, but plaintiffs fail to allege
that defendants knew of any data or other information that would
have demonstrated to them that direct selling was going to have a
long-term adverse impact on Avon's performance in China. Absent
such information, they cannot demonstrate misbehavior or
recklessness in concealing the truth about the company's
performance or future prospects. Indeed, it bears repeating that,
according to plaintiffs, Chinese retailers expressed unhappiness as
early as 2003 and 2004, and yet Avon's sales and profits in China
grew substantially throughout this period, and even in the first
quarter of 2005, thus demonstrating that unhappiness by any number
of retailers about a future new selling program was not necessarily
a harbinger of weakened performance, much less that defendants
should have intuited that it would adversely affect sales.

Furthermore, the first time that Avon's China business
suffered a downturn was in the second quarter of 2005, and the
company promptly and fully disclosed those results only nineteen
days after the quarter ended, nearly two months before the deadline
for its 10-Q. (Lee Decl. Ex. 37). This rapid disclosure, followed
by predictions on the part of Avon management of a continued
downturn in sales in the next quarter, together with an emphasis on
the notion that the new sales paradigm was likely to benefit the
company in the long run, further contradicts the implicit

suggestion that defendants acted recklessly. <u>See</u>, <u>e.g.</u>, <u>Rombach</u>, 355 F.3d at 168, 176.[9]


   B. <u>The United States</u>


   The thrust of plaintiffs' allegations concerning defendants' marketing in the United States concerns the use of misleading recruitment methods to hire some sales representatives through the Personal Shopper program and the practice of shipping unordered product to sales representatives, with onerous conditions discouraging their return of unwanted product. Defendants attack the adequacy of these pleadings on grounds that parallel those asserted with respect to the China-related allegations, and add two other grounds as well. We address them in the order in which they are argued in defendants' main brief.

---

   [9] We note as well that in fact Avon's revenue in China rose in 2006 by 3%, apparently after the company had adjusted to the role of the Chinese boutiques. Avon Products, Inc., Annual Report (Form 10-K), at 29 (Feb. 28, 2007), <u>available</u> <u>at</u> http://www.sec.gov/edgar.shtml (search "Search for Company Filings" for ticker symbol "AVP").  It also bears mention that the price of Avon shares rose in 2006, ending at more than $33 a share, reflecting an increase of just over $3 a share since the beginning of the class period. <u>See</u> BigCharts Historical Quotes, http://bigcharts.marketwatch.com/historical (Symbol AVP, Date 1/3/06 Closing Price $28.29; Date 12/29/06 Closing Price $33.04).

1. <u>Prior Public Disclosure</u>

Plaintiffs premise their claims on a fraud-on-the-market theory. Thus, they assert that misrepresentations or omissions by defendants were absorbed by the market and led to inflated market prices during the class period. Necessarily, then, if the truth was known in, and absorbed by, the market before the class period, the alleged misstatements could not create an inflated price. <u>See</u>, <u>e.g.</u>, <u>Ganino v. Citizens Util. Co.</u>, 228 F.3d 154, 167 (2d Cir. 2000); <u>In re Merck & Co. Sec. Litig.</u>, 432 F.3d 261, 270-71 (3d Cir. 2005); <u>White v. H&R Block, Inc.</u>, 2004 WL 1698628, at *12 (S.D.N.Y. July 28, 2004).

In arguing that plaintiffs' United States-based allegations were a matter of public record, defendants cite the filing of a class-action lawsuit in 2003 by a group of Avon sales representatives in the California Superior Court and the mass-media publicity and public announcements by Avon that followed in its wake. The lawsuit was filed in March 2003 (<u>Blakemore v. Avon Prods., Inc.</u>, Case No. BC292702 (Cal. Sup. Ct., L.A. County)) and alleged misconduct by Avon in not crediting the returns by sales representatives of unordered products. (Lee Decl. Ex. 2). In the Second Amended Complaint, filed in January 2004 (Lee Decl. Ex. 7), the plaintiffs alleged, <u>inter alia</u>, that Avon ships unordered

60

products to its sales representatives and then records these shipments as sales, thus boosting the company's sales figures. Noting that this program was originally known as "Preferred Preview", the Blakemore plaintiffs asserted that if a sales representative returned unordered product for credit, the company revoked that representative's "instant credit", a policy that normally gives the representative immediate credit for items that he or she is returning. (Lee Decl. Ex. 7, Blakemore Compl. ¶¶ 3, 17). By revoking that policy on the return of unordered product, plaintiffs alleged, Avon delayed by eight weeks or more the granting of credit for returns and thereby created a serious economic burden for the sales representatives, many of whom "cannot afford to sell Avon products without Instant Credit." (Id. ¶ 25). The Blakemore plaintiffs went on to allege that if a sales representative failed to order products for four campaigns, Avon sent the representative unordered products and attempted to keep the representative on its lists by instructing the District Sales Manager to order products for the representative and pay for them with so-called Demo Certificates. (Id. at ¶¶ 30-31).

Putting to one side whether the filing of a lawsuit itself may suffice to put the market on notice of what is alleged, the filing of the Blakemore lawsuit triggered further publicity about the charges. Defendants identify a series of stories in the media,

61

including prominent financial publications. The first cited report was found in the August 29, 2003 <u>Syracuse Post-Standard</u> (Lee Decl. Ex. 2), hardly a high profile publication. The next month, however, <u>Forbes</u> ran an article that mentioned the lawsuit and summarized the pertinent allegations as being that Avon was "shipping massive amounts of unordered products to its independent sales reps, then dunning the Avon ladies for payment." (Lee Decl. Ex. 3). The article went on to say, as plaintiffs here claim, "Even if a rep returns the products, the company 'engages in a pattern and practice of denying receipt', immediately booking the bogus shipments as revenue . . . ." (<u>Id.</u>). Then, on January 19, 2004 -- several weeks before the start of the class period -- <u>Barron's</u> ran a two-page article on Avon, reporting as well on the pending lawsuit. (Lee Decl. Ex. 5). As described by <u>Barron's</u>, the lawsuit alleged that Avon "delivered products to a former rep in California who did not order them and [Avon] then failed to credit her when she returned them." (<u>Id.</u>). It also noted that some Avon managers were accused of "using phony sales rep names and Social Security numbers to meet the company's key performance indicators." (<u>Id.</u>).

These descriptions of the allegations were also echoed by a number of analyst reports, including several released before the

start of the class period.[10] Thus Oppenheimer & Co. reported on September 15, 2003 that Avon had been accused of having "shipped unwanted product to sales reps, and then failed to give credit to reps when they returned the product." (Lee Decl. Ex. 4). Similarly, on January 20, 2004 UBS Investment Research provided a still more pointed report about the lawsuit, stating that Avon had been accused of "shipping reps unordered products and failing to credit returns, raising the possibility of sales manipulation" and of "using phony rep names/social security numbers to meet [Avon's] key performance indicator targets." (Lee Decl. Ex. 6; see also Lee Decl. Ex. 12, Prudential Equity Group, LLC Report dated Mar. 5, 2004).

As required by law, Avon itself also reported the commencement and nature of the lawsuit in its 10-K filing for 2003. (Lee Decl. Ex. 11). Although that filing did not occur until March 4, 2004 -- approximately four weeks after the start of the class period -- it predated the purchase of Avon shares by the one named plaintiff by nearly one year. And that filing by Avon in its turn triggered further comment by analysts, including a notation by Prudential Equity Group, LLC that highlighted Avon's reference to the lawsuit

_____

[10] "Judicial notice can be taken of . . . published analyst reports in determining what the market knew." In re Zyprexa Prods. Liab. Litig., 549 F. Supp. 2d 496, 501 (E.D.N.Y. 2008); see also Steinberg v. Ericsson LM Tel. Co., 2008 WL 5170640, at *10 n.5 (S.D.N.Y. Dec. 10, 2008).

and the <u>Blackmore</u> plaintiffs' allegations of misconduct. (Lee Decl. Ex. 11 at 8-9, Ex. 12).

In sum, insofar as plaintiffs base their United States-related allegations on Avon's use of unordered product shipments to increase sales and to keep more sales representatives on the corporation's books, facts of which we may take judicial notice reflect that the same allegations were a matter not only of public record, but also of presumptive knowledge in the pertinent financial market. Although it might be argued that the degree of market penetration of the <u>Blackmore</u> allegations could be a topic of evidentiary presentation and analysis, and hence that it is premature to dismiss this aspect of the plaintiffs' claims on such a basis, the federal courts have indicated that in appropriate circumstances a Rule 12(b)(6) dismissal is appropriate based on the presence in the media of even incomplete references to the facts that a plaintiff claims were concealed or misstated. <u>See</u>, <u>e.g.</u>, <u>In re Merck & Co. Sec. Litig.</u>, 432 F.3d 261, 269-71 (3d Cir. 2005).[11]

---

[11] Plaintiffs argue that there is an issue of fact as to the degree of market penetration because Avon denied the pertinent allegations of the <u>Blakemore</u> complaint. (Pls.' Mem. 19-20). We disagree. The securities laws do not require a company to accuse itself of wrongdoing, <u>see</u>, <u>e.g.</u>, <u>In re Citigroup Sec. Litig.</u>, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), and in any event if the accusations receive a public airing and the pertinent publications do not, on their own, explicitly discount the accusations, there is no reason to infer that reasonably prudent investors would simply ignore them in making investment decisions. In short, there is no reason to assume that such

Here the publicity given to the <u>Blakemore</u> allegations appears
plainly inconsistent with the suggestion that the omission by
defendants of references to the so-called forced-delivery practices
in the United States market artificially raised the market price.[12]

2. <u>The Safe-Harbor Defense</u>

Defendants also invoke both versions of the safe-harbor
defense with respect to most of the statements cited by plaintiffs
concerning the United States market. Although plaintiffs argue that
the statements targeted by defendants in connection with this
defense were not forward-looking, that is not the case. They deal
with projections of future performance, and as such qualify for
safe-harbor consideration even if they omit what plaintiffs believe
were important past or present facts that might arguably influence
the reliability of the future projections.

As for the further requirement of the first version of the
defense, the parties dispute whether the cited statements were

_____

published reports would not influence the market price of the
pertinent shares.

[12] To the extent that plaintiffs press a claim based on the
failure of defendants to mention the use of the Personal Shopper
program to recruit sales representatives, we do not interpret
defendants to argue that the <u>Blakemore</u> suit and attendant
publicity addressed the facts underlying that claim, and in any
event, if they did, we would reject such an argument.

accompanied by adequate cautionary statements. Plaintiffs in particular argue that the cautions were insufficient because they did not specifically reference the business practices that plaintiffs themselves have targeted. As noted, however, the requirement for adequate cautions mandates a reference only to "important" risks that Avon faced. 15 U.S.C. § 78u-5(c)(1). Apart from general nostrums about the uncertainty of future projections, and the fact that many conditions may alter for the worse the company's projected performance, the company noted uncertainties with regard to enhancing the "productivity" of its sales representatives. (Lee Dec. Ex. 26). Although not speaking directly to the recruitment and marketing practices that plaintiffs assert posed a threat to the company's prospects, this reference certainly targeted the question of whether performance by sales representatives might not meet corporate assumptions, and it thus fit well within the scope of plaintiffs' critique about the recruitment of unknowing sales representatives and Avon's use of forced deliveries, as well as the potential impact of those practices on the performance of sales representatives. In addition Avon's filings and press releases noted "the high rate of turnover among [sales] [r]epresentatives", making recruitment and training of new representatives "continually necessary." (Lee Decl. Ex. 30). The company also reported contemporaneously the declines in operating profits and margins in the United States market. (Lee

Decl. Exs. 8, 17). These various warnings suffice to meet this variant of the safe-harbor defense. See, e.g., Rombach, 355 F.3d at 175-76; In re Nokia Oyj. (Nokia Corp.) Sec. Litig., 423 F. Supp. 2d 364, 401 (S.D.N.Y. 2006).

The alternative safe-harbor defense also applies to the statements targeted by defendants' argument for this defense. As noted, plaintiffs must plead facts justifying an inference that the defendants acted with actual knowledge that their statements were false. The premise of such an assertion by plaintiffs must be that defendants pursued their hiring and forced-delivery programs even though they knew that these practices would harm the company's performance and hence preclude the realization of their predictions about the United States market.

Apart from a lack of inherent plausibility in this implicit assertion, the complaint offers no factual basis for such a conclusion. Indeed, to the contrary, plaintiffs allege that in 2003 and 2004 these practices actually contributed to total sales and profits both in the United States and in Mexico. (AC ¶¶ 78, 86, 99). Given that conceded track record, the complaint leaves as a complete mystery the basis for inferring knowledge of falsity on the part of the defendants.

3. <u>Failure to Adequately Plead Materiality</u>

Plaintiffs must plead facts reflecting that the omissions about which they complain were material, that is, that there is "a substantial likelihood that the disclosure of the omitted fact would have been a viewed by a reasonable investor as having altered the total mix of information made available." <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 231-32 (1988) (internal quotations omitted). To satisfy this requirement the pleading must state facts "tending to demonstrate the materiality of the alleged overstatements [or omissions] in light of the defendant's total financial picture." <u>Gavish v. Revlon</u>, 2004 WL 2210269, at *16 (S.D.N.Y. Sept. 30, 2004); <u>accord</u>, <u>e.g.</u>, <u>Nokia</u>, 423 F. Supp. 2d at 408. In the present context, plaintiffs must, at a minimum, link the purported bad (and supposedly unmentioned) practices to some specific and reasonably quantifiable downturn in the company's economic performance. <u>See</u>, <u>e.g.</u>, <u>Gavish</u>, 2004 WL 2210269, at *16.

Plaintiffs fail to meet this requirement. They describe the challenged practices and then, as noted, concede that they contributed to increased sales and profits through 2004. They then cite the flattening and modest downturn in sales and profits in the United States market in 2004, leaving to complete speculation whether and why the challenged practices, which earlier allegedly

improved the company's performance, injured that performance in any material degree in late 2004. Absent such an explanation, even in pleading, the complaint is fatally deficient in this respect.[13]

4. Scienter

Plaintiffs also fail to plead facts that permit a strong inference that the defendants, in making statements about the United States market, had the motive and opportunity to commit fraud, nor do they allege strong circumstantial evidence of conscious misbehavior or recklessness. This too justifies dismissal.

As noted, plaintiffs pin their scienter theory principally on the sale of shares by the three individual defendants. These allegations fail to demonstrate motive and opportunity to commit fraud. Part of the failure is, as previously noted, that the sales were not of unusual amounts. Moreover, they did not occur in circumstances suggesting the requisite motivation.

---

[13] Although plaintiffs note that the complaint cited an increase of 24% in Avon's allowance for doubtful accounts in 2004, Avon publicly disclosed this figure, and in any event plaintiffs fail to specify facts demonstrating or suggesting whether and to what extent this increase in doubtful accounts reflected what they assert was refusals by sales representatives to pay for orders, much less whether such refusals were caused by the company mailing unordered products to United States representatives.

The challenged statements about the United States market were made between February 3, 2004 and the stock decreases in early September (September 8) and late October (October 29) of 2004. Neither Ms. Kropf nor Mr. Corti are said to have made any sales in that period. As for Ms. Jung, she made two sales but the last was in August 2004, and she ended with more shares at the end of the class period. In any event she made her sales after the quarterly announcements, none of which are alleged to have misstated the corporate results. Finally, the fact that two of the three individual defendants engaged in no sales during the pertinent period fatally undercuts the scienter theory advanced by plaintiffs. See, e.g., San Leandro, 75 F.3d at 814; Acito, 47 F.3d at 54; Health Mgmt. Sys., 1998 WL 283286, at *6.

Plaintiffs also fail to allege facts providing strong circumstantial evidence of conscious misbehavior or recklessness. As noted, although plaintiffs criticize the targeted practices involving recruitment of sales representatives and shipment of product to them, they do not allege facts that would, if credited, reflect that the defendants knew that their predictions about future performance in the United States market were plainly unwarranted because of the challenged practices, or that the obviousness of this linkage was so clear that the defendants' failure to recognize it and warn the public amounted to at least

recklessness.

5. <u>Loss Causation</u>

Plaintiffs are required to plead a causal relation between the defendants' alleged improper omissions and their own losses. <u>See</u> 15 U.S.C. § 78u-4(b)(4); <u>Dura Pharm., Inc.</u>, 544 U.S. at 341, 346-47; <u>Lentell v. Merrill Lynch & Co., Inc.</u>, 396 F.3d 161, 173 (2d Cir. 2005); <u>In re Parmalat Sec. Litig.</u>, 375 F. Supp. 2d 278, 306 (S.D.N.Y. 2005). To do so they must plead facts reflecting that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." <u>Lentell</u>, 396 F.3d at 173. Plaintiffs fail to plead such facts with respect to their United States market allegations.

Plaintiffs suggest that the September 8, 2004 announcement by Avon of "flattish sales" in the United States -- an announcement that preceded a drop in share price -- was related to the criticized practices. Among the problems with this assertion is that the announcement did not refer to these practices. It simply predicted slower sales, compared to a 7% growth in the same quarter the prior year, and offered a series of reasons for this slowdown,

71

none related to the criticized practices. (Lee Decl. Ex. 20).[14] Moreover, as noted, the key practices had already been well-publicized at least eight months before -- as part of the publicity about the <u>Blakemore</u> lawsuit -- and those disclosures did not cause a share-price drop.

Plaintiffs' invocation of two statements from October 29, 2004 equally fail to salvage their case. One is a comment in Avon's 10-Q form that a "higher debt expense" was one factor that "negatively impacted" the company's operating margin in North America and the other is a statement at a same-day press conference call that the number of sales representatives had remained "flat due to a 'general consumer malaise.'" (AC ¶¶ 137-38). These statements also did not refer to the challenged business practices. (Lee Decl. Ex. 22 at 25, Ex. 23 at 4). Moreover, the company had made exactly the same statement about "bad debt expense" back in its 10-Q filing on July 30, 2004 (Lee Decl. Ex. 19 at 27), and that disclosure in July did not lead to a drop in the price of Avon shares. <u>See</u> BigCharts Historical Quotes, http://bigcharts.marketwatch.com/historical/ (Symbol AVP, Date 7/30/04). As for the October 29, 2004 reference to "consumer malaise", plaintiffs make no allegations suggesting

---

[14] The stated reasons included "weaker-than-expected Beauty sales due to underperformance of recent color promotions[,] soft sales of a Cellusculpt line extension, [and] softness in children's apparel and toys." (<u>Id.</u>).

that this was not a permissible, or indeed correct, assessment, much less that the price drop after the October 29 statements was attributable to the market just then learning about the recruitment practices and forced deliveries criticized by plaintiffs.

C. Mexico

Plaintiffs' allegations with respect to Avon's Mexico operations closely resemble the bulk of their allegations regarding the United States market. Most notably, they reassert the complaint that Avon engaged in the practice of shipping unordered products to sales representatives and forced district managers to accept products that they were then pressured into buying for some of their sales representatives in order to avoid having to drop those representatives from their rolls. Plaintiffs also point to a series of statements by Avon representatives offering projections or performance announcements, and claim that these statements were materially misleading because they did not mention the practice of so-called forced deliveries.

The analysis of plaintiffs' Mexico-related allegations closely resembles much of what we have discussed in connection with their

United States-based allegations.[15] We rehearse those points in far briefer scope here.

1. <u>Safe Harbor Defense</u>

As defendants argue, many of the cited statements are forward-looking, thus placing them within the ambit of the safe-harbor provision. Moreover, they were accompanied by adequate cautionary language, and plaintiffs fail to allege facts indicating that the defendants had "actual knowledge" at the time that their statements were false. By the same token, many of these same comments were, in whole or in part, statements of corporate optimism and hence not actionable. Similarly, these statements were, by and large, protected by the "bespeaks caution" doctrine. Statements protected under these principles include those projecting growth in Mexico, discussing the expectation of Mexico to resume growth after a slow first quarter growth rate in 2005, discussing Avon's competitiveness against Wal-Mart in Mexico, and predicting that Avon's business strategy would ultimately be successful in Mexico. (AC ¶¶ 153, 156, 162, 179, 181).

---

[15] Because the pending California litigation concerned only operations in the United States, defendants do not and cannot make the argument that the challenged practices from Mexico were in the public domain before the class period.

2. <u>Failure to Adequately Plead Materiality</u>

As discussed earlier, plaintiffs must plead that the alleged omissions concerning Mexico were material, that is, that they had a sufficient impact "in light of [Avon's] total financial picture." <u>Gavish</u>, 2004 WL 2210269, at *16. For the same reasons that we have noted with regard to the United States market, the complaint does not make the necessary specific allegations with regard to the practices in Mexico, suggesting that the forced deliveries had a material adverse effect, not disclosed by defendants, on the overall sales performance of Avon.

In resisting this conclusion, plaintiffs point to an allegation that the challenged business practices increased sales in Mexico by $22 million in the fourth quarter of 2003 and by $63.8 million in 2004. This argument plainly fails since these allegations do not even attempt to suggest that the cited figures reflect improper accounting by overstating revenue. The implication of plaintiffs' attack on the practices and their non-disclosure is that they injured the company, not that they increased sales, and plaintiffs offer no allegations specifying the nature and extent of the injury. Necessarily, then, they also fail to demonstrate that the injury to Avon's performance was sufficiently sizeable to be deemed material to the company's overall financial condition.

3. <u>Failure to Plead Scienter</u>

As is the case with the United States-based allegations, plaintiffs' pleading with regard to the statements about Mexico do not establish a basis for inferring scienter. The last sale of stock by any defendant occurred on February 9, 2005, thus precluding reliance on stock sales for allegedly misleading statements made after that date. These include statements referred to at paragraphs 162, 166, 179 and 181 of the amended complaint. Moreover, since Ms. Jung's last sale was on August 10, 2004, she cannot be found, based on stock sales, to have had the necessary motivation for statements postdating that date, including statements referred to in paragraphs 134, 143 and 156 of the amended complaint.

For reasons previously discussed, in any event none of the stock sales reflected circumstances -- including scale and timing -- that justify the inference of a motive to engage in fraud. <u>See</u>, <u>e.g.</u>, <u>In re eSpeed, Inc. Sec. Litig.</u>, 457 F. Supp. 2d 266, 289 (S.D.N.Y. 2006); <u>BISYS</u>, 237 F. Supp. 2d at 445. Indeed, as defendants properly note, the last sale by any defendant occurred more than seven months before the alleged public disclosure of the

targeted bad practices related to forced deliveries[16] and hence not anytime near the eve of such a disclosure. Cf., e.g., Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC, 376 F. Supp. 2d 385, 404 (S.D.N.Y. 2005).

The complaint also fails to plead strong circumstantial evidence of conscious misbehavior or recklessness. Plaintiffs simply do not offer a basis for inferring that the defendants knew that their various statements about the Mexico market were false or that they recklessly disregarded an evident and imminent prospect of a downturn. Indeed, as noted, plaintiffs allege that the very practices that they now criticize had substantially contributed to the sales upturns accurately reported by Avon for 2003 and 2004. Necessarily, then, it could not have been reckless for the defendants to assume that these practices would continue to contribute to positive sales prospects in 2005.

4. Loss Causation

To plead loss causation in a fraud-on-the-market case, plaintiffs may allege that disclosure of the falsity of prior

---

[16] For reasons to be noted, we cannot even say that the announcements cited by plaintiffs, which took place in September and October 2005, made any disclosure of the forced delivery practices.

77

statements took place and resulted in a decline in the market price of the stock. See, e.g., Lentell, 396 F.3d at 173. Although plaintiffs argue that Avon revealed the challenged forced-delivery practices in the Mexico market by way of a September 20, 2005 press release, thus triggering a stock-price decline, the press release referred neither to forced deliveries nor to Mexico. Rather, it reduced expectations for Latin America as well as several other markets, referring, inter alia, to a "deceleration in Latin America." (AC ¶ 205). This alone is not sufficient to plead loss causation.

Plaintiffs also fail to allege other facts indicating that the subject of the omissions -- that is, the forced deliveries to Mexico -- caused their loss. They cite Jung's statement on October 28, 2005 that the "competitive intensity" in Mexico was accelerated by "tactical and executional missteps" (id. ¶ 213), and they argue that the downturn in Latin America was due to Avon's "undisclosed practices." (Pls.' Mem. 33, 35). Again, however, we note that plaintiffs themselves plead that the practices in question were undertaken long before the class period and contributed to greater sales in 2003 and 2004, whereas the comments by Jung in October 2005 were evidently referring to much more recent events, which took place in the second half of 2005. (Compare AC ¶ 80 with ¶ 213). Furthermore, the stock drop after the September 20 press

release cannot be attributed to the October 28 statement of Ms. Jung.

## II.  The Section 20(a) Claims

Plaintiffs seek to impose liability on the individual defendants alternatively under section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a). Among the requirements for pleading a claim under that section, the plaintiffs must allege a primary violation -- in this case a violation of section 10(b). See, e.g., BISYS, 397 F. Supp. 2d at 450. For reasons already discussed, plaintiffs fail to do so. Necessarily then, their section 20(a) claims must fail as well.[17]

## III.  The Nature of the Dismissal

The Second Circuit has acknowledged that as a general rule a dismissal of a first complaint for failure adequately to plead a claim should be without prejudice, to permit the plaintiff to

---

[17] Defendants argue that plaintiffs also fail to plead defendants' control over the primary violator, as also required by section 20(a) (Defs.' Mem. 34 (citing In re Sotheby's Holdings, Inc., 2000 WL 1234601, *8 (S.D.N.Y. Aug. 31, 2000)), and that they also fail to plead "culpable participation by the 'control person'". (Id. at 35 (citing inter alia, Bayer, 2004 WL 2190357, at *16). We need not address these additional arguments in view of the evident failure of the complaint to plead a primary violation.

correct any inadequacies in that pleading if such correction is possible. See, e.g., Van Buskirk v. New York Times Co., 325 F.3d 87, 91 (2d Cir. 2003); Frasier v. Gen. Elec. Co., 930 F.2d 1004, 1007 (2d Cir. 1991). By the same token, the Court has recognized that dismissal with prejudice is proper if it is evident that the deficiencies in the complaint are not amenable to correction by re-pleading. See, e.g., ATSI Commc'ns, 493 F.2d at 98; Van Buskirk, 325 F.2d at 91-92.

In this case the complaint that is the target of defendants' motion is not plaintiffs' first version. Rather, it is an amended pleading that followed an initial conference at which the failure of the original complaint to comply with PSLRA standards was noted (Oct. 28, 2005 Tr. 6-7), and plaintiffs drafted the second version of the complaint with the evident intention of correcting those problems.

As we have noted, that effort has been singularly unsuccessful. Moreover, we do not see a basis on which most of the deficiencies that we have now cited may be corrected. In addition, although plaintiffs ask in their brief for leave to amend once more if the current version of the complaint is found lacking, they too fail to offer any suggestion as to how the problems with the current pleading may be remedied within the constraints of Rule 11.

In substance, plaintiffs cannot allege a set of material misrepresentations premised on the assorted practices that they have pled in detail, and they are unable to link those practices and the alleged omissions concerning them to (1) a definable and significant injury to the corporation and (2) a loss sustained by the shareholders who purchased stock during the class period. In short, amendment would be futile, and hence leave to undertake still another version of the complaint should be denied. <u>See</u>, <u>e.g.</u>, <u>Fraternity Fund</u>, 376 F. Supp. 2d at 449; <u>Davidoff v. Farina</u>, 2005 WL 2030501, at *18 & n.34 (S.D.N.Y. Aug. 22, 2005); <u>Bristol-Myers</u>, 312 F. Supp. 2d at 554, 570.

<u>CONCLUSION</u>

For the reasons noted, we recommend that defendants' motion to dismiss be granted and that the complaint be dismissed with prejudice.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Lewis A. Kaplan, Room 1310, and to the chambers of the undersigned,

New York, New York 10016

Room 1670, 500 Pearl Street, New York, New York 10007-1312. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985), reh'g denied, 474 U.S. 1111 (1986); DeLeon v. Strack, 234 F.3d 84, 86 (2d Cir. 2000) (citing Small v. Sec'y of Health and Human Serv., 892 F.2d 15, 16 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(d).


Dated: New York, New York
       February 23, 2009


MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE


Copies of the foregoing Report and Recommendation have been mailed today to:

Joel P. Laitman, Esq.
Christopher Lometti, Esq.
Kurt Hunciker, Esq.
Frank R. Schirripa, Esq.
Schoengold Sporn Laitman & Lometti, P.C.
19 Fulton Street
Suite 406
New York, New York 10038

82

Peter C. Hein, Esq.
Kenneth K. Lee, Esq.
Boris Bershteyn, Esq.
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019-6150

Melissa C. Rodriguez, Esq.
Morgan Lewis & Bockius
101 Park Avenue
37th Floor
New York, New York 10178

Stephen J. Fearon, Jr., Esq.
Squitieri & Fearon, LLP
32 East 57th Street
New York, New York 10022

Jeffrey Fink, Esq.
Geoffrey H. Matranga, Esq.
Robins Umeda & Fink, LLP
610 West Ash Street
Suite 1800
San Diego, California 92101

Alfred G. Yates, Jr., Esq.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, Pennsylvania 15219

Marvin Frank, Esq.
Gregory B. Linkh, Esq.
Murray, Frank & Sailer, LLP
275 Madison Avenue
New York, New York 10016